**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL URBAN LEAGUE,
80 Pine Street, 9th Floor,
New York, NY 10005

NATIONAL FAIR HOUSING ALLIANCE,
1331 Pennsylvania Avenue NW, #650,
Washington, DC 20004

               Plaintiffs,

   v.

DONALD J. TRUMP,
in his official capacity as
President of the United States;
1600 Pennsylvania Avenue NW,
Washington, DC 20500

EUGENE SCALIA,
in his official capacity as
United States Secretary of Labor;
200 Constitution Ave NW,
C-2318
Washington, DC 20210

U.S. DEPARTMENT OF LABOR,
200 Constitution Ave NW,
S-2521
Washington, DC 20210

               Defendants.

Case No. 1:20-cv-03121

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs National Urban League and National Fair Housing Alliance, on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), bring this civil rights class action for injunctive and declaratory relief against Defendants President Donald J. Trump; Eugene Scalia, United States Secretary of Labor; and the United States Department of Labor (collectively, "Defendants") for violations of the First and Fifth Amendments to the United States Constitution.

## PRELIMINARY STATEMENT

1.      Every nation's history includes unsettling truths that many would prefer to forget or deny.  But true patriotism demands confronting the truths of our history—no matter how embarrassing or dishonorable—and undertaking the difficult work of learning from the lessons of our past in order to move forward.  For the United States, that work requires reckoning with our shameful legacy of racial subjugation of Black people in this country— from slavery and Jim Crow to mass incarceration and police violence—as well as our long history of express discrimination against other people of color, women, and LGBTQ persons.

2.      Without uninhibited discussion and examination of that legacy, we are ill-equipped as a nation to address its ongoing manifestations in present-day forms of discrimination and bias. The First Amendment protection of free speech in the United States Constitution ensures that all Americans are empowered to engage freely in an exchange of ideas, truth-telling, and difficult conversations about this history. This protection extends equally to those who engage with the federal government, where the policies that affect the lives of all Americans are developed, enacted, and funded.

3.      On September 22, 2020, President Trump issued Executive Order 13950, entitled "Executive Order on Combating Race and Sex Stereotyping" ("EO 13950" or "the Order"). Contrary to its title, the Order is an extraordinary and unprecedented act by the Trump Administration to undermine efforts to foster diversity and inclusion in the workplace.  The Order

1

strikes at the heart of those critical efforts by government and nongovernment actors—including trainings and other forms of private speech in the workplace—to eradicate race and sex stereotyping and other continuing manifestations of entrenched discrimination and bias against people of color, women, and LGBTQ individuals.

4.      EO 13950 prohibits the National Urban League, the National Fair Housing Alliance, and Class members (including current and prospective federal contractors and grant recipients) from discussing and promoting concepts like, among other things, systemic race and sex discrimination and implicit race and sex biases.  In so doing, EO 13950 prevents Plaintiffs from effectively addressing the persistent harms, privileges, and disadvantages associated with systemic discrimination and implicit biases.  This broad-based prohibition of private speech on matters of immense public concern and public welfare violates the guarantees of Free Speech, Equal Protection, and Due Process, which are fundamental to the rights secured in the United States Constitution.  The depth and scope of EO 13950's constitutional flaws are alarming and, if left unremedied, will erode the core principles of our democracy and the foundations of our pluralistic society.

5.      The right to Free Speech, secured in the First Amendment, is foundational to a free and democratic republic.  As stated by the United States Supreme Court, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Texas v. Johnson*, 491 U.S. 397, 415 (1989) (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

6.      Yet, in an exercise of authoritarian thought- and speech-control, EO 13950 imposes expansive restrictions on the National Urban League, the National Fair Housing Alliance, and the

Class based on President Trump's inaccurate and discriminatory viewpoints, including his opinions that our Nation's founders—many of whom enslaved Africans in bondage—founded the United States on principles of racial and gender equality; that discussions of the lingering and damaging effects of race and sex discrimination constitute "divisive concepts," "race or sex stereotyping," or "race or sex scapegoating"; and that discussing, acknowledging, or remedying the harms, privileges, and disadvantages attendant to systemic race and sex discrimination would negatively impact the "economy and efficiency in Federal contracting" and the "unity in the Federal workforce."

7.     EO 13950 presents a false rendering of our Nation's history by misrepresenting the Founders as inspired by the "belief in the inherent equality of every individual" and "reject[ing] racialized views of America" that "our government 'was made on the white basis' 'by white men, for the benefit of white men.'" It is beyond dispute that, at the time of our Nation's founding, the Founders embraced a narrative of white supremacy, benefitted economically from the free labor of enslaved Africans, considered enslaved Africans to be three-fifths of a person in the United States Constitution, denied women and people of color the right to vote and other political rights, and passed laws that uniformly and expressly discriminated on the basis of race and sex.

8.     Almost seven decades after the ratification of the United States Constitution, the United States Supreme Court in *Dred Scott v. Sanford*, 60 U.S. 393 (1857), concluded that Black people could not be "citizens" entitled to "the rights and privileges" under the United States Constitution because they "had for more than a century before" the Constitution's adoption "been regarded as beings of an inferior order, and altogether unfit to associate with the white race, either in social or political relations; and so far inferior, that they had no rights which the white man was bound to respect." *Id.* at 404-07.

3

9.     United States Supreme Court opinions, both before and after *Dred Scott*, have likewise acknowledged and sometimes endorsed racist views and opinions about other people of color.  *See, e.g., Johnson & Graham's Lessee v. M'Intosh*, 21 U.S. 543, 590 (1823) (referring to Native Americans as "fierce savages, whose occupation was war and whose subsistence was drawn chiefly from the forest"); *Plessy v. Ferguson*, 163 U.S. 537, 561 (1896) (Harlan, J., dissenting) (disagreeing with *de jure* segregation, but noting that Chinese people are "a race so different from our own that we do not permit those belonging to it to become citizens of the United States"); *Hernandez v. Texas*, 347 U.S. 475, 479-80 (1954) (in first case recognizing Equal Protection rights for people of Mexican descent, noting that Mexican-American children had attended segregated schools, that a restaurant "prominently displayed a sign announcing 'No Mexicans Served,'" and that "[o]n the courthouse grounds . . . , there were two men's toilets, one unmarked, and the other marked 'Colored Men' and 'Hombres Aqui' ('Men Here')").  *Id.* at 479-80.

10.     Sexism also has deep roots in our political and social history.  For example, a concurring opinion in *Bradwell v. Illinois*, 83 U.S. 130 (1872), in which the United States Supreme Court refused to recognize a woman's right to be admitted as a practicing attorney, considered it "a maxim of that system of jurisprudence that a woman had no legal existence separate from her husband, who was regarded as her head and representative in the social state . . . .  The paramount destiny and mission of women are to fulfill the noble and benign offices of wife and mother." *Id.* at 141.

11.     Discrimination against LGBTQ individuals has also featured prominently in our country's laws.  A concurring opinion in *Bowers v. Hardwick*, 478 U.S. 186 (1986), in which the United States Supreme Court refused to invalidate criminal sodomy laws in Georgia, noted that "the proscriptions against sodomy have very 'ancient roots.'  Decisions of individuals relating to

homosexual conduct have been subject to state intervention throughout the history of Western civilization.  Condemnation of those practices is firmly rooted in Judeo-Christian moral and ethical standards. . . .  The common law of England, including its prohibition of sodomy, became the received law of Georgia and the other Colonies.  In 1816, the Georgia Legislature passed the statute at issue here, and that statute has been continuously in force in one form or another since that time." *Id.* at 196-97.

12.     The Supreme Court has since discredited these racist, sexist, and homophobic views, and our Nation has made significant progress in recognizing and enforcing the equal rights of people of color, women, and LGBTQ individuals.  But members of these protected groups continue to face substantial societal discrimination, including barriers to equal employment opportunities, and are still, to the present day, too often subject to hostile work environments.

13.     By denying the longstanding discrimination against people of color, women, and LGBTQ individuals, EO 13950 is an invitation for revisionism and retrogression on matters of truth and equality.  To the detriment of employees of color, women, and LGBTQ individuals, EO 13950 prohibits laudable and necessary efforts by Plaintiffs who want to counteract the effects of systemic discrimination and biases in the workplace.  This, in turn, prevents Plaintiffs from creating and maximizing economic efficiencies by ensuring the satisfaction and inclusivity of all their employees, and reaping the full benefits of a diverse and productive workforce.

14.     Despite the urgent need to address and remedy systemic discrimination and counter the harms stemming from implicit biases, EO 13950 unconstitutionally forces Plaintiffs to choose between censoring speech on these important issues or forfeiting any opportunity to enter into a federal contract for the provision of goods or services or to receive federal funds as a grant recipient.  The infringement of Plaintiffs' private speech on these matters of public concern and

public welfare is deeply troubling.  But Defendants' actions are even more menacing given that issues of systemic race and sex discrimination have been at the forefront of public discourse throughout the Trump Administration.  This censorship of Plaintiffs' speech by the federal government is anathema to a free democracy.

15.     Furthermore, EO 13950 utilizes imprecise and ill-defined terms that reflect the factually inaccurate viewpoints and opinions of President Trump and are dependent on the speculative and subjective reactions of individuals to the protected speech.  The difficulty—if not impossibility—of knowing precisely what is included in the wide swath of speech censored by EO 13950 has already had, and will continue to have, a broad chilling effect.  To protect their status as federal contractors or grant recipients, Plaintiffs and the Class would have to err on the side of caution and interpret the EO 13950 broadly to ensure compliance with its vague and seemingly expansive mandates.  When combined with the EO's encouragement that individuals report perceived violations of the Order's terms by calling a "hotline" telephone number at the Department of Labor, the uncertain boundaries of the speech purportedly prohibited by the Order creates a system of suppression as hostile to the First Amendment's core protections as can be imagined.

16.     EO 13950 is, therefore, in clear violation of the First and Fifth Amendments to the United States Constitution, resulting in serious and irreparable injury to Plaintiffs National Urban League and National Fair Housing Alliance, as well as the Class.

## PARTIES

17.     The National Urban League (or "NUL") is a 501(c)(3) non-profit corporation headquartered in New York, New York.  As a historic civil rights organization founded in 1910, NUL's mission is to collaborate with community leaders, policymakers and other partners to improve the standards of living for the Black community and other underserved groups across

America.  The NUL has 90 affiliates serving 300 communities across 36 states and the District of Columbia.  NUL works to spearhead and advocate for public policies that can close the equality gap, and NUL's local affiliates provide direct services that improve the lives of Americans in their communities.  NUL has been, is and seeks to be in the future a federal contractor and federal grant recipient.

18.     The National Fair Housing Alliance (or "NFHA") is a 501(c)(3) non-profit corporation headquartered in Washington, D.C.  NFHA and its operating members aim to eliminate housing discrimination and ensure equal housing opportunities to all people through education, outreach, membership service, policy initiatives, consulting services, community development, advocacy and enforcement.  The NFHA's members include over 200 private, non-profit fair housing organizations, state and local civil rights agencies and individuals across the United States.  NFHA has over 70 operating member organizations nationwide that support fair housing work in their regions in 29 states and the District of Columbia.  NFHA focuses on a variety of matters, including policy initiatives, research, education and outreach, and the operating members of the NFHA provide direct services to victims of housing discrimination.  NFHA has been, is and seeks to be in the future a federal contractor and federal grant recipient.

19.     Defendant Donald J. Trump is the President of the United States.  He is sued in his official capacity.  In that capacity, he issued the EO 13950 challenged in this lawsuit.

20.     Eugene Scalia is the United States Secretary of Labor.  He is sued in his official capacity.

21.     EO 13950 directs The United States Department of Labor, through the Office of Federal Contract Compliance Programs (or "OFCCP"), to establish a hotline and investigate complaints received under the order alleging that a Federal contractor or grantee is utilizing

training programs in violation the Order.  EO 13950 Sec. 4(b).  The Department of Labor is

instructed to "take appropriate enforcement action and provide remedial relief, as appropriate."

*Id.*

## JURISDICTION AND VENUE

22.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question)

because this action arises under the Constitution and the laws of the United States.

23.    Venue is proper in this District under 28 U.S.C. § 1391(e) because plaintiff National

Fair Housing Alliance resides within this District and/or because each Defendant is an agency of

the United States or an officer or employee of the United States or any agency thereof acting and

sued in their official capacities, at least one Defendant resides in this District, and a substantial

part of the events or omissions giving rise to the claim occurred in this District.

24.    The Court is authorized to award the requested declaratory and injunctive relief

under 28 U.S.C. §§ 2201-2202 (Declaratory Judgment Act).

## FACTUAL ALLEGATIONS

**I.     EO 13950 PROHIBITS AND CENSORS PROTECTED SPEECH.**

**A.    The Text of EO 13950 Demonstrates Its Purpose to Prohibit, Censor, and
          Chill Speech and Viewpoints with Which the Trump Administration
          Disagrees.**

25.    On September 22, 2020, President Trump issued EO 13950, which prohibits the

use of, or instruction on, certain defined "divisive concepts" by, *inter alia*, federal contractors and

their subcontractors and vendors and federal grant recipients, including diversity or inclusion

training programs in their workplaces ("Protected Speech").

26.    The very text of the Order confirms that its purpose is not to combat unlawful

stereotyping, but to prohibit private entities' expression of views on race, sex, and gender that take

into account the history and persistent discrimination of people of color, women, and the LGBTQ community in order to foster a diverse and inclusive workplace that values all employees.

27.     EO 13950 imposes the inaccurate and ahistorical viewpoints of the Trump Administration on federal contractors and grantees simply because President Trump disagrees with the Protected Speech.

28.     Among other things, EO 13950 takes exception to "people" advancing a "vision of America" that takes into account "collective social and political identities."  EO 13950 Sec. 1.  The Order objects to an "ideology" that is grounded in particular portrayals of "our country's history and its role in the world."  *Id.*

29.     EO 13950 bans discussions of inequality grounded in the context of our Nation's history and the lived experiences of those who have been most marginalized and discriminated against.  The Order presents an ahistorical and counterfactual narrative that prohibits consideration of the structural barriers rooted in race and gender discrimination, thereby reinforcing and cementing existing inequalities into a permanent status quo.

30.     EO 13950 restricts Protected Speech by proscribing the teaching of "divisive concepts" defined to include vague and subjective categories of speech that might cause an individual to feel "discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex" based on fact-based discussions about structural inequalities.  *Id.* at Sec. 2(a).

31.     To effectuate its categorical ban on the Protected Speech, EO 13950 requires government contracting agencies to place the following restrictions on any contractors they employ:

> The contractor shall not use any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of

race or sex scapegoating, including the concepts that (a) one race or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (d) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (h) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.

*Id.* at Sec. 4.

32.    Thus, for example, EO 13950 prohibits workplace training that discusses implicit biases and the collective responsibility of people of all races and sexes to counteract implicit biases, eradicate systemic discrimination, and ensure a hostility-free work environment.

33.    In short, EO 13950 prohibits any federal contractor from engaging in speech, including the provision of certain training to its employees, that may foster belief in certain concepts that President Trump has deemed divisive, but which are widely-accepted, historically-based concepts that have been used for years in trainings and programs across the country in corporate, public sector, and educational settings.

34.    If a contractor fails to comply with the Order, their contract "may be canceled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts." EO 13950 Sec. 4(a)(3). The contractor may also be subjected to sanctions as authorized in Executive Order 11246, such as publication of the contractors' names or recommendation that EEOC institute proceedings against the contractor under Title VII of the Civil Rights Act of 1964. *Id.* (citing Exec. Order No. 11,246 (Sept. 24, 1965), as amended by Exec. Order 12,086, 43 Fed. Reg. 46501 (Oct. 5, 1978).

35.     EO 13950 sets forth similar restrictions for federal grant recipients.  Under the Order, the heads of all government agencies must "identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use Federal funds to promote the concepts [(a) through (h) described above]," and they must submit this list to the Director of the Office of Management and Budget (or "OMB") within sixty days.  EO 13950 Sec. 5.

36.     EO 13950 also threatens the prospect of enforcement against those who express viewpoints that the Trump Administration disfavors.  Specifically, the Order directs the Attorney General to assess the extent to which "workplace training that teaches the divisive concepts" may contribute to a hostile work environment and give rise to liability under Title VII of the Civil Rights Act of 1964.

37.     EO 13950 further permits contractors who become involved in, or are threatened with, litigation with a subcontractor or vendor as a result of compliance with EO 13950 to request that the United States enter the litigation to protect the interest of the United States.  EO 13950 Sec. 4(a)(4).

**B.      Events Before and After President Trump Issued EO 13950 Illuminate the Administration's Intent to Silence Viewpoints on Race and Gender with Which the Trump Administration Disagrees.**

38.     The sequence of events leading up to the issuance of EO 13950 indicates that the Order was part of a reactionary effort by the Trump Administration to use the power of the federal government to force private entities to adopt its own narrative that denies or maligns any acknowledgement of the enduring consequences of slavery and the subsequent subjugation of Black people and other people of color in the United States.

39.    On June 26, 2020, during the aftermath of George Floyd's killing and in response to protests against monuments of men who enslaved Black people,[1] President Trump issued an Executive Order ensuring that any person or group that destroyed or vandalized a monument, memorial, or statue, would be prosecuted to the fullest extent, authorizing a penalty of up to ten years imprisonment for willful injury of Federal property.  Exec. Order No. 13933, 85 C.F.R.  40081 (2020).

40.    On July 3, 2020, in further response to protests against monuments of men who enslaved Black people, President Trump signed an Executive Order to re-erect monuments of these men in a National Garden of American Heroes.  Exec. Order No. 13934, 85 C.F.R. 41165 (2020).

41.    On August 12, 2020, Christopher F. Rufo, a director at the conservative think tank Discovery Institute, tweeted that Sandia National Laboratories hosted a mandatory training called "White Men's Caucus on Eliminating Racism, Sexism, and Homophobia in Organizations."[2] Mr. Rufo described this training as "a 3-day reeducation camp for 'white-males,' with the goal of exposing their 'white privilege' and deconstructing 'white male culture.'"  He then proceeded to post documents from what he described as "the race-segregated, taxpayer-funded session."[3]  The next day, Mr. Rufo tweeted an update that "multiple congressional and White House officials ha[d] reached out to [him] about Sandia Lab's white male reeducation camp.'"[4]  That same day, Mr. Rufo appeared on *Tucker Carlson Tonight*, a program on the Fox News Network, and described

---

[1] Alan Taylor, *The Statues Brought Down Since the George Floyd Protests Began*, THE ATLANTIC (Jul. 2, 2020), https://www.theatlantic.com/photo/2020/07/photos-statues-removed-george-floyd-protests-began/613774/.

[2] Christopher F. Rufo (@realchrisrufo), TWITTER (Aug. 12, 2020, 1:40 PM), https://twitter.com/realchrisrufo/status/1293603172842221570.

[3] *Id.*

[4] Christopher F. Rufo (@realchrisrufo), TWITTER (Aug. 13, 2020, 8:50AM), https://twitter.com/realchrisrufo/status/1293892725683568641.

the Sandia Labs trainings as "a mandatory program for white male executives where they were supposed to essentially break down their white male identity and confess their sins to diversity trainers."[5]

42.    On September 1, 2020, Mr. Rufo returned to *Tucker Carlson Tonight* and described his new investigation into a Treasury Department diversity training, which "told Treasury employees that America is a fundamentally white supremacist country . . . [a]sking them to accept all of the baggage that comes with this reducible essence of whiteness."[6] Mr. Rufo further revealed "[t]he FBI is now holding weekly sessions on intersectionality, which is a hard-Left academic theory . . . with the white, straight male being at the very top of this pyramid of evil."[7]  On Twitter, Mr. Rufo called on President Trump to "immediately issue an executive order abolishing critical race theory from the federal government."[8]

43.    Just three days later, on September 4, 2020, OMB Director Russell Vought released a memorandum that ended "agency spending related to any training on 'critical race theory' 'white privilege, 'or any other training or propaganda effort that teaches or suggests either (1) that the United States is an inherently racist or evil country or (2) that any race or ethnicity is inherently racist or evil."  Off. of Mgmt. & Budget, Exec. Off. of the President, Memorandum for the Heads of Executive Departments and Agencies No. M-20-34, *Training in the Federal Government* (Sept. 4, 2020).  Director Vought announced the Administration's measures "to halt critical race

---

[5] Christopher Rufo, TUCKER CARLSON TONIGHT, FOX NEWS (Aug. 13, 2020), https://www.foxnews.com/us/chris-rufo-one-man-war-race-theory.

[6] Christopher Rufo, TUCKER CARLSON TONIGHT, FOX NEWS (Sept. 1, 2020), https://www.youtube.com/watch?v=rBXRdWflV7M .

[7] *Id.*

[8] Christopher F. Rufo (@realchrisrufo), TWITTER (Sept. 1, 2020, 10:31 PM), https://twitter.com/realchrisrufo/status/1300984639108968449?s=20.

theory trainings immediately" on Twitter.[9] Director Vought described Critical Race Theory trainings as "indoctrination trainings that sow division and racism[.]"[10]

44.     On September 5, 2020, a day after OMB's Memorandum issued, President Trump tweeted that "Critical Race Theory" was a "sickness that cannot be allowed to continue" and directed people to "report any sightings so we can quickly extinguish!"[11]  The President's tweet linked to a Breitbart article entitled "Trump Orders Purge of 'Critical Race Theory' from Federal Agencies," which described Critical Race Theory as a "leftist, racist doctrine that forms the intellectual underpinnings of Black Lives Matter, Antifa, and other radical organizations currently engaged in unrest on America's streets."[12]

45.     On September 15, 2020, Director Vought responded to Mr. Rufo's tweet about a scheduled CDC implicit bias training.  Director Vought tweeted that the training had been "cancelled immediately," "per @POTUS's directive."  The training reportedly planned to "'examine the mechanisms of systemic racism' and address '[w]hite supremacist ideology.'"[13]

---

[9] Russel Vought (@RussVought45), TWITTER (Sept. 4, 2020, 7:57 PM), https://twitter.com/RussVought45/status/1302033078848753665.

[10] Russ Vought (@RussVought45), TWITTER (Sept. 4, 2020, 7:57 PM), https://twitter.com/RussVought45/status/1302033078848753665.

[11] Donald J. Trump (@realDonaldTrump), TWITTER (Sept. 5, 2020, 7:52 AM), https://twitter.com/realDonaldTrump/status/1302212909808971776.

[12] Id.; Allum Bokhari, Party's Over:  Trump Orders Purge 'Critical Race Theory' From Federal Agencies, Breitbart, (September 4, 2020), https://www.breitbart.com/tech/2020/09/04/partys-over-trump-orders-purge-of-critical-race-theory-from-federal-agencies/.

[13] Russell Vought (@RussVought45), TWITTER (Sept. 15, 2020, 11:08 AM), https://twitter.com/RussVought45/status/1305886092361715713 .

That same day, Director Vought was reported as describing diversity trainings that include Critical Race Theory as "problematic and un-American."[14]

46.     On September 17, 2020, President Trump hosted the inaugural White House Conference on American History, where he maligned Critical Race Theory and *The 1619 Project*—an historical account of slavery in America by leading journalists published in the New York Times in 2019—as "crusade[s] against American history," "toxic propaganda," and "ideological poison, that, if not removed [would] . . . destroy our country."[15]  The President explained that this was why he "banned trainings in this prejudiced ideology from the federal government and banned it in the strongest manner possible."  President Trump also announced that he would soon establish the 1776 Commission by Executive Order to "promote patriotic education."[16]

47.     Three days later, on September 22, 2020, President Trump issued EO 13950.  President Trump explained in a tweet:  "A few weeks ago, I BANNED efforts to indoctrinate government employees with divisive and harmful sex and race-based ideologies.  Today, I've expanded that ban to people and companies that do business . . . [17] . . . with our Country, the United States Military, Government Contractors, and Grantees.   Americans should be taught to take

---

[14] OMB Director Russell Vought on Defunding Critical Race Theory in Federal Agencies, The Federalist (Sept. 15, 2020), https://thefederalist.com/2020/09/15/omb-director-russell-vought-on-defunding-critical-race-theory-in-federal-agencies/.

[15] Remarks by President Trump at the White House Conference on American History, National Archives Museum (Sept. 17, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-white-house-conference-american-history/.

[16] *Id.*

[17] Donald J. Trump (@realDonaldTrump), Twitter (Sept. 22, 2020, 6:53 PM), https://twitter.com/realDonaldTrump/status/1308539918075883523.

PRIDE in our Great Country, and if you don't, there's nothing in it for you!"[18]  The White House announced the EO as one part of several previous executive actions intended to "Defend[] Our History."[19]  And Director Vought described it as "another important step that builds off [President Trump's] directive to agencies to stop trainings that push a radical anti-American agenda."[20]

48.     On September 23, 2020, Director Vought appeared on Fox News and further explained:

> "[Critical Race Theory] is a theory that emanates from left-wing universities across the country that suggests that our institutions are fundamentally racist and need to be brought down.  And it reflects itself in two primary thoughts.  One is that the country itself, the founding, was flawed and that this country is racist to its core.  And number two that all white people are fundamentally racist and that is just itself discrimination on the basis of race. . . .  ***And obviously we believe something different than that. . . .  This is a specific effort to go after a specific leftist theory that we think is un-American***.[21]

49.     After the issuance of the EO and the preceding OMB Memorandum, the sequence of trainings cancelled by the Administration revealed a pattern of targeting trainings that discussed Critical Race Theory and related concepts intended to benefit people of color.

50.     The same day EO 13950 was issued, Director Vought replied to a tweet by Mr. Rufo accusing the State Department, Environmental Protection Agency, and the Department

---

[18] Donald J. Trump (@realDonaldTrump), Twitter (Sept. 22, 2020, 6:53 PM), https://twitter.com/realDonaldTrump/status/1308539921829781504.

[19] The White House, Law  & Justice Briefing Statement, *President Trump is Fighting Harmful Ideologies that Cause Division in Our Federal Workplaces* (Sept. 22, 2020), https://www.whitehouse.gov/briefings-statements/president-trump-fighting-harmful-ideologies-cause-division-federal-workplaces/.

[20] Russ Vought (@RussVought45), Twitter (Sept. 22, 2020, 7:10 PM), https://twitter.com/RussVought45/status/1308544280701612034.

[21] Russ Vought (@RussVought45), Twitter (Sept. 23, 2020, 5:22 PM), https://twitter.com/RussVought45/status/1308879418891345920.

of Veterans Affairs of hosting trainings about "critical race theory," that allegedly violated the Order by "pressuring staff to denounce their 'white privilege,' become 'co-resistors' against 'systemic racism' and sign 'equality pledges.'" Director Vought responded that all three trainings were cancelled, despite there being no indication in the tweet that these trainings violated the text of EO 13950.[22]

51.    On October 8, 2020, in a sweeping action expanding the reach of EO 13950's repression, Assistant Attorney General Lee Lofthus ordered the Department of Justice leaders to suspend not only diversity and inclusion trainings, but also any related "programs, activities, and events."[23]

52.    A week later, during the first presidential debate, when asked why he ended "racial sensitivity training that addresses white privilege or Critical Race Theory," President Trump responded, "I ended it because it's racist … [t]hey were teaching people to hate our country, and I'm not going to allow that to happen."[24]

53.    The sequence of events leading to President Trumps issuance of EO 13950, as well as his own statements, reveal the order's clear purpose to restrict, if not, prohibit the expression of viewpoints with which he disagrees or, otherwise, deems "un-American."

---

[22] Russ Vought (@RussVought45), TWITTER (Sept. 22, 2020, 6:34 PM), https://twitter.com/RussVought45/status/1308535115006570498.

[23] Katie Benner, Justice Dept. Suspends All Diversity and Inclusion Training for Staff, N.Y. TIMES (Oct. 9, 2020), https://www.nytimes.com/2020/10/09/us/politics/justice-department-diversity-training.html.

[24] Donald J. Trump, WATCH: Biden urges unity to 'defeat racism'; Trump decries racial sensitivity training, First Presidential Debate, YOUTUBE (Sept. 29, 2020), https://www.youtube.com/watch?v=pqGyzLjXfjo (footage from the First Presidential Debate).

### C.     EO 13950 Fails to Provide Fair Notice of What Conduct and Content Is Actually Prohibited.

54.     Under the terms of EO 13950, there is no objective way to determine which activities are permitted and which are prohibited, creating a broad chilling effect and inviting unpredictable, uneven, and potentially selective enforcement.

55.     For example, EO 13950 prohibits employers from holding "workplace training" that "inculcates" certain "divisive concepts" in employees.  EO 13950 Sec. 4(a)(1).  However, the Order never defines "workplace training," which can occur in many contexts and for many reasons—such as an employee's onboarding, part of the promotion process, ongoing professional education, or an effort to address workplace conduct issues.

56.     In addition, the Order does not explain, or otherwise define, the prohibited act of "inculcat[ing]."  There are no criteria in the Order for a federal contractor to understand whether training needs to reach a certain level of repetition, admonition, and insistence to be deemed to "inculcate[e]" employees or whether, for example, a single training that references a so-called "divisive concept" is enough to trigger the Order. [25]

57.     Nor are the prohibited "divisive concepts" sufficiently defined.  For example, the Order prohibits training that "inculcates" the concept that "the United States is fundamentally racist or sexist."  But there is no description of what "fundamentally" racist or sexist means.  Under the Order's prohibitions, it is unclear if explaining this historical context (*e.g.*, discussing the Nation's history of slavery, the Jim Crow laws, the Civil Rights Movement, the Women's Liberation Movement, the Stonewall uprising, mass incarceration, pay equity or other topics

---

[25] Inculcate, *v.*, OXFORD ENGLISH DICTIONARY ONLINE (last visited October 28, 2020), www.oed.com/view/Entry/94107 (defining "inculcate" as "[t]o endeavor to force (a thing) into or impress (it) on the mind of another by emphatic admonition, or by persistent repetition . . . to teach forcibly").

18

related to racial injustice, gender discrimination or inequity) and the foundational ways this history shapes present-day manifestations of discrimination and biases, would be considered an assertion that the United States is "fundamentally" racist or sexist.

58.     The Order also prohibits training that "inculcates" the view that "members of one race or sex cannot and should not attempt to treat others without respect to race or sex." EO 13950 Sec. 4(a)(1).  But the Order provides no explanation for what it means "to treat others without respect to race or sex," and the prohibition inexplicably flips basic anti-discrimination principles on their head.  Indeed Title VII, the ADEA, and the Pregnancy Discrimination Act all expressly prohibit workplace conduct and decisions that perpetuate gender and age stereotypes under the guise of "protecting" or showing "respect" for the elderly, women, or pregnant people.

59.     Employees' words, gestures, jokes, or acts can be hostile and discriminatory when viewed in light of the "totality of the circumstances," which may necessarily include "race or sex." *See, e.g., Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993).  But contrary to well-established doctrine under Title VII, the Order suggests that considerations of race and sex should *not* factor into an employee's behavior—*i.e.*, that employees cannot be trained in a manner that restricts them from engaging in conduct "without respect to race or sex."  Because of the Order's vague language, it is unclear what anti-discrimination workplace training comports with the Order's restrictions.

60.     The Order's prohibition on inculcating "discomfort" and "guilt" is similarly inscrutable.  The Order apparently prohibits training that includes the view that "any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex."  EO 13950 Sec. 4(a)(1).  However, the Order leaves unclear whether any training that leads to feelings of discomfort by virtue of the nature of the subject matter is prohibited.

61.     The Order also prohibits the concept that "meritocracy or traits such as a hard work ethic are racist or sexist." EC 13950 Sec. 4(a)(1). Purported objective measures of merit, such as tests and evaluations, have been used historically to exclude qualified members of protected groups from employment opportunities. The Supreme Court has recognized that the disproportionate impact of these tools of purported meritocracy can undermine equality and fairness in the workplace and can, in fact, violate federal law. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971) ("[P]ractices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices."). Under the Order, a reasonable employer has no way of knowing whether a seemingly appropriate discussion about the interplay between purportedly "meritocratic" standards and discriminatory impact—even a faithful explanation of the law—may be prohibited "inculcation" of the view of "meritocracy" as "racist."

62.     Nor does the Order provide objective standards for enforcement. There is no basis to determine whether any particular training program that discusses race relations, implicit bias, the historical foundations and context of discrimination, and racial sensitivity, would comply or violate the Order. The Order gives the Department of Labor (or "DOL") unfettered discretion in enforcing the Order's workplace training prohibitions.

63.     The Order further states that grant recipients may need to certify that they will not use federal funds to "promote" the same vague and ill-defined concepts that are banned for federal contractors. EO 13950 Sec. 5. As with federal contractors, federal grant recipients are unable to discern what precisely would be a prohibited use of federal funds under EO 13950, thus risking their eligibility for federal grants.

20

64.     In a letter to President Trump, dated October 8, 2020, the American Council on Education wrote that the Order "is creating concern, confusion, and uncertainty for federal contractors and grant recipients across the country."[26]   Among other issues, the Council noted that the Order "contains many ambiguities and gray areas"—including the definition of "divisive concepts"—"which means potentially substantial penalties for federal contractors and grantees will be based upon the subjective determinations of federal officials."[27]

65.     On October 15, 2020 more than 150 businesses and nonprofit groups, including the U.S. Chamber of Commerce, wrote a letter to President Trump, stating that "[a]s currently written[,] . . . the E.O. will create confusion and uncertainty, lead to non-meritorious investigations, and hinder the ability of employers to implement critical programs to promote diversity and combat discrimination in the workplace."[28]   The groups noted that the definition of "divisive concepts" leaves "considerable ambiguity as to what content would not be permitted in diversity and inclusiveness . . . training" and "creates many gray areas and will likely result in multiple interpretations."[29]

66.     In addition, Paulette Granberry Russell, the President of the National Association of Diversity Officers in Higher Education, has said that the Order relies on "vague" terms,

---

[26] Letter from Ted Mitchell, President, Am. Council on Educ., to President Donald J. Trump (Oct. 8, 2020), https://www.acenet.edu/Documents/Letter-White-House-Race-and-Sex-Stereotyping-Executive-Order-100820.pdf.

[27] See id.

[28] Coalition Letter on Executive Order 13950, U.S. Chamber of Com. (Oct. 15, 2020), https://www.uschamber.com/letters/congress/coalition-letter-executive-order-13950.

[29] See id.

including "race or sex stereotyping," which the Order does not "concret[e]ly define."[30]  Likewise,

the National Council of Nonprofits has noted that terms like "inculcates" and "workplace training"

are vague and ambiguous, and the divisive concepts themselves are unclear.[31]

### D. Other Executive Branch Guidance and Statements Have Only Added to the Lack of Clarity

67.    On September 28, 2020, OMB published a Memorandum entitled "Ending

Employee Trainings that Use Divisive Propaganda to Undermine the Principle of Fair and Equal

Treatment for All" (Memorandum), which gave additional content to EO 13950's directives.  Off.

of Mgmt. & Budget, Exec. Off. of the President, OMB M-20-37 (Sept. 28, 2020).   The

Memorandum expanded on the Order by highlighting terms, such as "critical race theory," "white

privilege," "intersectionality," "systemic racism," "positionality," "racial humility," and

"unconscious bias," as key to identifying the targeted "divisive" diversity training programs.  *Id*.

at 2.

68.    This Memorandum singled out specific terms and subject matter, such as critical

race theory or white privilege, as targets of the Order even though they were not explicitly included

in the definition of "divisive concepts" proscribed by the text of the Order.

---

[30] *See* Jeremy Bauer-Wolf, *3 colleges pause diversity efforts over Trump executive order*, EDUCATION DIVE (Oct. 9, 2020, 2:35 PM), https://www.educationdive.com/news/3-colleges-pause-diversity-efforts-over-trump-executive-order/586593/.

[31] *See* Tim Delaney and David L. Thompson, *How Nonprofits Can Stop Trump's Effort to Roll Back Diversity Training*, NONPROFIT QUARTERLY (Oct. 5, 2020), https://nonprofitquarterly.org/how-nonprofits-can-stop-trumps-effort-to-roll-back-diversity-training/.

69.     On October 7, 2020, OFCCP released nine frequently asked questions addressing the EO.[32]  However, this guidance further contributed to the uncertainty surrounding the EO's enforcement.   Regarding the EO's date of effectiveness, the OFCCP claimed that it could "investigate claims of sex and race stereotyping" now "pursuant to its existing authority under Executive Order 11246."  However, OFCCP also instructed that EO 13950 applies to contracts entered into or modified after November 21, 2020.

70.     On October 22, 2020, OFCCP published, in the Federal Register, a request for information ("RFI")  pursuant to EO 13950, seeking "comments, information, and materials from Federal contractors, Federal subcontractors, and employees of Federal contractors and subcontractors concerning workplace trainings involving prohibited race or sex stereotyping or scapegoating."[33]  According to the RFI, the president "directed that the request for information should request copies of any training, workshop, or similar programming having to do with diversity and inclusion as well as information about the duration, frequency, and expense of such activities."[34]

71.     These interpretive documents from the federal government only reinforce how vague the terms of EO 13950 are and how expansively they can be interpreted for purposes of enforcement.

---

[32] Executive Order 13950 – Combatting Race and Sex Stereotyping, Office of Federal Compliance Programs (Oct. 7, 2020), https://www.dol.gov/agencies/ofccp/faqs/executive-order-13950.

[33] Request for Information; Race and Sex Stereotyping and Scapegoating, 85 Fed. Reg. 67,375-67,378 (Oct. 22, 2020).

[34] *Id.*

E.      **EO 13950 Departs from Normal Procedures.**

72.     Presidents historically follow specific procedural steps for enacting executive orders, which ensure that they are properly reviewed, vetted, and implemented.  One example of this procedure can be found in the provisions of 1 CFR § 19.2—"Routing and approval of drafts"—which lay out the procedure for review by the Office of Management and Budget, Attorney General, and Office of the Federal Register, in order to ensure legality and language, prior to submission to the President for signature. Other procedures ensure that the executive order is properly implemented.

73.     These procedures have historically been found within the executive order itself with provisions for amendment to reconcile the executive order with past orders, as well as instructions to the relevant cabinet Secretary to draft rules and regulations for implementation. Finally, executive orders are, historically, submitted to the Federal Acquisition Regulatory Council and Office of Federal Contract Compliance Programs for implementation onto the Federal Register and insertion into federal government contracts.

74.     EO 13950 reflects a radical departure from other executive orders and from these usual procedures.  For example, unlike recent executive orders related to the federal workplace, such as, President Obama's Executive Order 13672 (amending two prior executive orders to extend prohibitions against discrimination to also prohibit discrimination targeting sexual orientation or gender identity) and Executive Order 13665 (prohibiting retaliation for inquiring about, discussing, or disclosing compensation information), EO 13950 lacks any provision that purports to amend Executive Order 11246 (1965), which already addresses anti-discrimination requirements for federal contractors.  Instead, EO 13950 excludes all contracts exempted by Executive Order 11246, section 204, and mandates that all federal government contracting agencies shall include specified contract language set forth in the Order.  EO 13950 Sec. 4(a).

75.     In addition, unlike prior workplace discrimination-related executive orders, the Order does not instruct the Secretary of Labor to prepare regulations to implement the requirements of the Order.  Instead, the Order merely instructs the Department of Labor to establish a hotline and investigate complaints of purported violations of the Order.  EO 13950 Sec. 4(b).

76.     In another departure from the ordinary procedural attributes of executive orders concerning workplace discrimination, the Order lacks any mechanism for rulemaking by the Federal Acquisition Regulatory Council that would permit implementation and insertion of specific language into contracts by the OFCCP.  Instead, the Order purports to require "the Director of OFCCP [to] publish in the Federal Register a request for information seeking information from Federal contractors, Federal subcontractors, and employees [thereof] regarding the training, workshops, or similar programming provided to employees" and, as described, mandates that all federal government contracting agencies include specified contract language set forth in the Order. EO 13950 Sec. 4.

## II.     THE PROTECTED SPEECH THAT EO 13950 CENSORS AND CHILLS IS OF IMMENSE PUBLIC CONCERN AND A MATTER OF PUBLIC WELFARE.

### A.   Discussions to Support and Advance Workplace Diversity, Inclusion, and Equality Are Important Speech Due to the Persistence of Employment Discrimination.

77.     Of the many ways that racism has blighted our democracy, economic and employment-based injustice and exclusion rank among the most pervasive.  Slavery involved the theft of Black labor.  Even in the non-slave states, Black people in the antebellum era were relegated to menial employment positions.  After the Civil War, Black Codes, the Convict Lease system, and a veritable reign of terror by white supremacist groups in the South was motivated, in part, by a desire to ensure a racialized employment hierarchy that forced Black people into the lowest status employment sectors.

78.     For most of the twentieth century, state-sanctioned segregation in education and employment ensured that most Black people were maintained in low-paying jobs of domestic or agricultural work, and blue-collar factory and plant jobs in the South included strict racial hierarchies in which Black workers were held to the lowest rungs.  The federal government itself practiced this racial hierarchy and, in the Woodrow Wilson administration, segregated or purged the few Black employees in low-level positions from federal service.[35] By the time that Title VII of the Civil Rights Act of 1964 was passed into law, employers regularly and overtly discriminated against Black employees in hiring, work assignments, and compensation.

79.     While Title VII achieved much progress in equalizing employment opportunities, the historic subjugation of Black people and other people of color persists in implicit biases and structural inequalities that have led to their continued underrepresentation at the highest levels of corporate leadership.

80.     For example, although Black people represent 13.4 percent of the U.S. population, within U.S. financial institutions, they account for only 2.4 percent of executive committee members, only 1.4 percent of managing directors, and only 1.4 percent of senior portfolio managers.[36]  Black people represent just 1.9 percent of technology executives and 5.3 percent of technology professionals.[37]

---

[35] Judson MacLaury, The Federal Government and Negro Workers Under President, U.S. Dep't of Labor Woodrow Wilson, https://www.dol.gov/general/aboutdol/history/shfgpr00; Dick Lehr, *The Racist Legacy of Woodrow Wilson*, The Atlantic (Nov. 27, 2015), https://www.theatlantic.com/politics/archive/2015/11/wilson-legacy-racism/417549/.

[36] Laura Morgan Roberts & Anthony J. Mayo, *Toward A Racially Just Workplace*, Harv. Bus. Rev. (Nov. 2019), https://hbr.org/cover-story/2019/11/toward-a-racially-just-workplace.

[37] *Id*.

81.     Moreover, Asian Americans make up five percent of the U.S. population, but account for only 1.4% of *Fortune* 500 CEOs and 1.9% of corporate officers overall.[38] And more than one-third of Latinx people report having experienced discrimination in terms of either their job applications, compensation, or consideration for promotions for jobs they already have.[39]

82.     Studies indicate that the underrepresentation of people of color in the private and public sector is not an issue of merit, but rather, opportunity.  For example, a Harvard Business School study found that people of color had to manage their careers more strategically than their white peers and were required to prove greater competence than their white peers before securing the same promotions.[40]  Research by the Deans of Cornell University's Dyson School and Emory University's Goizueta Business School found that Black leaders in business are disproportionately given assignments with a high risk of failure.[41]  Another study of Black leaders found that, because of stereotyping, they were evaluated negatively regardless of their performance.[42]

83.     In addition to racial discrimination and harassment in the workplace, sexual harassment, gender discrimination, and discrimination on the basis of sexual orientation and gender identity are disconcertingly prevalent.

---

[38] Liza Mundy, *Cracking the Bamboo Ceiling,* THE ATLANTIC (Nov. 2014), https://www.theatlantic.com/magazine/archive/2014/11/cracking-the-bamboo-ceiling/380800/.

[39] Press Release, Harv. Sch. of Pub. Health, *Poll finds one-third of Latinos say they have experienced discrimination in their jobs and when seeking housing* (Nov. 1, 2017), https://www.hsph.harvard.edu/news/press-releases/poll-latinos-discrimination/.

[40] Roberts & Mayo, *Toward a Racially Just Workplace* (citing David A. Thomas & John J. Gabarro, Breaking Through: The Making of Minority Executives in Corporate America (1999)).

[41] *Id.*

[42] Andrew M. Carton & Ashleigh Shelby Rosette, Explaining Bias against Black Leaders: Integrating Theory on Information Processing and Goal-Based Stereotyping, 54 ACAD. OF MGMT. J., 1141, 1141 (2012).

84.     In 2014, women who worked full time, year-round in the United States were paid only 79 cents for every dollar paid to their male counterparts.[43]  This wage gap reflects a number of factors, including lower pay for women within the same employment positions, segregation of women into lower-paying jobs, bias against women caregivers as workers, and workplace policies that impose long-term economic penalties on workers who take time out of the workforce to care for their families.[44]

85.     Moreover, women—many of whom are supporting families—are over-represented in the low-wage workforce and comprise two-thirds of low-wage workers, despite making up slightly less than half of the workforce overall.[45]

86.     The intersectionality of race and gender exacerbates these dual biases for women of color.  Nearly half of women in the low-wage workforce are women of color,[46] and women of color are disproportionately represented in the low-wage sector of the workforce.[47]  For example, Black women are 6 percent of the overall workforce but their share of the low-wage workforce is

---

[43] *See* Nat'l Women's L. Ctr., Fact Sheet: FAQ About the Wage *Gap* 1 (Sept. 2015), https://nwlc.org/wp-content/uploads/2015/08/faq_about_the_wage_gap_9.23.15.pdf (comparing median earnings by women in full time, year round employment with median earnings by men in full time, year round employment).

[44] *Id.*

[45] *See* Anne Morrison & Katherine Gallagher Robbins, Nat'l Women's L. Ctr., *Women's Overrepresentation in Low-Wage Jobs* 1 (Oct. 2015) , https://nwlc.org/wp-content/uploads/2015/08/chartbook_womens_overrepresentation_in_low-wage_jobs.pdf (defining low-wage jobs as those that typically pay $10.50 per hour or less); Anne Morrison & Katherine Gallagher Robbins, Nat'l Women's L. Ctr., *The Women in the Low-Wage Workforce May Not Be Who You Think* 4 (Sept. 2015), https://nwlc.org/wp-content/uploads/2015/08/chartbook_women_in_the_low-wage_workforce_may_not_be_who_you_think.pdf.

[46] *Id.*

[47] Morrison & Robbins, *Women's Overrepresentation in Low-Wage Jobs*, at 6.

nearly double that at 11 percent.[48]   Black and Hispanic women experience greater wage gaps—60 cents and 55 cents for every dollar paid to white, non-Hispanic men, respectively—than their white, non-Hispanic counterparts.[49]

87.     LGBTQ persons of color also are more than twice as likely to have experienced discrimination as compared to their white peers.  Whereas 13% of white LGBTQ persons report having experienced discrimination based on their LGBTQ status during the job-application process, that figure is 32% for LGBTQ people of color.[50]  Similarly, 27% of LGBTQ persons of color state that they are afraid to take time off work to care for a loved one for fear it would reveal their LGBTQ status at work (compared to 16% of white LGBTQ employees).[51]

88.     The rates of workplace discrimination against transgender people—including 26% reporting they have been fired based on anti-transgender bias and 50% who have been harassed on the job—are even higher for transgender people of color, who face "up to twice or three times the rates of various negative outcomes" as compared to white transgender employees.[52]

---

[48] *Id.*

[49] *See* Nat'l Women's L. Ctr., Fact Sheet: The Wage Gap Is Stagnant for Nearly a Decade 1-2 (Sept. 2016), https://nwlc.org/wp-content/uploads/2016/09/Wage-Gap-Stagnant-2016-3.pdf.

[50] Nat'l Pub. Radio, et al., *Discrimination in America: Experiences and Views of LGBTQ Americans* 11 (Nov. 2017), https://legacy.npr.org/documents/2017/nov/npr-discrimination-lgbtq-final.pdf.

[51] Human Rights Campaign Foundation, *LGBTQ Working People of Color Need Paid Leave* 8 (May 2018), https://hrc-prod-requests.s3-us-west-2.amazonaws.com/files/assets/resources/HRC-PaidLeave-POCReport-FINAL.pdf?mtime=20200713133946&focal=none.

[52] Jaime M. Grant et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* 3, 51 (2011) https://transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf; *see also, e.g.*, Nat'l Ctr. for Transgender Equality, *Issues: Non-Discrimination Laws*, https://transequality.org/issues/non-discrimination-laws (last visited June 28, 2019); M.V. Lee Badgett et al., Williams Institute, *Bias in the Workplace: Consistent Evidence of Sexual Orientation and Gender Identity Discrimination* 3 (June 2007),

**B.      Discussions About Implicit Bias, Systemic Discrimination, and Racial and Gender Privilege Are Important Speech of Public Concern and Debate, About Which President Trump Has Expressed Disagreement.**

89.      As demonstrated by hostile environments in the workplace and persistent disparities in access to opportunities, the lasting effects of race and sex discrimination are deep and widespread.  Such discrimination, which was normalized for generations, continues to shape our perceptions and assumptions about individuals and groups based on their race, sex, gender identity, and/or sexual orientation, resulting in both explicit and implicit biases at an individual and systemic level.

90.      According to Professor Jennifer Eberhardt, one of the most preeminent experts of implicit bias and the recipient of the MacArthur "genius" fellowship, "categorization is a fundamental tool that our brains are wired to use"; beliefs we have about categorized social groups are "stereotypes," and the attitudes we have about them are "prejudice."[53]  "Whether bad or good, whether justified or unjustified, our beliefs and attitudes can become so strongly associated with the category that they are automatically triggered, affecting our behavior and decision making . . . . The process of making these connections is called bias."[54]

91.      The explicit discrimination against people of color, women, and LGBTQ individuals was grounded upon—and has further generated—entrenched stereotypes that fuel the explicit and implicit biases that affect our interactions and decision making, resulting in significant

---

https://williamsinstitute.law.ucla.edu/wp-content/uploads/Bias-Workplace-SOGI-Discrim-Jun-2007.pdf (reporting similar evidence of pronounced discrimination against LGBTQ employees of color); M.V. Lee Badgett et al., Ctr. for Emp. Equal., *Evidence from the Frontlines on Sexual Orientation and Gender Identity Discrimination* (July 2018), https://www.umass.edu/employmentequity/evidence-frontlines-sexual-orientation-and-gender-identity-discrimination (same).

[53] Jennifer Eberhardt, Biased:  Uncovering the Hidden Prejudice That Shapes What We See, Think, and Do 31 (2019).

[54] *Id.*

disparities and inequality today.  For example, one of the strongest and most pervasive stereotypes in the United States is the strong association between Blackness and criminality, which has had dire consequences in the criminal justice system.[55]

92.     Ongoing implicit biases also have severe ramifications in the workplace.  A well-known study of the U.S. labor market sent out thousands of identical resumes with names that signaled the race of the applicant as white or Black, resulting in applications with "Black-sounding names" to be 50% less likely to get a callback.[56]  Even increasing the qualifications of the Black applicants did not help—they were still less likely to be called back than less-qualified white applicants.[57]

93.     Women likewise face implicit biases in the workplace, such as being considered ill-fitted for high-powered positions, either too masculine or too feminine in male-dominated fields, and conflicted between their professional commitment and motherhood.[58]  And women of color experience the intersectionality of both race and gender bias—*i.e.*., needing to prove themselves as both women and people of color.[59]

94.     LGBTQ employees also suffer from implicit biases in the workplace.  In a study by the Human Rights Campaign, one-in-five LGBTQ employees (compared to one in 24 non-LGBTQ employees) were told by coworkers to dress in a more masculine or feminine way.[60]  Forty-six

---

[55] *Id.* at 6.

[56] *Id.* at 263-64.

[57] *Id*.

[58] Joan C. Williams, Double Jeopardy? An Empirical Study with Implications for the Debates over Implicit Bias and Intersectionality, 37 HARV. J. L. & GENDER 185, 189-93 (2014).

[59] *Id.* at 194.

[60] Human Rights Campaign, *Workplace Divided: Understanding the Climate for LGBTQ Workers Nationwide* 6 (2018), at

percent of non-LGBTQ workers state that they would not be very comfortable working with an LGBTQ colleague, and most of the discomfort stems from a desire not to hear about their LGBTQ colleagues' sex lives.[61]   And 46% of LGBTQ employees are still closeted at work.[62] Intersectionalities with race and gender further exacerbate the implicit biases that LGBTQ employees confront.

95.    Both explicit and implicit biases normalize conditions under which people of color, women, and LGBTQ people are underrepresented and undervalued.  Thus, what may be perceived as natural, neutral, and objective is, to the contrary, a direct product of the legacy of discrimination that has become fully embedded in various aspects of our society, such as the educational system, the criminal justice system, housing, health care, and most certainly employment.

96.    The absence of explicit forms of bias that are more easily identified and remedied within the contours of our anti-discrimination laws do not render more nuanced and structural inequalities any less harmful to the victims of such inequalities.  It is in response to these structural inequalities that Critical Race Theory was born.  Although Critical Race Theory is comprised of a wide variety of scholarship, it is "unified by two common interests": (1) the pursuit of understanding how racial subordination originated and has been maintained in the United States, especially in relation to the legal system; and (2) a desire to change the legal system so that it no longer supports racial subordination.[63]

---

https://assets2.hrc.org/files/assets/resources/AWorkplaceDivided-2018.pdf?_ga=2.11363569.430490975.1603766732-68969451.1603766732.

[61] *Id.*

[62] *Id.*

[63] Kimberlé Crenshaw, et al., *Critical Race Theory: The Key Writings That Formed the Movement* viii (The New Press, ed. 1995).

97.     Although it largely resides within the field of legal academia, Critical Race Theory is an invaluable lens through which to understand how structural inequalities proliferate despite the Equal Protection Clause and civil rights and anti-discrimination laws.  Moreover, the basic tenets of Critical Race Theory are very much aligned with the Black Lives Matter movement, which gained widespread support, including in the form of mass peaceful protests across the country and globe, following the police killing of George Floyd this past summer and has been the subject of popular discourse, as well as discussions in the workplace.

98.     The mass protests against police violence in the Black community during the summer of 2020 have been widely reported as the largest movement in American history with dozens of millions of people of all races, both domestically and internationally, protesting against police violence and abuse against the Black community.[64]  In one day alone—on June 6, 2020—about 500,000 people protested in 550 locations across the United States.[65]

99.     Support for eradicating anti-Black racism has increased significantly among multiple entities and across industries.  Professional sports associations, such as the National Football League and NASCAR, that were previously reticent have publicly voiced their support for anti-racist efforts.[66]

---

[64] Larry Buchanan, Quoctrung Bui, and Jugal K. Patel, *Black Lives Matter May Be the Largest Movement in U.S. History*, N.Y. TIMES, July 3, 2020, https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.

[65] *Id.*

[66] Tonya Pendleton, *NASCAR Stands for 'Black Lives Matter' in Video*, THE GRIO, June 8, 2020, https://thegrio.com/2020/06/08/nascar-black-lives-matter/; Mark Maske and Adam Kilgore, *What Made Roger Goodell Say 'Black Lives Matter' and Where It Leaves the NFL*, WASH. POST, June 6, 2020, https://www.washingtonpost.com/sports/2020/06/06/roger-goodell-black-lives-matter/.

100.    In July, several large banks spoke out against the Department of Housing and Urban Development's decision to eviscerate the disparate impact standard under the Fair Housing Act, explaining that housing discrimination remains a reality for many Black Americans.[67]   And numerous corporations have expressed support not only for racial justice protesters, but also for their own Black employees, by encouraging leadership to stand in solidarity with their Black friends and colleagues in the fight to eradicate racism.[68]

101.    Moreover, on June 4, 2020, all nine justices of the Washington State Supreme Court signed an open letter to the legal community in response to George Floyd's death and the subsequent mass protests.[69]   The letter recognized "the injustices faced by black Americans are not relics of the past . . . .   Our institutions remain affected by the vestiges of slavery: Jim Crow laws that were never dismantled and racist court decisions that were never disavowed."[70]   The Justices further stated that "we must recognize that systemic racial injustice against black Americans is not an omnipresent specter that will inevitably persist.   It is the collective product of each of our individual actions—every action, every day.   It is only by carefully reflecting on our

---

[67] Joe Adler, *Big Banks Urge HUD to Shelve Redlining Plan. Small Banks Say Not So Fast*, AMERICAN BANKER, June 20, 2020, https://www.americanbanker.com/news/big-banks-urge-hud-to-shelve-redlining-plan-small-banks-say-not-so-fast#:~:text=A%202015%20Supreme%20Court%20decision%20affirmed%20disparate%20impact%2C,should%20restrict%20how%20the%20legal%20doctrine%20is%20applied

[68] Tiffany Hsu, *Corporate Voices Get Behind 'Black Lives Matter' Cause*, N.Y. TIMES, May 31, 2020, https://www.nytimes.com/2020/05/31/business/media/companies-marketing-black-lives-matter-george-floyd.html.

[69] The Supreme Court, State of Washington, *Open Letter to the Legal Community* (June 4, 2020), http://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%20060420.pdf.

[70] *Id.*

actions, taking individual responsibility for them, and constantly striving for better that we can address the shameful legacy we inherit."[71]

102.    The effects of structural racism have also been revealed the COVID-19 pandemic. "Blacks, Latinos, and American Indians are experiencing hospitalizations at rates 4.5 to 5.5 times higher than non-Hispanic whites . . . .  Hispanics and Native Americans are both dying about 1.5 times the rate of white people.  And Black people are dying at 2.4 times the white rate."[72] Shockingly, the "mortality rates and life expectancy are far better for white Americans" during the COVID-19 pandemic "than they are for Black people during normal, non-pandemic years."[73]

103.    Dr. Anthony Fauci, the foremost infectious disease expert in the United States and a member of the President's Coronavirus Task Force, attributed these disparities to institutional racism that contributed to socioeconomic inequality. Oversight of the Trump Administration's Response to the COVID-19 Pandemic: Hearing Before the House Energy and Commerce Committee, 116 Cong. 56 (2020) (Unedited Hearing Transcript).

---

[71] *Id.*

[72] Daniel Wood, *As Pandemic Deaths Add Up, Racial Disparities Persist – And in Some Cases Worsen*, NPR, Sept. 23, 2020, https://www.npr.org/sections/health-shots/2020/09/23/914427907/as-pandemic-deaths-add-up-racial-disparities-persist-and-in-some-cases-worsen.

[73] Maria Godoy, *'Racial Inequality May Be as Deadly as COVID-19,' Analysis Finds*, NPR, Aug. 27, 2020, https://www.npr.org/sections/health-shots/2020/08/27/906002043/racial-inequality-may-be-as-deadly-as-covid-19-analysis-finds.

104.    Additionally, concerns about sexual harassment and violence and gender inequities have reached a pinnacle the past few years due to the Me Too Movement[74] and Times Up,[75] which have unearthed and publicized rampant discrimination against women in the workplace, especially against women of color and transwomen of color.

105.    The United States Supreme Court's recognition of marriage equality in *Obergefell v. Hodges*, 576 U.S. 644 (2015) was a culmination of decades of activism by the LGBTQ movement,[76] which continues to seek equality in other aspects of LGBTQ life, including employment.[77]

106.    Concepts like implicit bias, systemic discrimination, structural inequalities, and race and gender privileges and hierarchies have been increasingly acknowledged, embraced, and espoused in the speech of individuals, organizations, corporations, and associations of all races and backgrounds during recent months  leading up to the issuance of EO 13950.

---

[74] Founded in 2006 by sexual violence survivor and activist Tarana Burke, the Me Too Movement went viral on social media in 2017 with the #MeToo hashtag in connection with highly publicized revelations of sexual violence; Me Too continues to assist and support survivors of sexual violence and their allies by "connecting survivors to resources, offering community organizing resources, pursuing a 'me too' policy platform, and working with researchers . . . ." https://metoomvmt.org/.  Me Too Movement, *Get to Know Us* (last visited Oct. 28, 2020)*, https://metoomvmt.org/get-to-know-us/;* Me Too Movement, *Vision & Theory of Change* (last visited Oct. 28, 2020), https://metoomvmt.org/get-to-know-us/vision-theory-of-change/.

[75] Originally founded in 2017 by over 300 women in the entertainment industry, Times Up is a not-for-profit organization and charitable foundation committed to gender equality. Time's Up *Time's Up Was Born When Women Said "Enough Is Enough"* (last visited Oct. 28, 2020), https://timesupfoundation.org/about/our-story/.

[76] Nathaniel Frank, *The Long Road to Marriage Equality*, SLATE, June 26, 2015, https://slate.com/human-interest/2015/06/gay-marriage-a-history-of-the-movement-for-marriage-equality.html.

[77] Emma Green, *America Moved on From Its Gay-Rights Moment and Left a Legal Mess Behind*, THE ATLANTIC, Aug. 17, 2019, https://www.theatlantic.com/politics/archive/2019/08/lgbtq-rights-america-arent-resolved/596287/.

107.    It is, therefore, clear from the text of EO 13950, the statements and conduct of the Trump Administration before and after the issuance of the Order, and the words of President Trump himself that EO 13950 was conceived, drafted, and implemented to impose upon both public and private entities the views, opinions, and perspectives of the Trump Administration, in conflict with the Plaintiffs' own speech, as well as the Class—to the detriment of Plaintiffs' interests, as well as the interests of their employees, in diversity, inclusion, and equality for people of color, women, and LGBTQ individuals.

### C.    EO 13950 Censors and Chills Important Speech that Advances Equality for People of Color, Women, and LGBTQ Persons in Deference to the Trump Administration's Viewpoints, as Expressed by President Trump Himself.

108.    Federal contractors and grant recipients like Plaintiffs reasonably want to discuss and address implicit biases and structural inequalities to ensure equal opportunity in their workplaces and prevent hostile work environments.  For example, a study of gender biases among committee members evaluating candidates for competitive research positions found that "educating evaluative committees about gender biases" had an effect on whether committee members with strong implicit gender biases were able to make selection decisions unaffected by those biases.[78]

109.    Counteracting the effects of implicit biases or structural inequalities produces positive results for employers by maximizing the potential and productivity of their workforce, facilitating efficiency and economy in the workplace, and preventing discord and possible litigation regarding employment discrimination or a hostile work environment.  For example, a study of LGBTQ employees working in unwelcoming environments found that 25% felt

---

[78] Isabelle Régner et al., *Committees with Implicit Biases Promote Fewer Women When They Do Not Believe Gender Bias Exists*, 3 NATURE HUM. BEHAV. 1171 (2019).

"distracted from work," "17% felt exhausted from spending time and energy hiding their sexual orientation," and "20% searched for a different job."[79]

110.    Moreover, employers benefit directly from the diversity of their workforce. "[C]ompanies in the top quartile for gender or racial and ethnic diversity are more likely to have financial returns above their national industry medians.  Companies in the bottom quartile in these dimensions are statistically less likely to achieve above-average returns."[80] Diversity can also "drive innovation" by "creating an environment where 'outside the box' ideas are heard."[81]  And "[i]n the fight for global talent, diversity and inclusion policies . . . help[] to broaden the pool of talent a company can recruit from, while also helping to build an employment brand that is seen as fully inclusive."[82]

111.    Fortune 500 companies and leaders in the United States military have repeatedly expressed the importance of diversity to the success of their work and speak openly about the value of diversity initiatives to building strong teams and increasing productivity.  *See*, *e.g.*, Brief of Lt. Gen. Julius W. Becton Jr. et al., as Amici Curiae Supporting Respondents, *Grutter v. Bollinger*, 539 U.S. 98 (2003) (Nos. 02-241, 02-516), 2003 WL 1787554; Brief for General Motors as Amici Curiae Supporting Respondents, *Grutter v. Bollinger*, 539 U.S. 98 (2003) (Nos. 02-241, 02-516), 2003 WL 399096; Brief of Lt. Gen. Julius W. Becton Jr. et al., as Amici Curiae

---

[79] Human Rights Campaign Foundation, *LGBTQ Working People of Color Need Paid Leave* 8 (May 2018), https://hrc-prod-requests.s3-us-west-2.amazonaws.com/files/assets/resources/HRC-PaidLeave-POCReport-FINAL.pdf?mtime=20200713133946&focal=none.

[80] Vivian Hunt et al., *Why Diversity Matters*, McKinsey & Company, Jan. 1, 2015, https://www.mckinsey.com/business-functions/organization/our-insights/why-diversity-matters.

[81] Sylvia Ann Hewlett et al., *How Diversity Can Drive Innovation*, Harv. Bus. Rev. (2013), https://hbr.org/2013/12/how-diversity-can-drive-innovation.

[82] *Fostering Innovation Through a Diverse Workforce*, Forbes 7 (2011), https://images.forbes.com/forbesinsights/StudyPDFs/Innovation_Through_Diversity.pdf.

Supporting Respondents, *Fisher v. Univ. of Texas at Austin* (No. 14-981), 2015 WL 6774556; Brief for Fortune-100 et al. as Amici Curiae Supporting Respondents, *Fisher v. Univ. of Texas at Austin*, (No. 14-981), 2015 WL 6735839.

112.    Nevertheless, EO 13950 threatens to slow, restrict and, in some cases, prohibit the various forms of speech and actions that corporations and other entities have undertaken in response to increased awareness of racial and gender inequity in general and in response to the related demands of their employees, customers, investors, boards of directors and leadership.

113.    EO 13950 censors and chills Protected Speech of all federal contractors and subcontractors, hindering their ability to successfully train their employees and implement critical programs to combat discrimination in the workplace and promote diversity and inclusion. Plaintiffs' Protected Speech, including any diversity trainings, provides an essential forum for citizens to discuss public issues that affect society broadly speaking and also have a meaningful application in the workplace, maximizing the productivity of employees and ensuring that employees of all backgrounds are respected and included.

114.    Thus, when federal contractors and grant recipients are discussing issues of equality and inclusion, they are expressing protected viewpoints concerning topics of the utmost importance to our democracy and essential to the successful functioning of a diverse workplace. Such discourse is critical speech protected by the First Amendment. *Snyder v. Phelps*, 562 U.S. 443, 453 (2011).

115.    The Supreme Court has recognized that such speech is at the *core* of the First Amendment's protections. "Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Lane v. Franks*, 573

U.S. 228, 235-36 (2014) (quoting *Roth v. U.S.*, 354 U.S. 476, 484 (1957)).   Speech on public issues, particularly relating to any matter of political, social, or other concern to the community, "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."   *Snyder*, 562 U.S. at 453.   For that reason, courts have historically struck down government actions censoring speech by federal employees that relates to issues of racial justice, gender equality, and social progress. *See, e.g., Hardy v. Jefferson Cmty. College*, 260 F.3d 671, 679 (6th Cir. 2001) (finding that "race, gender, and power conflicts in our society" are "matters of overwhelming public concern").

116.    EO 13950 places a significant burden on Plaintiffs' Protected Speech because it explicitly calls for government retaliation against federal contractors and subcontractors who express Protected Speech, including diversity trainings, that are in not line with President Trump's views, even when those trainings are with the contractors' own employees.

117.    The Protected Speech, including workplace trainings, of an entire organization can be censored by EO 13950 by virtue of a single federal contract even when the Protected Speech has no connection to a federal contract.

118.    As a result, private entities must refrain from constitutionally protected speech in order to compete for and receive federal contracts and grants.

119.    The Order also threatens to chill speech that may not even violate the restrictions in the Order because many federal contractors will choose to err on the side of caution and decline to discuss any matters that even remotely bear on issues of race or sex, for fear of violating the broad prohibitions in the Order.   In addition, the Order invokes the enforcement power of the Department of Justice and the prospect of liability under Title VII of the Civil Rights Act of 1964

for those who would express views on race and gender that differ from the Administration's preferred approach as set out in the Order.  EO 13950 Secs. 4(a)(4) & 8.

120.    EO 13950 is already having an immediate and discernible chilling effect on protected speech as companies, organizations, and academic institutions halt diversity trainings for fear of the retaliation they might face pursuant to the terms of Section 4(a)(3) of the Order, which punishes non-compliance by "cancel[ing], terminat[ing], or suspend[ing]" contracts and allowing the offending contractors to "be declared ineligible for further Government contracts." EO 13950 Sec. 4(a)(3).

121.    On information and belief, workshops, trainings, and initiatives to address systemic racial discrimination have been put on hold or canceled; some entities have requested the exclusion of terms like "diversity," "racism," "systemic racism," "critical race theory," "white privilege," "intersectionality," and "unconscious bias" for fear of violating the Order.

122.    For example, John A. Logan College, in Carterville, IL, rescinded an invitation to a professor who planned to give a talk in celebration of Hispanic Heritage Month.[83]  The talk would have included discussions of Hispanic identity as well as Mr. Barrios's own story as an immigrant from Guatemala.[84]

123.    Similarly, within days of the Order's issuance, University of Iowa administrators suspended all diversity and inclusion trainings pending review even though the Order is not explicitly directed at public universities and despite the University administrators'

---

[83] Hailey Fuchs, *Trump Attack on Diversity Training Has a Quick and Chilling Effect*, N.Y. TIMES, Oct. 13, 2020, https://www.nytimes.com/2020/10/13/us/politics/trump-diversity-training-race.html.

[84] *Id.*

acknowledgment that the Order would have a chilling effect on campus.[85] The administrators' actions were motivated by a fear of losing federal funding due to potential noncompliance with the Order.

124.    This chilling effect works to the detriment of all employees, but particularly members of protected groups who will lose out on the beneficial effects of such opportunities and programs that otherwise would have been available.

125.    Likewise, Plaintiffs experience the chilling effect by having to consider what terms can or cannot be used in their Protected Speech in order to comply with EO 13950 and allow them to be remain eligible for federal contracts and/or federal grants.

126.    The Administration can offer no credible justification for its broad assault on free speech.  To the contrary, the language in the Order, as well as the context in which it was issued, make clear that the primary motive for the Order is to silence particular viewpoints on race and gender with which President Trump disagrees.

127.    With the enforcement of the Order, Plaintiffs and more than 100,000 other federal contractors and grantees will be denied the right to free speech, one of the most fundamental rights in our democratic system.

### III.    EO 13950 DIRECTLY HARMS PLAINTIFFS NATIONAL URBAN LEAGUE, NATIONAL FAIR HOUSING ALLIANCE, AND CLASS MEMBERS

128.    NUL entered into an Apprenticeship Contract with the Department of Labor in July of 2016, for a 12-month term with four (4) one-year renewal options.  Specifically, NUL contracted

---

[85] Cleo Krejci, *Executive order silences speech, UI leaders say, following decision to suspend diversity training under White House treat to cut funding*, Iowa City Press-Citizen, Oct. 9, 2020, https://www.press-citizen.com/story/news/education/university-of-iowa/2020/10/09/university-iowa-suspend-diversity-training-trump-executive-order-raises-questions/5903117002/

to act as a National Equity Partner to work with the DOL's Office of Apprenticeship to develop partnerships with strategic sponsors committed to increasing the numbers of underrepresented persons who enter and complete Registered Apprenticeship Programs.  NUL's work under the Apprenticeship Program includes: developing and presenting trainings on diversity and inclusion; developing strategic tools and plans to increase access, entry and retention of underrepresented persons to apply to Registered Apprenticeships; scaling current diversity and inclusion practices; and developing tools and strategies for employer affirmative action plans among other work.

129.    NUL's Apprenticeship Contract is a part of the DOL's Employment and Training Administration's ("ETA") investment in the growth of apprenticeship programs in various industries, including healthcare, construction, transportation and logistics, manufacturing, and information and communications technology; and support increasing demographic diversity and inclusion in apprenticeship among traditionally underrepresented populations.

130.    NUL intends to apply for future contracts with the government.  After working with the ETA for four years, NUL has become a valuable contractor with the government and has gained further expertise in the apprenticeship program.  NUL's contract with the government was extended in 2017, 2018 and 2019.  Despite a positive relationship for almost four years, this September, around the time that the EO 13950 was written and issued, DOL extended the contract only until December 31, 2020 instead of September 20, 2021, as was an option in the contract.

131.    NUL has also received many grant awards from various federal government agencies and expects to continue to apply for and receive federal grants in the future.  Several of NUL's government grants are currently effective.  NUL received a grant from DOL and ETA for $4,626,557 for the period of July 1, 2020 through November 1, 2020.  This grant award was provided under DOL's Senior Community Service Employment Program, which is a program

under the DOL and ETA where grantees provide training for low-income, unemployed seniors to allow them to reenter the workforce.  NUL's funding under this grant program was also recently increased to a total of $11,571,239 for the period beginning on January 1, 2020.  NUL also received a grant under DOL and ETA's H-1B One Workforce Grant Program which provides funds for grantees to develop workforce strategies for middle- to high-skilled H-1B occupations.  NUL recently received a grant from the Department of Commerce of $500,000 for the period of June 1, 2020 until May 31, 2021 to fund NUL's work with their Entrepreneurship Cares Act Assistance. Moreover, NUL has received further funds of $4,500,000 from DOL and ETA under the Young Adult Reentry Partnership for the period of July 1, 2020 through December 31, 2023 wherein NUL uses the funds to provide education and training to young adults who have been involved in the criminal justice system in order to help them reenter the workforce.

132.    NUL's past grants further evidence the organization's continued interest in applying for future grant funds.  NUL previously received a grant for $10,000,000 covering the period from October 27, 2015 through October 26, 2019 under the H-1B Ready to Work Partnership which provides funds for grantees to provide unemployed workers with counseling and training for employment in industries that use H-1B visas to hire foreign workers.  NUL also received an award for $1,800,000 covering the period of October 1, 2017 to September 30, 2020 from the Department of Justice's ("DOJ") Office of Juvenile Justice and Delinquency Prevention under the Juvenile Mentoring Program where grantees provide mentorship programs for youth. During the financial year of 2019, NUL received a grant of $871,183 from the Department of Housing and Urban Development ("HUD") in order for NUL to engage in comprehensive counseling for HUD customers from October 1, 2018 until March 31, 2020.

133.     In order to qualify for the Apprenticeship Contract, NUL was considered a subject matter expert regarding issues of diversity, equity and inclusion.  In keeping with this status, NUL provides external and internal messaging to the public and its own employees regarding the issues of bias and structural racism that are inherent in American institutions and workplaces.  Over the years, NUL has published a variety of external-facing documents that mirror the concepts that NUL communicates internally to its employees.  From discussions on implicit racial biases to the systemic oppression that Black Americans face, NUL employees regularly engage in the discussion of concepts that the Order appears to target.[86]

134.     Fundamental to NUL's current and future work is its conceptual understanding of racism and sexism, especially as roadblocks to diversity and inclusion efforts.  NUL employees operate from an understanding that successful diversity and inclusion efforts must acknowledge and account for systemic racism and sexism in America and that diversity and inclusion efforts require open dialogue around these issues and the space to recognize and name biases consciously and unconsciously held.

135.     Moreover, NUL's diversity and inclusion work specifically aims to counteract the reliance in this country on concepts like "colorblindness" and "meritocracy" as a means to ignore or minimize the historical and ongoing impact of policies and institutions set up for the benefit of a white majority at the expense of people of color.  These concepts—that inform and animate NUL's internal and government-contracted work—have been deemed unacceptable "divisive concepts" under EO 13950, which specifically prohibits all government contractors (such as NUL) from communicating these concepts to their own employees.  The Order thus invades NUL's

---

[86] *See, e.g.*, Marc Morial (President, NUL), *Starbucks Arrests Show "Hidden" Implicit Bias*, HUDSON VALLEY PRESS (April 25, 2018), https://hudsonvalleypress.com/2018/04/25/starbucks-arrests-show-hidden-implicit-bias/.

freedom of speech and unduly interferes with its prerogative to communicate mission-critical ideas and principles to its employees.

136.    NUL has a mutual interest with its employees to ensure diversity and inclusion in its workplace so that all employees, regardless of their race, ethnicity, sex, gender, sexual orientation, or gender identity, feel welcome and valued.  Having a more diverse and inclusive workplace increases employee satisfaction and productivity, produces greater innovation and ideas, and helps NUL better serve its mission overall.  NUL is concerned that EO 13950 will have a detrimental impact on its employees of color, female employees, and LGBTQ employees, who may not be able to challenge the Order themselves.

137.    Because NUL has been considered a subject matter expert in diversity concepts that the Order targets, NUL is less likely to be awarded future contracts or grants due to its visible alignment with (and promotion of) these disfavored concepts.  Notwithstanding NUL's ability and readiness to do so, Enforcement of the Order would mean that NUL will no longer be able to compete for federal grants or contracts on a fair and equitable basis against other organizations whose mission and public statements are less intertwined with promoting racial equality.  Indeed, within days of the Order being released on September 22, 2020, NUL was informed that its current DOL contract would not be extended for a fifth year, despite being previously granted extensions in each of the last four years.

138.    Likewise, NFHA and its members have previously been awarded contracts and grants from the Federal Government.  NFHA contracted with the Department of Housing and Urban Development ("HUD") in 2019 in the Technical Assistance and Capacity Building Program Cooperative Agreement (the "TACBP Contract").  The TACBP Contract is a part of a broader HUD program aimed at procuring and supporting organizations to focus on needs assessments,

capacity-building engagements, maintenance of tools and products used in teaching adults how to understand HUD requirements, data analysis and reporting, Indian Housing Block Grant Allocation Formula rulemaking, administrative activities, coordination of activities, and other learning initiatives and knowledge management initiatives.  The TACBP Contract between HUD and NFHA has a three-year term and is currently set to expire on July 29, 2022.  Under the TACBP Contract, HUD requests that NFHA performs certain services, such as trainings, to HUD and its customers under the direction and oversight of HUD through a work order.  HUD reimburses NFHA for both administrative costs and approved time and expenses under specific work plans.

139.   Over the duration of the TACBP Contract, NFHA conducted several internal trainings for its members regarding diversity and inclusion efforts.  In order to fulfill its mission in an effective manner, NFHA commonly holds trainings and conversations for its members and staff that address issues of systemic racism, unconscious bias, and racial inequities.  Recently, NFHA held informal discussions with its employees concerning systemic racism and perceptions of white people and other demographic groups in connection with the killing of George Floyd.  As an organization focused on preventing housing discrimination and providing underserved populations with equal access to housing opportunities, NFHA will continue to hold similar trainings and discussions with its members and employees in the future.  Indeed, fair housing advocates must use the lessons of history to address the current manifestations of that history; otherwise, they cannot help create a fair and equitable society.  NFHA has also held conversations, discussions, education and outreach events, and trainings with non-profit groups and housing and lending stakeholders, including fair housing organizations, academicians, think tanks, non-profit organizations, financial services institutions, governmental entities, real estate sales groups, and housing industry trade associations on issues of systemic racism, structural inequities, sexism,

unconscious bias, and intersectionality.  Many of these groups include NFHA's members.  These conversations, discussions, education and outreach events, and trainings increased precipitously in the aftermath of the COVID-19 health pandemic and the murder of George Floyd.  Various stakeholders wanted training and information from NFHA on why the nation was experiencing grave disparities related to the COVID-19 pandemic and economic crisis; a better understanding about why residential segregation is still significant in many communities; insights into why racial disparities exist with respect to arrest and conviction rates; information about the intersectionality between segregation and disparate health, housing, credit, and criminal justice outcomes; and help understanding what programs and policies should be implemented to address continuing racial inequities.

140.    NFHA also produces an annual report, Fair Housing Trends, that discusses the major issues related to housing discrimination and equal housing opportunity in the nation.  This report often covers issues like residential segregation and its intersection with structural inequality, environmental injustice, criminal injustice, climate change.  The report often also deals with issues that impact fair housing like implicit or unconscious bias, systemic racism, and sexism.  This report is used by a wide group of stakeholders, including its members and employees.

141.    The Order purports to prohibit private entities from speaking about structural inequalities in America and implicit biases with their employees or member organizations by deeming such subjects "divisive concepts."  Based on its past and future speech, NFHA could face debarment or the loss of future opportunities to compete for federal grants and contracts should it continue to discuss issues of race and inclusion with its members and its employees consistent with its mission and purpose.

142.     NFHA has a mutual interest with its employees to ensure diversity and inclusion in its workplace so that all employees, regardless of their race, ethnicity, sex, gender, sexual orientation, or gender identity, feel welcome and valued.  In fact, having a more diverse and inclusive workplace increases employee satisfaction and productivity, produces greater innovation and ideas, and helps NFHA better serve its mission overall.  NFHA is concerned that EO 13950 might have a detrimental impact on its employees of color, female employees, and LGBTQ employees, who may not be able to challenge the Order themselves.

## CLASS ACTION ALLEGATIONS

143.     Plaintiffs bring this suit on behalf of themselves and, under Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and/or (c)(4), as representatives of the Class defined as follows ("the Class"):

> All persons and entities who contract, bid to contract, or intend to bid to contract with, or who receive or intend to seek to receive federal grant funds from, the United States government or any federal agency, department, or division and who offer or intend to offer "workplace training" or programming concerning racial and/or gender discrimination and/or undertake work intended to examine and dismantle racism and gender discrimination.

Plaintiffs reserve the right to amend the Class definition, including with the use of subclasses, as additional facts become known through discovery.

144.     The members of the Class are so numerous that joinder is impracticable.  Upon information and belief, there are more than 100,000 federal contractors and more than 10,000 federal grantees each year.  All such contractors and grantees are subject to the unlawful Order.

145.     The claims and defenses of Plaintiffs are typical of the claims or defenses of members of the Class.  Plaintiffs' claims arose out of the same events and course of conduct that gives rise to the claims of other members of the Class.  Plaintiffs and all members of the Class are subject to similar harm from the Order now and in the future.

146.   The members of the Class share common issues of fact and law, including but not limited to:

    a.   whether the Order's prohibition of Protected Speech, including trainings, qualifies as unconstitutional viewpoint discrimination in violation of the First Amendment;

    b.   whether the Order's prohibition of Protected Speech, including trainings, is unconstitutionally vague in violation of the Fifth Amendment;

    c.   whether the Order's prohibition of Protected Speech, including trainings, violates the Equal Protection component of the Fifth Amendment's Due Process Clause;

    d.   whether and to what extent Defendants' actions may impair or threaten future activities protected by the First Amendment; and

    e.   what equitable and injunctive relief is warranted.

147.   Plaintiffs will fairly and adequately protect the interests of the proposed Class. Neither Plaintiff has any interest that is now or may later be antagonistic to the interests of the proposed Class. The attorneys representing the Plaintiffs include experienced attorneys who are considered able practitioners in federal civil litigation, including complex litigation and class actions, and they should be appointed class counsel.

148.   Maintaining individual actions would create a risk of "inconsistent or varying adjudications with respect to individual members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Multiple courts issuing multiple injunctions governing the permissible reach and effect of the Order on the Class would

be untenable.  Doing so would only contribute to the existing state of uncertainty and confusion that surrounds the meaning and effect of the Order.

149.    This case involves "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications."  Fed. R. Civ. P. 23(b)(1)(A).  A ruling with respect to a single Plaintiff in this case would arguably be strong stare decisis—if not necessarily res judicata—with respect to the other putative Class members and the federal government's contracting and granting bodies. There is no benefit to allowing the overwhelmingly common issues in this case to be litigated individually.  The interests of both Class members and Defendants requires class-wide treatment.

150.    Defendants have acted or will act on grounds generally applicable to the Class by subjecting them to and purporting to enforce the Order. Injunctive and declaratory relief is therefore appropriate with respect to the Class as a whole.

151.    Questions of law and fact common to members of each Class will predominate over any questions that may affect only individual members because Defendants have acted on grounds generally applicable to members of the Class.

152.    Class treatment is a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated entities to prosecute their common claims in the same forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

153.    A class action is also manageable, and Plaintiffs know of no management difficulties that would preclude class certification in this case.

154.    Plaintiffs reserve the right to seek to certify common questions related to Defendants' knowledge, intent, and actions.

## PLAINTIFFS REQUIRE IMMEDIATE RELIEF

155.    Plaintiffs have standing to challenge the EO 13950 and their claims are ripe for immediate adjudication today.

156.    Plaintiffs have suffered injury-in-fact.  As set forth above, Plaintiffs provide Protected Speech, including workplace training and other communications, containing subjects almost certainly prohibited by the Order.  For example, Plaintiffs' workplace training relies on in-depth discussion of systemic racism, gender and sex discrimination, and implicit biases, which, under the vague definitions of the Order, is considered prohibited "inculcat[ion]" of several "divisive concepts."  Given the existing content of Plaintiffs' Protected Speech, including any workplace training, and their intention to continue expressing the Protected Speech, Plaintiffs are preemptively disqualified from federal contract and grant opportunities.  These "lost contracting [and grant] opportunities" are sufficient to establish injury in fact.  *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003).

157.    Plaintiffs would compete for future federal contracts and/or federal grants absent the unconstitutional censorship of Plaintiffs' Protected Speech.  As set forth above, Plaintiffs competed for and received federal contracts and grants in the past; Plaintiffs provide expertise and services that are beneficial to the government and to disadvantaged communities; and Plaintiffs have actively explored whether they could compete for future federal contracts and/or federal grants consistent with their organizational mission and values.  Notwithstanding Plaintiffs' ability

and readiness to compete for future contracts and/or federal grants, the Order prevents Plaintiffs from doing so.

158.    In addition, the Order burdens Plaintiffs' expressive rights.  As set forth above, the Protected Speech, including any workplace diversity training, is critical to Plaintiffs' respective organizational missions.  But the only way they can continue to compete for and receive federal contracts and/or grants is to refrain from expressing their Protected Speech.  NFHA, in particular, will be required to cease, or substantially modify, its diversity training as of November 21, 2020, when grantees must certify that they will not use federal funds for promoting certain "divisive concepts"—topics that NFHA routinely discusses.

159.    In light of the substantial and imminent constitutional injury, Plaintiffs are left with no choice but to seek immediate judicial relief, including declaratory relief and a preliminary and permanent injunction.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### ULTRA VIRES ACTION IN VIOLATION OF THE FIRST AMENDMENT – VIEWPOINT DISCRIMINATION

1.    Plaintiffs incorporate and re-allege each and every allegation contained above as if fully set forth herein.

2.    Plaintiffs have a cause of action in equity and under the All Writs Act, 28 U.S.C. § 1651, to declare unlawful and to enjoin a Presidential Executive Order or other Presidential action that is ultra vires.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.").

3.      The First Amendment to the United States Constitution prohibits any law that "abridg[es] the freedom of speech."  U.S. CONST. amend. I.

4.      In violation of the First Amendment's protection of speech, President Trump issued EO 13950 to silence viewpoints disliked by his Administration.  *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017).

5.      The Order identifies viewpoints that the Trump Administration dislikes—such as the existence of white privilege, implicit bias, systemic racism, structural inequalities, or intersectional experiences of discrimination—and attempts to purge them from the national conversation by denying benefits, such as government contracts and grants, to private entities like Plaintiffs who expresses speech on these censored topics.

6.      This targeted censorship violates the First Amendment rights of Plaintiffs and the Class by chilling their ability to speak on important issues of diversity and equality without risking the loss of government benefits. *See Agency v. Int'l Dev. v. Alliance for Open Soc'y Int'l Inc.*, 570 U.S. 205 (2013) (holding unconstitutional a statutory provision conditioning funding on organizations expressly opposing prostitution).

7.      Plaintiffs' Protected Speech is protected by the First Amendment in the workplace because they are speaking 1) in their capacity as a private citizen and 2) on matters of public concern.  *Garcetti v. Ceballos*, 547 U.S. 410, 420, 426 (2006); *Umbehr*, 518 U.S. at 669 (treating employees and contractors the same).

8.      The Trump Administration is not permitted to ban Plaintiffs' Protected Speech because their interests "in a broad range of present and future expression" are not "outweighed by that expression's 'necessary impact on the actual operation' of the Government," *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 468 (1995), and EO 13950 is not "tailored to

address the harm that the government allegedly aims to protect," *Sanjour v. E.P.A.*, 56 F.3d 85, 97 (D.C. Cir. 1995).

9.      A Presidential Executive Order issued in violation of the U.S. Constitution is *ultra vires* and therefore void.

10.      EO 13950 unlawfully restricts speech on matters of public concern and public welfare, which is entitled to the highest protection in our constitutional system.  The Order was intended to have, is having, and will likely continue to have, the effect of chilling constitutionally protected speech on issues of racial and gender equality as well as efforts to reckon with historical systems of oppression in order to shape a more just and fair society.

11.      As alleged above, EO 13950, on its face and as applied to Plaintiffs, unconstitutionally infringes or imminently threatens to infringe Plaintiffs' rights under the First Amendment to the United States Constitution.

12.      Plaintiffs have been and will be irreparably harmed by President Trump's ultra vires EO 13950 issued in violation of the First Amendment and have no adequate remedy at law.

**SECOND CLAIM FOR RELIEF**

**VIOLATION OF THE FIFTH AMENDMENT – VOID FOR VAGUENESS**

13.      Plaintiffs incorporate and re-allege each and every allegation contained above as if fully set forth herein.

14.      Under the Fifth Amendment to the United States Constitution, a federal law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008); ); *see also* U.S. CONST. amend. V.  EO 13950 fails on both fronts.

15.     EO 13950 fails to provide fair notice of what conduct it requires from the Plaintiffs. The Order prohibits "workplace training" that "inculcates" in employees certain "divisive concepts," but it does not adequately define "workplace training," "inculcates," or many of the "divisive concepts," among other terms.  EO 13950 provides no way to reasonably discern the line between "discussing" a divisive concept on the one hand, and impermissibly "inclucat[ing]" that concept on the other.  The failure to define this subjective term, among others, renders EO 13950 essentially meaningless.

16.     EO 13950 also fails to provide any explicit, objective standards for enforcement. Section 4, for example, directs the Department of Labor to "investigate complaints" and "take appropriate enforcement action and provide remedial relief, as appropriate" in response to violations.  EO 13950 Sec. 4.  There are no standards to guide what is and what is not a violation. As a result, the Department of Labor has unfettered discretion to enforce EO 13950 as it sees fit, including by terminating the federal contracts and/or grants of organizations committed to diversity and inclusion, or preventing them from competing for contracts and/or grants in the first place.   EO 13950 thus encourages and sanctions arbitrary, subjective, and discriminatory enforcement.

17.     The absence of explicit, objective standards in EO 13950, coupled with the Department of Labor's unfettered discretion to enforce the Order, have, is having, and will likely continue to have the effect of chilling constitutionally protected speech on issues of racial and gender equality as well as efforts to reckon with historical systems of oppression in order to shape a more just and fair society.

18.     For all these reasons, and as set forth elsewhere in this Complaint, EO 13950 is unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

### THIRD CLAIM FOR RELIEF

### FIFTH AMENDMENT – VIOLATION OF EQUAL PROTECTION CLAUSE

19.    Plaintiffs incorporate and re-allege each and every allegation contained above as if fully set forth herein.

20.    The Equal Protection component of the Fifth Amendment's Due Process Clause guarantees persons the equal protection of the laws and prohibits the government from treating persons differently—on the basis of their race, religion, national origin, or alienage—than similarly situated individuals. *Sessions v. Morales*, 137 S. Ct. 1678, 1686 n.1 (2017); *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013); *Bolling v. Sharpe*, 347 U.S. 497 (1954).

21.    Race and sex-based discrimination against individuals who are people of color, women, and/or LGBTQ were a substantial or motivating factor behind the issuance of EO 13950, in violation of the Fifth Amendment.

22.    The inference of a race and sex-based discriminatory motive is supported by several factors.

23.    President Trump's multiple false statements maligning speech and viewpoints that acknowledge the history and persistence of discrimination evince a discriminatory motive.

24.    EO 13950's prohibitions on topics, including systemic race and sex discrimination, implicit race and sex biases, and the persistent harms associated with systemic discrimination and implicit biases, penalizes employers seeking to eradicate discrimination in the workplace and to ensure a hostility-free work environment for people of color, women, and/or LGBTQ individuals.

25.    The Trump Administration has engaged in procedural and substantive departures in the course of its issuance, resulting in substantive irregularities, which are indicative of its discriminatory intent.

26.     Although maximizing efficiency and economy in the workplace are noted as motivating reasons for the issuance of EO 13950, the Order actually undermines these goals because employers counteracting the effects of implicit biases, structural inequalities, systemic discrimination, and racial/gender privileges and hierarchies maximize the potential, productivity, and economy of their workforce.

27.     The historical background of the Order evinces its "invidious purpose" of silencing viewpoints inconsistent with those of the Trump Administration and advancing a revisionist history that denies the enduring effects of the historic subjugation of people of color, women, and/or LGBTQ individuals to the detriment of those persons.

28.     Moreover, the specific sequence of events leading up to the issuance of the Order illustrate its intention to continue the Trump Administration's efforts to deny the historic and persistent discrimination experienced by people of color, women, and/or LGBTQ community in our society.

29.     Finally, the Trump Administration's cancellation of trainings in response to EO 13950 has established a clear pattern of targeting trainings and other speech that addresses and discusses concepts pertaining to systemic discrimination and structural inequalities.

30.     Taken together, the false statements made about the Order's prohibited speech; the inconsistency between the Order's stated goals for workforce economy and efficiency and opposite actual effect; the foreseeable certainty of its disparate impact on people of color, women, and/or LGBTQ individuals; the Order's procedural and substantive departures; the Order's historical background and the sequence of events preceding its issuance; and the Trump Administration's clear pattern of cancelling trainings that address and discuss issues pertaining to systemic discrimination and structural inequalities against people of color, women, and/or LGBTQ

individuals, all indicate an intent to discriminate on the basis of race, national origin, sex, and/or gender.

31.     The Trump Administration's stated justifications and policy rationales for EO 13950 are pre-textual and meant to obfuscate its impermissible discriminatory purpose.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that the Court grant the following relief:

A.      A declaration pursuant to 28 U.S.C. § 2201 that EO 13950 is unlawful and invalid.

B.      A permanent injunction enjoining Defendant, his officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing any part of EO 13950;

C.      An order awarding Plaintiff cost of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law; and

D.      Such other relief as this Court deems equitable, just, and proper.

Dated:   October 29, 2020

Respectfully submitted,

/s/ Samuel Spital
Sherrilyn Ifill*
     *Director-Counsel*
Janai Nelson*
Samuel Spital, Bar ID NY0248
     *Counsel of Record*
Jin Hee Lee**
Monique Lin-Luse**
Amber Koonce**
**NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.**
40 Rector St., 5th Floor
New York, NY 10006
Tel.: (212) 965-2200
Fax.: (212) 226-7592
sspital@naacpldf.org

Ajmel Quereshi, Bar ID 1012205
**NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.**
700 14th Street N.W., Ste.600
Washington, DC 20005
Tel: (202) 682-1300

*admission to the D.D.C. forthcoming*
**pro hac vice application forthcoming*