## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL URBAN LEAGUE,
*et al.*,

                Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

                Defendants.

Civil Action No. 1:20–cv–03121–APM

## DEFENDANTS' MOTION TO DISMISS

Defendants Donald J. Trump, the President of the United States; Eugene Scalia, the Secretary of Labor; and the U.S. Department of Labor (collectively, "Defendants") respectfully move the Court to dismiss this action pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. In support of this Motion, Defendants submit the accompanying memorandum of law.  A proposed order is attached hereto.

DATED:  December 29, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

BRAD P. ROSENBERG
CARLOTTA P. WELLS
Assistant Branch Director

/s/ Elliott M. Davis
ZACHARY A. AVALLONE
(D.C. Bar No. 1023361)
ELLIOTT M. DAVIS
(N.Y. Reg. No. 4596755)
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC  20005
Phone:   (202) 353-5639
Fax:       (202) 616-8470
E-mail:  elliott.m.davis@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL URBAN LEAGUE,
*et al.*,

                    Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

                    Defendants.

Civil Action No. 1:20–cv–03121–APM

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

BACKGROUND .......................................................................................................................2

ARGUMENT ............................................................................................................................6

I.    THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER THIS
      ACTION BECAUSE PLAINTIFFS LACK STANDING AND THEIR CLAIMS
      ARE UNRIPE .................................................................................................................6

      A.    Plaintiffs' "Some Day" Intentions Do Not Suffice To Maintain an Article
            III Case or Controversy .......................................................................................8

      B.    Plaintiffs Lack Standing To Assert a Void-For-Vagueness Claim for Two
            Additional Reasons ............................................................................................11

      C.    Plaintiffs' Equal Protection Clause Claim Is a Generalized Grievance .................12

II.   PLAINTIFFS FAIL TO STATE A SINGLE CLAIM AS A MATTER OF LAW ..........13

      A.    Plaintiffs Fail To State a First Amendment Claim ...................................................13

      B.    Plaintiffs Fail To State a Void-For-Vagueness Claim ...........................................19

      C.    Plaintiffs Fail To State an Equal Protection Clause Claim ....................................24

CONCLUSION.........................................................................................................................26

## INTRODUCTION

"It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (plurality opinion). To that end, the federal government has long required federal contractors and grantees to abide by certain anti-discrimination mandates. *See, e.g.*, 42 U.S.C. § 2000d (Title VI); 20 U.S.C. § 1681(a) (Title IX); Exec. Order 11246, 30 Fed. Reg. 12,319 (Sept. 24, 1965), as amended. Executive Order 13950 furthers this goal. While workplace training that "perpetuates racial stereotypes and division . . . may be fashionable in the academy," "they have no place in programs and activities supported by Federal taxpayer dollars." Exec. Order No. 13950, 85 Fed. Reg. 60,683, 60,684 (Sept. 28, 2020).

Plaintiffs—two non-profit corporations—do not allege that they are currently bound by the Executive Order's restrictions. And their abstract allegations that they would like to be federal contractors and grantees in the future (such that they might later become bound by the Order's restrictions) are the precise type of "'some day' intentions" that the Supreme Court has held do not suffice to establish standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992).

Even assuming Plaintiffs could surmount that jurisdictional hurdle, they have failed to state a claim. Plaintiffs complain that the Executive Order would circumscribe the contents of their workplace training. The Supreme Court, however, has made clear that by accepting federal funds, federal contractors and grantees acquiesce to the conditions of their contracts or grants, including applicable restrictions on their speech. Those restrictions, to be sure, are not without limit. But, as explained below, the Executive Order's restrictions fall well within the Constitution's boundaries.

For these reasons, the Court should dismiss this action.

**BACKGROUND**

On September 22, 2020, the President signed Executive Order 13950 "in order to promote economy and efficiency in Federal contracting, to promote unity in the Federal workforce, and to combat offensive and anti-American race and sex stereotyping and scapegoating." Exec. Order No. 13950, 85 Fed. Reg. 60,683 (Sept. 28, 2020) (the "Order" or "EO"); *see* 40 U.S.C. §§ 101, 121(a) (the President has the power to "prescribe policies and directives . . . necessary to carry out" an "economical and efficient system for" procurement). The Order declares that "it shall be the policy of the United States not to promote race or sex stereotyping or scapegoating in the Federal workforce or in the Uniformed Services, and not to allow grant funds to be used for these purposes. In addition, Federal contractors will not be permitted to inculcate such views in their employees." EO § 1.

The Order expressly states that it "does not prevent agencies, the United States Uniformed Services, or contractors from promoting racial, cultural, or ethnic diversity or inclusiveness." *Id.* § 10(a). But training that "perpetuates racial stereotypes and division" has "no place in programs and activities supported by Federal taxpayer dollars." *Id.* § 1. To effectuate the policy, the Order issues distinct directives regarding (1) government training, (2) government information gathering, (3) review of federal grant programs, (4) government contracts, and (5) Title VII guidance.

*1. Government Training.* The Order prohibits the United States Uniformed Services from training its own members to believe certain defined "divisive concepts," and similarly directs heads of federal agencies to ensure that agency trainings of their own employees, whether provided by agency employees or contractors, do not teach the divisive concepts. *Id.* §§ 3, 6. As applied to government training, the term "divisive concepts" incorporates nine concepts, such as "one race or sex is inherently superior to another race or sex," "the United States is fundamentally racist or sexist," and "an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously." *Id.* § 2(a).

2

The term "divisive concepts" also "includes any other form of race or sex stereotyping or any other form of race or sex scapegoating." *Id.* "Race or sex stereotyping" means "ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex." *Id.* § 2(b). And "race or sex scapegoating" means "assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex" and also "encompasses any claim that, consciously or unconsciously, and by virtue of his or her race or sex, members of any race are inherently racist or are inherently inclined to oppress others, or that members of a sex are inherently sexist or inclined to oppress others." *Id.* § 2(c). Nothing in the Order categorically prohibits training that incorporates concepts like "unconscious bias" or "intersectionality." The question is whether such training promotes a "divisive concept" like race or sex stereotyping or scapegoating, all as defined in the Order.

The Order further directs the Office of Personnel Management (OPM) to review and preclear any training programs that an agency wants to use relating to diversity or inclusion to ensure compliance with the Order. *Id.* § 7(a).

*2. Government Information Gathering.* The Order directs agencies to collect information about trainings that have been conducted within federal agencies and government contractors. Each agency must "report to OMB [the Office of Management and Budget] all spending in Fiscal Year 2020 on Federal employee training programs relating to diversity or inclusion." *Id.* § 7(c). Pursuant to the Order, the Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) published a request for information about trainings provided by federal contractors. *Id.* § 4(c); "Request for Information; Race and Sex Stereotyping and Scapegoating," 85 Fed. Reg. 67,375 (Oct. 22, 2020) ("RFI").

*3. Review of Federal Grant Programs.* The Order directs agencies to "review their respective grant programs and identify programs for which [they] may . . . require the recipient to certify that it will

not use Federal funds to promote" certain divisive concepts.  EO § 5.  Agencies must "submit a report to the Director of the [OMB] that lists all grant programs so identified."  *Id.*  The Order does not direct any changes to current or future grants or grant programs.

*4. Government Contracts.*  The Order instructs agencies to include in most government contracts entered into after November 21, 2020, certain contractual language providing that during the performance of the contract, the contractor agrees "not [to] use any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating."  EO § 4(a)(1).  The phrases "race or sex stereotyping" and "race or sex scapegoating" are defined as they are in the government-training section, and include all of the divisive concepts except for the concept that "the United States is fundamentally racist or sexist."  *Compare id. with id.* §§ 2(a)–(c).  The Order also directs contractors to include the contractual language in certain subcontracts or purchase orders. *Id.* § 4(a)(4).

The Order's contractual language does not prevent the contractor from promoting divisive concepts or race or sex stereotypes to the contractor's employees in contexts other than workplace training, and it does not restrict contractor employees from expressing their personal views in the workplace (though certain types of such expression could potentially violate other federal laws).  Nor does the Order's contractual language restrict contractors or their employees from expressing their views outside of the workplace such as in public remarks, newspaper articles, social media, or *amicus* briefs.

The Order further directs the Department of Labor to set up a hotline to collect and investigate complaints alleging that a federal contractor uses training programs prohibited by the Order.  *Id.* § 4(b).

*5. Title VII Guidance.*  The Order instructs the Attorney General to "continue to assess the extent to which workplace training that teaches the divisive concepts . . . may contribute to a hostile

work environment and give rise to potential liability under Title VII." *Id.* § 8.  And the Attorney General and Equal Employment Opportunity Commission are, if appropriate, to "issue publicly available guidance" related to compliance with Title VII of the Civil Rights Act of 1964.  *Id.*

\*     \*     \*

Plaintiffs National Urban League and National Fair Housing Alliance are non-profit corporations.  Doc. 1 ("Compl.") at 6–7 ¶¶ 17, 18.  Each Plaintiff alleges that it is party to a single current federal contract.  *See id.* at 42–43 ¶ 128 (National Urban League's Apprenticeship Contract); *id.* at 46–47 ¶ 138 (National Fair Housing Alliance's Technical Assistance and Capacity Building Program Cooperative Agreement).  And each Plaintiff alleges that it "seeks to be in the future a federal contractor," *id.* at 6–7 ¶¶ 17–18, but neither Plaintiff identifies any impending federal contract for which they would be qualified, on which they would bid, and which would be subject to the Executive Order.  Each Plaintiff similarly alleges that it has previously been awarded federal grants, *see id.* at 43–44, 46–47 ¶¶ 131, 138,  and "seeks to be in the future a . . . federal grant recipient," *id.* at 6–7 ¶¶ 17–18, but neither Plaintiff identifies any impending federal grant for which they would be qualified, to which they would apply, and which would be subject to the Executive Order.

Plaintiffs filed their Complaint on October 29, 2020, on behalf of themselves and a putative class.  *See generally* Compl.  They allege that their "workplace training . . . contain[s] subjects almost certainly prohibited by the Order" and that they are thus "preemptively disqualified from federal contract and grant opportunities."  *Id.* at 52 ¶ 156.  They name as Defendants President Donald J. Trump, in his official capacity; Secretary of Labor Eugene Scalia, in his official capacity; and the U.S. Department of Labor, and assert three claims for relief:  (i) a claim for First Amendment viewpoint discrimination; (ii) a void-for-vagueness claim under the Fifth Amendment; and  (iii) an Equal Protection Clause claim under the Fifth Amendment.  *See id.* at 53–59 ¶¶ 1–31.  Plaintiffs seek, among other things, a declaration that the entire Executive Order "is unlawful and invalid" and an "injunction

enjoining Defendant[s] . . . from implementing or enforcing any part of EO 13950." *See id.* at 59 ¶¶ A–D.

## ARGUMENT

This action should be dismissed for two independent reasons.  Initially, Plaintiffs have not carried their burden of establishing the Court's subject-matter jurisdiction.  And even assuming *arguendo* that the Court could entertain this action, Plaintiffs fail to state a single claim as a matter of law.  Accordingly, this action should be dismissed under Federal Rules of Civil Procedure 12(b)(1) or 12(b)(6).[1]

## I.      THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER THIS ACTION BECAUSE PLAINTIFFS LACK STANDING AND THEIR CLAIMS ARE UNRIPE

Plaintiffs "bear[] the burden of invoking the [C]ourt's subject matter jurisdiction, including establishing the elements of standing." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).  "[S]tanding is assessed at the time of filing." *Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012).  "To establish standing at the motion to dismiss stage, the plaintiff must state a plausible claim that she has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Fryshman v. U.S. Comm'n for Preservation of America's Heritage Abroad*, 422 F. Supp. 3d 1, 5 (D.D.C. 2019) (Mehta, J.).[2]

---

[1]      Defendants note that a district court in the Northern District of California has preliminarily enjoined two sections of the Executive Order.  *See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, No. 20–cv–07741, 2020 WL 7640460 (N.D. Cal. Dec. 22, 2020).  Defendants respectfully submit that the *Santa Cruz* court did not correctly decide the preliminary-injunction motion and, in all events, the standing evidence that the plaintiffs in that action proffered was far more extensive than the threadbare allegations advanced by Plaintiffs' Complaint in this case.

[2]      Unless expressly included, all internal quotation and alteration marks and citations have been omitted.

"When ruling on a Rule 12(b)(1) motion in which the defendant challenges the plaintiff's standing to assert a claim, a federal court must presume that it lacks jurisdiction unless the contrary appears affirmatively from the record." *Gerber Prods. Co. v. Perdue*, 254 F. Supp. 3d 74, 79 (D.D.C. 2017) (Mehta, J.). "Even on a motion to dismiss, 'standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record . . . . It is the burden of the party who seeks the exercise of jurisdiction in his favor, clearly to allege facts demonstrating that he is the proper party to invoke judicial resolution of the dispute.'" *Equal Rights Ctr. v. Hilton Hotels Corp.*, No. 07–cv–1528, 2009 WL 6067336, at *2 (D.D.C. Mar. 25, 2009) (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)). And Plaintiffs "must establish standing for each claim [they] seek[] to press and for each form of relief that is sought." *Gerber Prods. Co.*, 254 F. Supp. 3d at 79.

The Court's standing inquiry here is more rigorous than in most other cases, for two reasons. *First*, Plaintiffs "bear[] a more rigorous burden to establish standing" because they "rest [their] claims for declaratory and injunctive relief on predicted *future* injury." *Arpaio*, 797 F.3d at 21 (emphasis added). *Second*, "the [C]ourt's standing inquiry" is also "especially rigorous" "[b]ecause reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Comm. On the Judiciary of the U.S. House of Representatives v. McGahn*, 968 F.3d 755, 763 (D.C. Cir. 2020) (en banc).

Plaintiffs have not satisfied their doubly rigorous burden because they have not come close to demonstrating an essential element of standing: an injury in fact. *See Gerber Prods. Co.*, 254 F. Supp. 3d at 80. "An injury in fact is an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* "Plaintiff[s] must show [they are] suffering an ongoing injury or face[] an *immediate* threat of injury." *Id.* (emphasis altered). "A potential future injury must be 'certainly impending'; the mere possibility of such injury is not enough." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10 (2013)). "Although

'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is '*certainly* impending.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992) (emphasis in original).

For this same reason, Plaintiffs' claims are not ripe. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). *See also DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 298 (D.C. Cir. 1989) ("[S]tanding and ripeness theories often merge so closely that there is no reason to attempt separation."); *cf. MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007) ("The justiciability problem that arises, when the party seeking declaratory relief is himself preventing the complained-of injury from occurring, can be described in terms of standing . . . or in terms of ripeness . . . .").

### A.      Plaintiffs' "Some Day" Intentions Do Not Suffice To Maintain an Article III Case or Controversy

Plaintiffs lack standing because they neither allege that they are a party to any existing contract that contains the challenged restrictions nor identify any contract on which they would bid or any grant to which they would apply, but for the Executive Order.  For the same reasons, all of Plaintiffs' claims are unripe.

The relevant question for standing and ripeness is whether Plaintiffs "ha[ve] made an adequate showing that sometime in the relatively near future [they] will bid on another Government contract" or grant.  *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995).  After all, "'some day' intentions— without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that [the Supreme Court's] cases require."  *Lujan*, 504 U.S. at 564 (emphasis in original).

Though Plaintiffs identify certain existing contracts and grants in their complaint, *see* Compl. at 42–48, ¶¶ 128, 129, 131, 138, they do not allege that any of those contracts or grants contain the

restrictions from the Executive Order.  Indeed, the Order directs that the contracting provisions are to be inserted into most government contracts entered into after November 21, 2020, *see* EO §§ 4, 9—more than three weeks after Plaintiffs filed their Complaint.  *See also* Compl. at 23 ¶ 69 ("OFCCP also instructed that EO 13950 applies to contracts entered into or modified after November 21, 2020.").  And although Plaintiffs allege that Plaintiff NFHA "will be required to cease, or substantially modify, its diversity training" on November 21, 2020, "when grantees" supposedly "must certify that they will not use federal funds for promoting certain 'divisive concepts,'" Compl. at 53 ¶ 158, Plaintiffs misread the Order.  The Court need not accept as true allegations that are contradicted by documents attached to or incorporated into the Complaint, *see Gilliam v. U.S. Dep't of Justice,* 128 F. Supp. 3d 134, 145 (D.D.C. 2015) (Mehta, J.), and as explained above, the Order does not direct any changes to current or future grants or grant programs.  Rather, the November 21, 2020, date identified by Plaintiffs is the date by which "the heads of agencies" were obligated "to submit a report to the Director of the Office of Management and Budget" listing grant programs that they identified pursuant to section 5 of the Order.  EO § 5.  The Order imposes no November 21, 2020, certification obligation on Plaintiffs.

Plaintiffs also do not allege any concrete plans to bid on or apply for future contracts or grants that would be subject to restrictions described in the Order.  Nor do they specifically identify any such future contracts or grants on which they would bid or to which they would apply, but for the Executive Order.  Rather, each Plaintiff generically alleges that it "has been, is and seeks to be in the future a federal contractor and federal grant recipient."  Compl. at 7 ¶¶ 17, 18; *see also id.* at 42 ¶ 130 ("NUL intends to apply for future contracts with the government."); *id.* at 43 ¶ 131 (NUL "expects to continue to apply for and receive federal grants in the future.").  That is not good enough.

Plaintiffs' allegations, or lack thereof, stand in stark contrast to the evidence offered in *Adarand*. In *Adarand*, the Supreme Court found that the plaintiff contractor had standing to challenge future

contract conditions based on evidence that:  (i) the subject Colorado guardrail contracts with the offending clause were likely to be offered "at least once per year," and (ii) the contractor offered testimony that it "bids on every guardrail project in Colorado."  515 U.S. at 212.  Here, however, Plaintiffs have not alleged how often the Government offers contracts or grants for which they would be qualified and on which they would bid or apply.

The opinion in *Ah Chong v. McManaman*, Civ. No. 13–00663, 2014 WL 1366181 (D. Haw. Apr. 4, 2014), is instructive.  In *Ah Chong*, the plaintiff—a licensed foster-care provider—sought an injunction obligating Hawaii "to provide adequate maintenance payments to foster parents." *Id.* at *1. Although the plaintiff was not currently receiving foster-care maintenance payments, *see id.* at *3, she argued that her extant foster-care license, her history of caring for an average of five foster children per year for several decades, and her testimony that she would accept a foster-care placement as soon as Hawaii's Department of Human Services (DHS) offered her a suitable child, sufficed "to establish standing based on a likelihood of future injury." *Id.* at *4.

Distinguishing *Adarand*, the district court granted the defendant's motion to dismiss for lack of standing.  "Although Plaintiff is currently eligible to care for foster children, she is not obligated to accept, nor does she accept, every placement DHS offers her." *Ah Chong*, 2014 WL 1366181, at *5. And "[t]here is no objective evidence in the current record that it is likely that DHS will offer Plaintiff an appropriate placement." *Id.*  Because "Plaintiff has not pled that it is objectively likely that she will suffer future injury of the type alleged in the Complaint . . . Plaintiff does not have standing to bring the claim alleged in the Complaint." *Id.*  So, too, here. *See also, e.g.*, *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 495 (3d Cir. 1999) (finding no standing and distinguishing *Adarand*:  "In evaluating Schurr's evidence of imminent harm, we are also mindful of what is *not* in the record.  There is no evidence of how frequently jobs for which Schurr is qualified become available.") (emphasis in original).

Because Plaintiffs have not alleged with any level of specificity that, but for the Executive Order, they would bid on or apply for a particular federal contract or grant that is subject to the Order's restrictions, their Complaint should be dismissed as unripe and for lack of standing.

**B.      Plaintiffs Lack Standing To Assert a Void-For-Vagueness Claim for Two Additional Reasons**

In addition to the standing deficiencies associated with all of their claims, Plaintiffs do not have standing to assert a void-for-vagueness claim for two additional reasons.  *First*, Plaintiffs that "engage in clearly proscribed conduct . . . lack standing to assert a vagueness claim."  *Blum v. Holder*, 744 F.3d 790, 799 n.14 (1st Cir. 2014); *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) ("[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."); *accord Hodge v. Talkin*, 799 F.3d 1145, 1172 (D.C. Cir. 2015).  Plaintiffs can hardly claim that they are injured by any supposed vagueness inherent in the Executive Order as they allege that their trainings fall squarely within the scope of activities prohibited by the Executive Order.  Indeed, Plaintiffs affirmatively allege that they "provide . . . workplace training . . . containing subjects almost certainly prohibited by the Order" and, because they "inten[d] to continue" such workplace trainings, they "are preemptively disqualified from federal contract and grant opportunities."  Compl. at 52 ¶ 156.

*Second*, any "injury" caused by the Executive Order's supposed vagueness is self-inflicted because they have not alleged they have requested clarification about any allegedly vague terms. Indeed, the October 22, 2020, RFI, which Plaintiffs reference in (and thus incorporate into) their Complaint, *see* Compl. at 23 ¶ 70 & n.33,[3] explained that:  (i) "federal contractors and subcontractors questioning whether their workplace trainings, workshops, or similar programs are compliant with

---

[3]      "On a motion to dismiss, the court may consider," *inter alia*, "documents . . . incorporated by reference in the complaint."  *Doe v. Am. Univ.*, No. 19–cv–03097, 2020 WL 5593909, at *6 (D.D.C. Sept 18, 2020) (Mehta, J.).

Executive Order 13950 . . . are encouraged to voluntarily submit information and materials in response to this request for information"; and (ii) "OFCCP will provide compliance assistance as requested to Federal contractors and subcontractors that voluntarily submit such information or materials." 85 Fed. Reg. at 67,377.  To the extent that Plaintiffs believed that the Order "fails to provide fair notice of what conduct it requires from the Plaintiffs," Compl. at 56 ¶ 15; *but see id.* at 52 ¶ 156, all Plaintiffs had to do was ask.

Plaintiffs' "claimed confusion . . . is, in a sense, of [their] own making." *Gerber Prods. Co.*, 254 F. Supp. 3d at 81.  As this Court has explained in *Gerber Products*, "[i]f a plaintiff can easily remedy . . . purported harm by seeking clarification from an agency, but has not done so, then the plaintiff cannot claim to suffer from an injury of fact for purposes of standing." *Id.* (citing *Nat'l Family Planning & Reproductive Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006)).  Because Plaintiffs here have "'chosen to remain in the lurch, [they] cannot demonstrate an injury sufficient to confer standing.'" *Id.* (quoting *Nat'l Family Planning & Reproductive Health Ass'n, Inc.*, 468 F.3d at 831). If Plaintiffs were unsure about whether their workplace trainings violated the Executive Order, the appropriate recourse was to submit them pursuant to the RFI and get a definitive answer from the Department of Labor, not file a lawsuit seeking to strike down the entire Executive Order by claiming it is unconstitutionally vague.

### C.    Plaintiffs' Equal Protection Clause Claim Is a Generalized Grievance

Plaintiffs lack standing to bring a claim under the Equal Protection Clause because they have not personally been injured by any supposed race- or sex-based discrimination, and thus assert only a generalized grievance that does not suffice to generate standing.  "The rule against generalized grievances applies with as much force in the equal protection context as in any other." *United States v. Hays*, 515 U.S. 737, 743 (1995).  "[E]ven if a governmental actor is discriminating on the basis of race,

the resulting injury accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." *Id.* at 743–44.

Plaintiffs do not allege any particular injury resulting from any supposed race- or sex-based discrimination. To the contrary, their grievance is so generalized that they seek to represent a class of over 100,000 federal contractors and grantees, who supposedly "are subject to similar harm from the Order." Compl. at 49 ¶¶ 144–145. Plaintiffs accordingly lack standing to bring their Equal Protection Clause claim.

## II.   PLAINTIFFS FAIL TO STATE A SINGLE CLAIM AS A MATTER OF LAW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* Likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.*

Even assuming *arguendo* that the Court has subject-matter jurisdiction over this action, Plaintiffs fail to adequately state a single claim, and thus all of their claims should be dismissed as a matter of law pursuant to Federal Rule of Civil Procedure 12(b)(6).

### A.   Plaintiffs Fail To State a First Amendment Claim

Even assuming all allegations in the Complaint are true, Plaintiffs have not alleged a valid First Amendment Claim. The First Amendment does not apply to regulations of the government's own

13

training because "[t]he Free Speech Clause . . . does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009).  Although the Order itself places no restrictions on grants, even if the government were to implement the policy of not "allow[ing] grant funds to be used" to promote divisive concepts, *see* EO § 1, the government would be entitled to do so, as long as any speech restrictions do not extend beyond the scope of the grant program.  *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("*USAID*").  As to government-contractor speech, the Supreme Court squarely held in *Board of County Commissioners v. Umbehr* that restrictions on government-contractor speech are governed by the *Pickering* balancing test.  518 U.S. 668, 672–73 (1996) (holding that "the *Pickering* balancing test, adjusted to weigh the government's interests as contractor rather than as employer, determines the extent of their protection") (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)).  While the "government cannot restrict the speech of the public at large just in the name of efficiency, . . . where the government is employing someone [or contracting] for the very purpose of effectively achieving its goals, such restrictions may well be appropriate." *Waters v. Churchill*, 511 U.S. 661, 675 (1994).  The Order readily satisfies these standards.

   *1. Government Training.*  Plaintiffs cannot assert a First Amendment claim based on the government's training of its own employees.  "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove*, 555 U.S. at 467.  "A government entity has the right to speak for itself, [i]t is entitled to say what it wishes, and to select the views that it wants to express." *Id.* at 467–68.  In this context, the government has the freedom to choose the content of its own trainings—and that right does not change just because the government sometimes hires third parties to conduct those trainings: "A government entity may exercise this same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message." *Id.* at 468.  Plaintiffs cannot dictate the

government's message and thus have no First Amendment claim arising from the government's own training.

*2. Government Information Gathering.*  Plaintiffs do not argue that the government's collection of information about agency or contractor trainings violates the First Amendment.  And they would have no basis to challenge this information gathering in any event.  *See Laird v. Tatum*, 408 U.S. 1, 10 (1972) (rejecting First Amendment claim based on "the mere existence, without more, of a governmental investigative and data-gathering activity").

*3. Grant Recipients.* The Order does not restrict how grant recipients may use their funds.  The Order simply instructs agencies to "*review* their respective grant programs and *identify* programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use Federal funds to promote" certain of the divisive concepts.  EO § 5 (emphases added).  The Order directs agencies to submit the compiled lists to the OMB Director.  *Id.*  Plaintiffs do not explain how the mere review and identification of certain grant programs could violate the First Amendment.

Even if agencies eventually require grant recipients to certify that federal funds will not be used to promote certain divisive concepts, that type of restriction would be constitutional because the government has broad authority to place conditions on how grant recipients use federal funds.  *USAID*, 570 U.S. at 214.  "As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights."  *Id.* (citing *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 212 (2003) and *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 546 (1983)).  "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time

funding an alternative program which seeks to deal with the problem in another way." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991).

When a grant condition compels or prohibits a grantee's speech "outside the scope of the federally funded program," it violates "the First Amendment and cannot be sustained." *USAID*, 570 U.S. at 219 & 221.  But when "regulations [do] not 'prohibit the recipient from engaging in the protected conduct outside the scope of the federally funded program,' they [do] not run afoul of the First Amendment." *Id.* at 217 (quoting *Rust*, 500 U.S. at 193).  In other words, the constitutional line is that the government may only control what its money is spent to support—not speech that goes beyond the use of federal funds.  The Supreme Court, for example, upheld regulations that prohibited the use of Title X funds in any program where "abortion is a method of family planning" because "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." *Rust*, 500 U.S. at 193–94.  Those limitations did not violate the First Amendment because they did not "prohibit[] the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Id.* at 197.  While there are some limits to this principle, they do not apply here.  *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548–49 (2001) (condition on funding for legal services violated separation of powers when it blocked attorneys from challenging constitutionality of statutes); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (when government funds a limited public forum, conditions cannot discriminate based on viewpoint).  Here, the Order declares that "the policy of the United States" is that "grant *funds*" should not be used to promote race or sex stereotyping or scapegoating.  EO § 1 (emphasis added).  Per *USAID* and *Rust*, a restriction limited to the use of grant funds would pass constitutional muster.

*4. Government Contractors.* The government's power to regulate its contractors' speech is broader than its power to regulate grant recipients' speech and is generally coextensive with its power over the speech of federal employees.  *See Umbehr*, 518 U.S. at 673; *Wagner v. Fed. Election Comm'n*, 793 F.3d 1,

7 (D.C. Cir. 2015) (*en banc*) (the government "has greater latitude to restrict the expression of both employees and government contractors than it does with respect to the general public"). When analyzing First Amendment challenges made by government contractors, courts are required to strike a "balance between the interests of the [government contractor], in commenting upon matters of public concern and the interest of the State, . . . in promoting the efficiency of the public services it performs through its [contractors]." *Pickering*, 391 U.S. at 568; *Umbehr*, 518 U.S. at 673.

The *Pickering* balancing test proceeds in two steps: first, a court must determine "whether the [contractor] spoke as a citizen on a matter of public concern"—if it does not, there is no "First Amendment cause of action" and the inquiry ends. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). But even if it does, the government "has broader discretion to restrict speech when it acts in its role as employer"—or as a contractor—"but the restrictions it imposes must be directed at speech that has some potential to affect the [contractor's] operations." *Id.*; *Umbehr*, 518 U.S. at 673.

The Court need not proceed past the first *Pickering* step because the speech at issue is not made as a private citizen. The Supreme Court made clear in *Garcetti* that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. Thus, "even if the Court accepts [a plaintiff's] assertion that [his speech] addressed a public interest," dismissal is appropriate when the plaintiff "failed to establish that his [speech] was made in his capacity as a private citizen." *Jangjoo v. Broad. Bd. of Governors*, 244 F. Supp. 3d 160, 172 (D.D.C. 2017). A deputy district attorney, for example, does not act as a citizen when he writes an internal memo as part his job. *See Garcetti*, 547 U.S at 423. But a teacher acts as a citizen when she submits a letter to the editor of a local newspaper criticizing a proposed tax increase because writing a letter to the editor is outside the scope of her employment duties. *See Pickering*, 391 U.S. at 568. The Order's limits on government contractors' workplace trainings apply only to speech made

pursuant to official duties. The Order does not prohibit contractors or their employees from expressing views outside of workplace trainings or regulate any speech outside the workplace. *See* EO § 4(a)(1). The Order thus does not violate the First Amendment. *Garcetti*, 547 U.S. at 417.

Even if internal trainings could be considered speech by "citizen[s]" on "matters of public concern," Plaintiffs' First Amendment claim would still fail *Pickering*'s second step. The constitutionality of a restriction on a government contractor's speech depends on balancing the expressive interests at stake against the government's "legitimate interests as contractor." *Umbehr*, 518 U.S. at 680, 685; *see also Connick v. Myers*, 461 U.S. 138, 143–51 (1983). The D.C. Circuit sitting *en banc* explained that "courts give substantial deference to the government's predictions of harm concerning its own employees and contractors." *Wagner*, 793 F.3d at 25; *Waters*, 511 U.S. at 673 ("we have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern.").

The Order makes a reasonable prediction of disruption by finding that "blame-focused diversity training reinforces biases and decreases opportunities for minorities." EO § 1. It further explains that "participation of contractors' employees in training that promotes race or sex stereotyping or scapegoating similarly undermines efficiency in Federal contracting" and that "[s]uch requirements promote divisiveness in the workplace and distract from the pursuit of excellence and collaborative achievements in public administration." *Id.*; *see, e.g.*, Frank Dobbin & Alexandra Kalev, "Why Diversity Programs Fail." *Harv. Bus. Rev.* (July-August 2016) ("people often respond to compulsory courses with anger and resistance—and many participants actually report more animosity toward other groups afterwards"); Elizabeth Paluck & Donald Green, "Prejudice Reduction: What Works? A Review and Assessment of Research and Practice." Ann. Rev. Psych. 2009; 60:339–67 (trainings that categorize individuals are "often enough to create prejudice"). Under the *Pickering* standard and the relaxed standard required to show workplace disruption applicable in this Circuit,

the Order's reasonable predictions of disruption from trainings that include race and sex stereotyping or scapegoating suffice to outweigh Plaintiffs' claimed expressive interests in continuing contractor workplace trainings that promote the identified divisive concepts.

*5. Title VII Guidance.*  Plaintiffs cannot make out a First Amendment claim with respect to the Order's provisions instructing the Attorney General to assess whether workplace training that teaches divisive concepts may give rise to potential Title VII liability and, if appropriate, to issue Title VII guidance.  Enjoining these provisions would (i) violate the Opinions Clause, which empowers the President to "require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices," U.S. Const., art. II, § 2, cl. 1, and (ii) unlawfully interfere with the Attorney General's statutory duty to "give his advice and opinion on questions of law when required by the President," 28 U.S.C. § 511; *see also* 28 C.F.R. § 0.50(b), (f).

## B.    Plaintiffs Fail To State a Void-For-Vagueness Claim

Plaintiffs also have not stated a void-for-vagueness claim under the Fifth Amendment's Due Process Clause.  The Due Process Clause requires that laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provide explicit standards for those who apply them."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  And "[w]hen speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012).  That being said, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  *United States v. Williams*, 553 U.S. 285, 304 (2008); *see also Grayned*, 408 U.S. at 110 ("[W]e can never expect mathematical certainty from our language.").

The Order's contractual language and the potential future grant conditions are not vague.  The contractual language provides that contractors "shall not use any workplace training that inculcates in

its employees any form of race or sex stereotyping or any form of race or sex scapegoating."  EO § 4(a)(1).  It further defines "race or sex stereotyping" and "race or sex scapegoating" in objective terms.  "The term 'race or sex stereotyping' means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex, and the term 'race or sex scapegoating' means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex."  *Id.*  If that were not sufficiently clear, the contractual language provides eight examples of such stereotyping and scapegoating (which examples may, at some indeterminate future time, constitute restrictions in certain grant programs, *see* EO § 5). These terms are far more definite than the statute at issue in *Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015), which barred school districts from holding classes that, *inter alia*, "'[p]romote resentment toward a race or class of people'" or "'[a]dvocate ethnic solidarity instead of the treatment of pupils as individuals.'"  *Id.* at 973 (quoting Ariz. Rev. Stat. § 15–112(A)).  "[I]n light of the statute's purpose to reduce racism in schools," the Ninth Circuit held that "the phrases here in issue sufficiently give notice as to what conduct is prohibited and do not inherently invite arbitrary enforcement."  *Id.* at 988.  *See also id.* at 988–89.

In an effort to cast the Order as vague, Plaintiffs generally complain that the Order:  does not define the term "workplace training"; does not "explain, or otherwise define, the prohibited act of 'inculcat[ing]'; and does not "sufficiently define[]" the "divisive concepts."  Compl. at 18 ¶¶ 55–57. But Plaintiffs' "basic mistake lies in the belief that the mere fact that close cases can be envisioned renders a statute vague."  *Williams*, 553 U.S. at 305.  "That is not so."  *Id.* at 305–06.  A regulation "is *not* rendered unconstitutionally vague because it does not mean the same thing to all people, all the time, everywhere."  *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (emphasis added). "In any system that relies on the administration of laws of general applicability in many different circumstances, some degree of ambiguity is all but inevitable."  *Act Now To Stop War & End Racism*

*Coal. v. District of Columbia*, 846 F.3d 391, 411 (D.C. Cir. 2017) ("*ANSWER*").  Nor is a regulation impermissibly vague simply "because it is marked by flexibility and reasonable breadth, rather than meticulous specificity."  *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 737 (D.C. Cir. 2016).  In fact, the D.C. Circuit has recognized that "by requiring regulations to be too specific courts would be opening up large loopholes allowing conduct which should be regulated to escape regulation."  *Id.*

In other words, courts "are not concerned with vagueness in the sense that [a] term requires a person to conform his conduct to an imprecise but comprehensible normative standard, whose satisfaction may vary depending upon whom you ask."  *Bronstein*, 849 F.3d at 1107.  "Rather, a statute is unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning specifies no standard of conduct at all."  *Id.*  Accordingly, courts properly strike statutes and regulations that include "highly subjective" requirements.  *ANSWER*, 846 F.3d at 411.  Examples of impermissible vagueness include:  "a statute requiring a suspect to present 'credible and reliable' identification," *id.*; "a regulation prohibiting 'objectionable' appearance in a library," *id.*; and an ordinance that punished individuals who conducted themselves in an "annoying" manner, *see Grayned*, 408 U.S. at 113.

Plaintiffs' quibbles with the contours of the Order, *see generally* Compl. at 18–20, ¶¶ 55–61, do not approach the indeterminacy and subjectivity inherent in terms like "credible," "reliable," "objectionable," or "annoying."  While Plaintiffs surely can imagine "close cases"—such as whether a given event constitutes "workplace training"—"[c]lose cases can be imagined under virtually any statute."  *Williams*, 553 U.S. at 306.  And Plaintiffs' unrealistic demands for *ex ante* specificity are out of step with Circuit precedent making clear that "meticulous specificity" is not required, *see, e.g., U.S. Telecom Assoc.*, 825 F.3d at 737, and noting the inherent "limitations in the English language with respect to being both specific and manageably brief," *Crooks v. Mabus*, 845 F.3d 412, 417 (D.C. Cir. 2016).

In all events, Plaintiffs' specific complaints lack merit:

- Plaintiffs complain that the term "workplace training" is "never define[d,]" Compl. at 18 ¶ 55, but Plaintiffs themselves describe the content of their own "workplace training," thus illustrating that the term is readily comprehensible. *See id.* at 52 ¶ 156 ("Plaintiffs' workplace training relies on in-depth discussion of systemic racism, gender and sex discrimination, and implicit biases . . . .").

- Plaintiffs assert that "the Order does not explain, or otherwise define, the prohibited act of inculcat[ing]," noting that the Order contains "no criteria . . . for a federal contractor to understand whether training needs to reach a certain level of repetition, admonition, and insistence to be deemed to 'inculcate[e] [sic]' employees" *Id.* at 18 ¶ 56. But "the vagueness doctrine does not doubt the constitutionality of laws that call for the application of a qualitative standard to real-world conduct; the law is full of instances where a man's fate depends on his estimating rightly some matter of degree." *Bronstein*, 849 F.3d at 1108. And the term "inculcate" has been a familiar element of the Supreme Court's Establishment Clause jurisprudence, indicating that it is not unconstitutionally vague. *See, e.g., Agostini v. Felton*, 521 U.S. 203, 223 (1997) ("As we have repeatedly recognized, government inculcation of religious beliefs has the impermissible effect of advancing religion.").

- Plaintiffs allege that the "divisive concepts" are not "sufficiently defined," pointing only to "the concept that 'the United States is fundamentally racist or sexist.'" Compl. at 18 ¶ 57. But that concept applies only to the Uniformed Services and federal-agency provisions of the Executive Order, *see* EO §§ 2(a), 3, 6(a)(i)—and is not among the concepts prohibited by the Order's contractual language or potential future grant conditions. *See id.* §§ 4(a), 5 (specifically omitting that prong of the "divisive concepts" definition). Plaintiffs cannot level a constitutional-vagueness challenge to a provision that does not, and could not, apply to them.

- Plaintiffs profess confusion over what it means to "treat others without *respect* to race or sex," noting that federal civil-rights laws prohibit workplace conduct that discriminates against women, pregnant women, or the elderly by treating them with faux "respect."  Compl. at 19 ¶ 58.  But of course, a plain reading of the Order reveals that "respect" in this context is the phrase "without respect to" (synonymous with "without regard to") and not "respect" meaning admiration or appreciation.  *See, e.g.*, *Lamar, Archer & Cofrin v. Appling*, 138 S. Ct. 1752, 1759 (2018) ("As a matter of ordinary usage, 'respecting' means 'in view of: considering; with regard or relation to: regarding; concerning.'") (quoting *Webster's* 1934).

The remainder of Plaintiffs' supposed examples have nothing to do with any purported vagueness in the actual text, and instead question whether the Order might have some unwritten requirement that precludes training that leads to feelings of discomfort, *see* Compl. at 19 ¶ 60; or whether the Order is compatible with existing law, *see id.* at 19–20, ¶¶ 59, 61.  And because the Order is reasonably definite and specific, Plaintiffs' naked allegation that the Department of Labor has "unfettered discretion in enforcing the Order's workplace training prohibitions," *id.* at 20 ¶ 62, is not plausibly pled.

Finally, "any potential lingering constitutional deficiency," *U.S. Telecom Ass'n*, 825 F.3d at 738, is cured by OFCCP's pledge to "provide compliance assistance as requested to Federal contractors and subcontractors that voluntarily submit such information or materials" in response to its RFI.  85 Fed. Reg. at 67,377.  In *U.S. Telecom Association*, for example, the FCC "did not reach a definitive resolution during the rulemaking process as to the permissibility" of certain "open Internet" practices, but allowed companies that sought to pursue those practices to "petition for an advisory opinion and thereby avoid an inadvertent infraction."  825 F.3d at 738.  The advisory-opinion procedure "thereby alleviate[d] any remaining concerns about the Rule's allegedly unconstitutional vagueness."  *Id.* at 739.  So, too, here:  even to the extent that the Order could somehow be construed as unconstitutionally

23

vague, OFCCP's offer to "provide compliance assistance," 85 Fed. Reg. at 67,377, "cures [the Order] of any potential lingering constitutional deficiency."  *U.S. Telecom Ass'n*, 825 F.3d at 738.

### C.    Plaintiffs Fail To State an Equal Protection Clause Claim

The Executive Order is race- and sex-neutral on its face.  Accordingly, "[t]o sustain an equal protection claim, Plaintiff[s] must demonstrate that 'similarly situated individuals' [are] treated differently and that the" Executive Order "ha[s] a discriminatory effect and that it was motivated by a discriminatory purpose."  *Smith v. Mayor, District of Columbia*, 191 F. Supp. 3d 114, 117 (D.D.C. 2016) (Mehta, J.), *aff'd*, No. 16–7109, 2017 WL 2193615 (D.C. Cir. May 19, 2017) (per curiam); *see Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 42 (D.C. Cir. 2016).  Plaintiffs cannot satisfy any of these elements.

*First*, Plaintiffs cannot show that similarly situated individuals are treated differently because— with limited exceptions not based on race or sex—the Executive Order applies to all federal agency training and all prospective government contracts.  In other words, the Executive Order applies equally across the board, and certainly does not discriminate on the basis of race or sex.

*Second*, Plaintiffs have not plausibly alleged that the Executive Order has a discriminatory effect. To be sure, Plaintiffs allege that there is a "foreseeable certainty of [the Order's] disparate impact on people of color, women, and/or LGBTQ individuals."  Compl. at 58 ¶ 30.  But "[s]uch a conclusory allegation falls far short of asserting a plausible claim."  *Jackson v. Office of Mayor of Dist. of Columbia*, No. 1:16–cv–02049, 2019 WL 5579724, at *3 (D.D.C. Oct. 29, 2019) (Mehta, J.), *aff'd*, No. 19–7148, 2020 WL 2554609 (D.C. Cir. May 14, 2020).  Although Plaintiffs allege that the Order constitutes an effort "to undermine efforts to foster diversity and inclusion in the workplace," Compl. at 1 ¶ 3, again, the Court need not accept as true allegations that are contradicted by documents incorporated into the Complaint.  *See Gilliam*, 128 F. Supp. 3d at 145.  And again, Plaintiffs' naked allegation is contradicted by the plain text of the Order, which clearly states that it "does *not* prevent agencies, the

United States Uniformed Services, or contractors from promoting racial, cultural, or ethnic diversity or inclusiveness, provided such efforts are consistent" with the Order.  EO § 10(a) (emphasis added). Nothing in the Order precludes diversity training—so long as that training does not incorporate race or sex stereotyping or scapegoating as defined.  And there are no plausible allegations explaining how an Order that *prohibits* race and sex stereotyping and scapegoating in certain workplace trainings could have a negative effect on "people of color, women, and/or LGBTQ individuals."  Compl. at 58 ¶ 30. *Cf. Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (plurality opinion) ("The way to stop discrimination on the basis of race is to stop discriminating on the basis of race.").

*Finally*, Plaintiffs have not plausibly alleged any discriminatory purpose.  Plaintiffs acknowledge that "maximizing efficiency and economy in the workplace are noted as motivating reasons for the issuance of" the Order.  Compl. at 58 ¶ 26.  Plaintiffs discount this rationale, but do not plausibly explain how workplace training that inculcates race and sex stereotyping and scapegoating could increase economy and efficiency in the workplace.  Nor do Plaintiffs allege any discriminatory statement by the President—the only relevant decision-maker with respect to the issuance of the Order.  None of the relevant presidential statements to which Plaintiffs cite, *see* Compl. at 14–17, ¶¶ 44, 46, 47, 52, are discriminatory in nature, and with regard to Plaintiffs' other supposed evidence of discriminatory intent, *see id.* at 12 ¶ 39–40, "these statements—remote in time and made in unrelated contexts—do not qualify as 'contemporary statements' probative of the decision at issue."  *Dep't of Homeland Sec. v Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1916 (2020) (plurality opinion).  Plaintiffs also allege that the Executive Order was not enacted in exactly the same manner as other workplace-discrimination executive orders.  *See* Compl. at 24–25 ¶¶ 74–76.  These allegations are not probative of anything.  But even assuming *arguendo* that Plaintiffs could provide plausible support for their conclusory allegation that the "Administration . . . engaged in procedural and substantive departures in the course of [the Order's] issuance," *id.* at 57 ¶ 25, any such supposed departures could not sustain

an equal protection claim in the absence of evidence of a discriminatory purpose. *See Kingman Park Civic Ass'n*, 815 F.3d at 42 ("The District did, indeed, cut significant procedural corners . . . . But the Association has offered no evidence of a racially discriminatory purpose for this failure.").

The face of the Executive Order plainly states that its purpose is "to promote economy and efficiency in Federal contracting, to promote unity in the Federal workforce, and to combat offensive and anti-American race and sex stereotyping and scapegoating." EO at preamble. Plaintiffs have failed to plausibly allege that, notwithstanding this permissible purpose, it was merely a pretext for a "real reason" to discriminate, *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993), or that it was motivated by such animus, *Pers. Admin. of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Accordingly, Plaintiffs' Equal Protection Clause claim should be dismissed.

## CONCLUSION

For the foregoing reasons, this action should be dismissed.

DATED:  December 29, 2020

Respectfully submitted,


JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

BRAD P. ROSENBERG
CARLOTTA P. WELLS
Assistant Branch Director

/s/ Elliott M. Davis
ZACHARY A. AVALLONE
(D.C. Bar No. 1023361)
ELLIOTT M. DAVIS
(N.Y. Reg. No. 4596755)
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC  20005
Phone:   (202) 353-5639
Fax:      (202) 616-8470
E-mail:   elliott.m.davis@usdoj.gov

*Counsel for Defendants*