# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL URBAN LEAGUE,
80 Pine Street, 9th Floor,
New York, NY 10005

NATIONAL FAIR HOUSING ALLIANCE,
1331 Pennsylvania Avenue NW, #650,
Washington, DC 20004

AMERICAN ASSOCIATION FOR ACCESS,
EQUITY AND DIVERSITY,
1701 Pennsylvania Avenue NW, #200
Washington, DC 20006

                Plaintiffs,

    v.

DONALD J. TRUMP,
in his official capacity as
President of the United States,
1600 Pennsylvania Avenue NW,
Washington, DC 20500

EUGENE SCALIA,
in his official capacity as
United States Secretary of Labor,
200 Constitution Ave NW,
C-2318
Washington, DC 20210

U.S. DEPARTMENT OF LABOR,
200 Constitution Ave NW,
S-2521
Washington, DC 20210

CRAIG E. LEEN,
in his official capacity as
Director of the Office of Federal Contract
Compliance Programs,
U.S. Department of Labor
200 Constitution Ave, NW
C-3325

Case No. 1:20-cv-3121

Washington, DC 20210

OFFICE OF FEDERAL CONTRACT
COMPLIANCE PROGRAMS,
U.S. Department of Labor
200 Constitution Ave, NW
C-3325
Washington, DC 20210

RUSSELL VOUGHT,
in his official capacity as
Director of the Office of Management and
Budget,
725 17th Street, NW
Washington, DC 20503

OFFICE OF MANAGEMENT AND BUDGET,
725 17th Street, NW
Washington, DC 20503

DR. MICHAEL E. WOOTEN,
in his official capacities as Administrator for the
Office of Federal Procurement Policy and
Chair of the Federal Acquisition Regulatory
Council,
Office of Management and Budget
725 17th Street, NW
Washington, DC 20503

OFFICE OF FEDERAL PROCUREMENT
POLICY,
Office of Management and Budget
725 17th Street, NW
Washington, DC 20503

FEDERAL ACQUISITION REGULATORY
COUNCIL,
Office of Management and Budget
725 17th Street, NW
Washington, DC 20503

CHRISTOPHER C. MILLER,
in his official capacities as
U.S. Secretary of Defense and Member of the
Federal Acquisition Regulatory Council,
Office of the Secretary of Defense

1000 Defense Pentagon
Washington, DC 20301-1000

U.S. DEPARTMENT OF DEFENSE,
1000 Defense Pentagon
Washington, DC 20301-1000

JAMES FREDERICK BRIDENSTINE,
in his official capacities as
Administrator of the National Aeronautics and
Space Administration and Member of the Federal
Acquisition Regulatory Council,
NASA Headquarters
300 E. Street SW, Suite 5R30
Washington, DC 20546

NATIONAL AERONAUTICS AND SPACE
ADMINISTRATION,
NASA Headquarters
300 E. Street SW, Suite 5R30
Washington, DC 20546

DAN BROUILLETTE,
in his official capacity as
U.S. Secretary of Energy,
1000 Independence Ave., SW
Washington, DC 20585

U.S. DEPARTMENT OF ENERGY,
1000 Independence Ave., SW
Washington, DC 20585

SONNY PERDUE,
in his official capacity as
U.S. Secretary of Agriculture,
1400 Independence Ave., SW
Washington, DC 20250

U.S. DEPARTMENT OF AGRICULTURE,
1400 Independence Ave., SW
Washington, DC 20250

DR. BEN CARSON,
in his official capacity as
U.S. Secretary of Housing and Urban
Development,

451 7th Street, SW
Washington, DC 20410

U.S. DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT,
451 7th Street, SW
Washington, DC 20410

NEIL JACOBS,
in his official capacity as
Administrator of the National Oceanic and
Atmospheric Administration,
1401 Constitution Avenue NW, Room 5128
Washington, DC 20230

NATIONAL OCEANIC AND ATMOSPHERIC
ADMINISTRATION,
1401 Constitution Avenue NW, Room 5128
Washington, DC 20230

ROBERT WILKIE,
in his official capacity as
U.S. Secretary of Veterans Affairs,
810 Vermont Ave., NW
Washington, DC 20420

U.S. DEPARTMENT OF VETERANS
AFFAIRS,
810 Vermont Ave., NW
Washington, DC 20420

MICK ZAIS,
in his official capacity as
U.S. Acting Secretary of Education,
400 Maryland Avenue, SW
Washington, D.C. 20202

U.S. DEPARTMENT OF EDUCATION,
400 Maryland Avenue, SW
Washington, D.C. 20202

DR. FRANCIS COLLINS,
in his official capacity as
Director of the National Institutes of Health,
9000 Rockville Pike
Bethesda, MD 20892

iv

NATIONAL INSTITUTES OF HEALTH,
9000 Rockville Pike
Bethesda, MD 20892

JIM REILLY,
in his official capacity as
Director of the U.S. Geological Society,
12201 Sunrise Valley Drive
Reston, VA 20192

U.S. GEOLOGICAL SOCIETY,
12201 Sunrise Valley Drive
Reston, VA 20192

ROBERT R. REDFIELD,
in his official capacity as
Director of the Centers for Disease Control,
1600 Clifton Road
Atlanta, GA 30333

CENTERS FOR DISEASE CONTROL,
1600 Clifton Road
Atlanta, GA 30333

EMILY W. MURPHY,
in her official capacities as
Administrator of the General Services
Administration and Member of the Federal
Acquisition Regulatory Council,
1800 F Street, NW
Washington, DC 20405

GENERAL SERVICES ADMINISTRATION,
1800 F Street, NW
Washington, DC 20405

CHAD WOLF,
in his official capacity as
U.S. Acting Secretary of Homeland Security,
2707 Martin Luther King Jr Ave, SE
Washington, DC 20528

U.S. DEPARTMENT OF HOMELAND
SECURITY,
Office of the General Counsel

MS 0485
2707 Martin Luther King Jr Ave, SE
Washington, DC 20528

DR. KATHERINE LEMOS,
in her official capacity as
Chairperson and CEO of the U.S. Chemical
Safety and Hazard Investigation Board,
1750 Pennsylvania Avenue, NW
Suite 910,
Washington, DC 20006

U.S. CHEMICAL SAFETY AND HAZARD
INVESTIGATION BOARD,
1750 Pennsylvania Avenue, NW
Suite 910,
Washington, DC 20006

GLEN SMITH,
in his official capacity as
Board Chairman and CEO of the Farm Credit
Administration,
1501 Farm Credit Drive
McLean, VA 22102-5090

FARM CREDIT ADMINISTRATION,
1501 Farm Credit Drive
McLean, VA 22102-5090

KRISTINE SVINICKI,
in her official capacity as
Chairman of the Nuclear Regulatory
Commission,
U.S. Nuclear Regulatory Commission
Mail Stop O-16 B33
Washington, DC 20555-0001

U.S. NUCLEAR REGULATORY
COMMISSION,
Mail Stop O-16 B33
Legal Counsel and Deputy Chief of Staff
Washington, DC 20555-0001

JOSEPHINE K. OLSEN,
in her official capacity as
Director of the Peace Corps,

1275 First Street NE
Washington, DC 20526

PEACE CORPS,
1275 First Street NE
Washington, DC 20526

JOHN RYDER,
in his official capacity as
Chair of the Tennessee Valley Authority,
400 West Summit Hill Drive
Knoxville, TN 37902

TENNESSEE VALLEY AUTHORITY,
400 West Summit Hill Drive
Knoxville, TN 37902

ANDREW WHEELER,
in his official capacity as
Administrator of the U.S. Environmental
Protection Agency,
Office of the Administrator - 1101A
1200 Pennsylvania Avenue, NW
Washington, DC 20460

U.S. ENVIRONMENTAL PROTECTION
AGENCY,
Office of General Counsel - 2310A
1200 Pennsylvania Avenue, NW
Washington, DC 20460

MICHAEL R. POMPEO,
in his official capacity as
U.S. Secretary of State,
2201 C St NW
Washington, DC 20037

U.S. DEPARTMENT OF STATE,
2201 C St NW
Washington, DC 20037

JEFFREY A. ROSEN,
in his official capacity as
U.S. Acting Attorney General,
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

U.S. DEPARTMENT OF JUSTICE,
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Defendants.[1]

**AMENDED CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

[1] As relevant, the Defendants named in their official capacities include any successors in office.

1.      Plaintiffs National Urban League, National Fair Housing Alliance, and American
Association for Access, Equity and Diversity, on behalf of themselves and all others similarly
situated (collectively, "Plaintiffs"), bring this civil rights class action for injunctive and declaratory
relief against Defendants President Donald J. Trump, Eugene Scalia, United States Secretary of
Labor, the United States Department of Labor, Craig E. Leen, Director of the Office of Federal
Contract Compliance Programs, the Office of Federal Contract Compliance Programs, Russell
Vought, Director of the Office of Management and Budget, the Office of Management and Budget,
Dr. Michael E. Wooten, Administrator for the Office of Federal Procurement Policy and Chair of
the Federal Acquisition Regulatory Council, the Office of Federal Procurement Policy, the Federal
Acquisition Regulatory Council, Christopher C. Miller, United States Secretary of Defense and
Member of the Federal Acquisition Regulatory Council, the United States Department of Defense,
James Frederick Bridenstine, Administrator of the National Aeronautics and Space Administration
and Member of the Federal Acquisition Regulatory Council, the National Aeronautics and Space
Administration, Dan Brouillette, United States Secretary of Energy, the United States Department
of Energy, Sonny Perdue, United States Secretary of Agriculture, the United States Department of
Agriculture, Dr. Ben Carson, United States Secretary of Housing and Urban Development, the
United States Department of Housing and Urban Development, Neil Jacobs, Administrator of the
National Oceanic and Atmospheric Administration, the National Oceanic and Atmospheric
Administration, Robert Wilkie, United States Secretary of Veterans Affairs, the United States
Department of Veterans Affairs, Mick Zais, United States Acting Secretary of Education, the
United States Department of Education, Dr. Francis Collins, Director of the National Institutes of
Health, the National Institutes of Health, Jim Reilly, Director of the United States Geological
Society, the United States Geological Society, Robert R. Redfield, Director of the Centers for

Disease Control, the Centers for Disease Control, Emily W. Murphy, Administrator of the General

Services Administration and Member of the Federal Acquisition Regulatory Council, the General

Services Administration, Chad Wolf, United States Acting Secretary of Homeland Security, the

United States Department of Homeland Security, Dr. Katherine Lemos, Chairperson and CEO of

the United States Chemical Safety and Hazard Investigation Board, the United States Chemical

Safety and Hazard Investigation Board, Glen Smith, Board Chairman and CEO of the Farm Credit

Administration, the Farm Credit Administration, Kristine Svinicki, Chairman of the Nuclear

Regulatory Commission, the Nuclear Regulatory Commission, Josephine K. Olsen, Director of the

Peace Corps, the Peace Corps, John Ryder, Chair of the Tennessee Valley Authority, and the

Tennessee Valley Authority, Andrew Wheeler, Administrator of the United States Environmental

Protection Agency, the United States Environmental Protection Agency, Michael R. Pompeo,

United States Secretary of State, the United States Department of State, Jeffrey A. Rosen, United

States Acting Attorney General, and the United States Department of Justice (collectively,

"Defendants") for violations of the First and Fifth Amendments to the United States Constitution.

## PRELIMINARY STATEMENT

2.      Every nation's history includes unsettling truths that many would prefer to forget

or deny.  But true patriotism demands confronting the truths of our history—no matter how

embarrassing or dishonorable—and undertaking the difficult work of learning from the lessons of

our past in order to move forward.  For the United States, that work requires reckoning with our

shameful legacy of racial subjugation of Black people in this country—from slavery and Jim Crow

to mass incarceration and police violence—as well as our long history of express discrimination

against other people of color, women, and LGBTQ persons.

3.      Without uninhibited discussion and examination of that legacy, we are ill-equipped

as a nation to address its ongoing manifestations in present-day forms of discrimination and bias.

The First Amendment protection of free speech in the United States Constitution ensures that all Americans are empowered to engage freely in an exchange of ideas and truth-telling—and participate in difficult conversations—about this history, which are matters of immense public importance. This protection extends equally to those who engage with the federal government, where the policies that affect the lives of all Americans are developed, enacted, and funded.

4. On September 22, 2020, President Trump issued Executive Order 13950, entitled "Executive Order on Combating Race and Sex Stereotyping" ("EO 13950" or "the Order"). Contrary to its title, the Order is an extraordinary and unprecedented act by the Trump Administration to undermine efforts to foster diversity, equity, and inclusion in the workplace. The Order strikes at the heart of those critical efforts by government and nongovernment actors— including trainings and other forms of private speech in the workplace—to eradicate race and sex stereotyping and other continuing manifestations of entrenched discrimination and bias against people of color, women, and LGBTQ individuals.

5. EO 13950 prohibits the National Urban League, the National Fair Housing Alliance, the American Association for Access, Equity and Diversity and its members, and Class members (including current and prospective federal contractors, subcontractors, and grant recipients) from discussing and promoting concepts like, among other things, systemic race and sex discrimination and implicit race and sex biases.  In so doing, EO 13950 prevents Plaintiffs from effectively addressing the persistent harms, privileges, and disadvantages associated with systemic discrimination and implicit biases.  This broad-based prohibition of private speech on matters of immense public concern and public welfare violates the guarantees of Free Speech, Equal Protection, and Due Process, which are fundamental to the rights secured in the United States Constitution.  The depth and scope of EO 13950's constitutional flaws are so profound and

alarming that they should render the entire Order inoperable.  EO 13950's continued operation in any form threatens to erode the core principles of our democracy and the foundations of our pluralistic society.

6.    The right to Free Speech, secured in the First Amendment, is foundational to a free and democratic republic.  As stated by the United States Supreme Court, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Texas v. Johnson*, 491 U.S. 397, 415 (1989) (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

7.    Yet, in an exercise of authoritarian thought- and speech-control, EO 13950 imposes expansive restrictions on the National Urban League, the National Fair Housing Alliance, the American Association for Access, Equity and Diversity and its members, and the Class based on President Trump's inaccurate and discriminatory viewpoints, including his opinions that our Nation's founders—many of whom enslaved Africans in bondage—founded the United States on principles of racial and gender equality; that discussions of the lingering and damaging effects of race and sex discrimination constitute "divisive concepts," "race or sex stereotyping," or "race or sex scapegoating"; and that discussing, acknowledging, or remedying the harms, privileges, and disadvantages attendant to systemic race and sex discrimination would negatively impact the "economy and efficiency in Federal contracting" and "unity in the Federal workforce."

8.    EO 13950 presents a false rendering of our Nation's history by misrepresenting the Founders as inspired by the "belief in the inherent equality of every individual" and prohibiting so-called " racialized views of America" that "our government 'was made on the white basis' 'by white men, for the benefit of white men.'" It is beyond dispute that, at the time of our Nation's

founding, the Founders embraced a narrative of white supremacy, benefitted economically from the free labor of enslaved Africans, required enslaved Africans to be counted as three-fifths of a person in the United States Constitution, denied women and people of color the right to vote and other political rights, and passed laws that uniformly and expressly discriminated on the basis of race and sex.

9.  Almost seven decades after the ratification of the United States Constitution, the United States Supreme Court in *Dred Scott v. Sanford*, 60 U.S. 393 (1857), concluded that Black people could not be "citizens" entitled to "the rights and privileges" under the United States Constitution because they "had for more than a century before" the Constitution's adoption "been regarded as beings of an inferior order, and altogether unfit to associate with the white race, either in social or political relations; and so far inferior, that they had no rights which the white man was bound to respect." *Id.* at 404-07.

10.  United States Supreme Court opinions, both before and after *Dred Scott*, have likewise acknowledged and sometimes endorsed racist views and opinions about other people of color.  *See, e.g.*, *Johnson & Graham's Lessee v. M'Intosh*, 21 U.S. 543, 590 (1823) (referring to Native Americans as "fierce savages, whose occupation was war and whose subsistence was drawn chiefly from the forest"); *Plessy v. Ferguson*, 163 U.S. 537, 561 (1896) (Harlan, J., dissenting) (disagreeing with *de jure* segregation, but noting that Chinese people are "a race so different from our own that we do not permit those belonging to it to become citizens of the United States"); *Hernandez v. Texas*, 347 U.S. 475, 479-80 (1954) (in first case recognizing Equal Protection rights for people of Mexican descent, noting that Mexican-American children had attended segregated schools, that a restaurant "prominently displayed a sign announcing 'No Mexicans Served,'" and

that "[o]n the courthouse grounds . . . , there were two men's toilets, one unmarked, and the other marked 'Colored Men' and 'Hombres Aqui' ('Men Here')").

11.     Sexism also has deep roots in our political and social history.  For example, a concurring opinion in *Bradwell v. Illinois*, 83 U.S. 130 (1872), in which the United States Supreme Court refused to recognize a woman's right to be admitted as a practicing attorney, considered it "a maxim of that system of jurisprudence that a woman had no legal existence separate from her husband, who was regarded as her head and representative in the social state . . . .  The paramount destiny and mission of women are to fulfill the noble and benign offices of wife and mother." *Id.* at 141.

12.     Discrimination against LGBTQ individuals has also featured prominently in our country's laws.  A concurring opinion in *Bowers v. Hardwick*, 478 U.S. 186 (1986), in which the United States Supreme Court refused to invalidate criminal sodomy laws in Georgia, noted that "the proscriptions against sodomy have very 'ancient roots.'  Decisions of individuals relating to homosexual conduct have been subject to state intervention throughout the history of Western civilization.  Condemnation of those practices is firmly rooted in Judeo-Christian moral and ethical standards. . . .  The common law of England, including its prohibition of sodomy, became the received law of Georgia and the other Colonies.  In 1816, the Georgia Legislature passed the statute at issue here, and that statute has been continuously in force in one form or another since that time." *Id.* at 196-97.

13.     The Supreme Court has since discredited these racist, sexist, and homophobic views, and our Nation has made significant progress in recognizing and enforcing the equal rights of people of color, women, and LGBTQ individuals.  But members of these protected groups

continue to face substantial societal discrimination, including barriers to equal employment opportunities, and are still, to the present day, too often subject to hostile work environments.

14.     By denying the longstanding discrimination against people of color, women, and LGBTQ individuals, EO 13950 is an invitation for revisionism and retrogression on matters of truth and equality.  To the detriment of employees of color, women, and LGBTQ individuals, EO 13950 prohibits laudable and necessary efforts by Plaintiffs who want to counteract the effects of systemic discrimination and biases in the workplace.  This, in turn, prevents Plaintiffs from creating and maximizing economic efficiencies by ensuring the satisfaction and inclusivity of all their employees, and reaping the full benefits of a diverse and productive workforce.

15.     Despite the urgent need to address and remedy systemic discrimination and counter the harms stemming from implicit biases, EO 13950 unconstitutionally forces Plaintiffs to choose between censoring speech on these important issues or forfeiting any opportunity to enter into a federal contract or subcontract for the provision of goods or services or to receive federal funds as a grant recipient.  The infringement of Plaintiffs' private speech on these matters of public concern and public welfare is deeply troubling.  But Defendants' actions are even more menacing given that issues of systemic race and sex discrimination have been at the forefront of public discourse throughout the Trump Administration. This targeted censorship of Plaintiffs' speech by the federal government is anathema to a free democracy.

16.     Furthermore, EO 13950 utilizes imprecise and ill-defined terms that reflect the factually inaccurate viewpoints and opinions of President Trump and are dependent on the speculative and subjective reactions of individuals to the protected speech.  The difficulty—if not impossibility—of knowing precisely what is included in the wide swath of speech censored by EO 13950 already has had, and will continue to have, a broad chilling effect.  To protect their status

as federal contractors, subcontractors, or grant recipients, Plaintiffs and the Class must err on the side of caution and interpret the EO 13950 broadly to ensure compliance with its vague and seemingly expansive mandates. When combined with EO 13950's encouragement that individuals report perceived violations of its terms by calling a "hotline" telephone number at the Department of Labor, the uncertain boundaries of the speech purportedly prohibited by the Order creates a system of suppression hostile to the First Amendment's core protections.

17.     EO 13950 is, therefore, in clear violation of the First and Fifth Amendments to the United States Constitution, resulting in serious and irreparable injury to Plaintiffs National Urban League, National Fair Housing Alliance, and American Association for Access, Equity and Diversity and its members, as well as the Class.

**PARTIES**

## I.      PLAINTIFFS

18.     The National Urban League (or "NUL") is a 501(c)(3) non-profit corporation headquartered in New York, New York.  As a historic civil rights organization founded in 1910, NUL's mission is to collaborate with community leaders, policymakers and other partners to improve the standards of living for the Black community and other underserved groups across America.  The NUL has 90 affiliates serving 300 communities across 36 states and the District of Columbia.  NUL works to spearhead and advocate for public policies that can close the equality gap, and NUL's local affiliates provide direct services that improve the lives of Americans in their communities.  NUL has been, is, and seeks to be in the future a federal contractor, federal subcontractor, and/or federal grant recipient.

19.     The National Fair Housing Alliance (or "NFHA") is a 501(c)(3) non-profit corporation headquartered in Washington, D.C.  NFHA and its operating members aim to eliminate housing discrimination and ensure equal housing opportunities to all people through

8

education, outreach, membership service, policy initiatives, consulting services, community development, advocacy, and enforcement.  NFHA's members include over 200 private, non-profit fair housing organizations, state and local civil rights agencies and individuals across the United States.  NFHA has over 70 operating member organizations nationwide that support fair housing work in their regions in 29 states and the District of Columbia.  NFHA focuses on a variety of matters, including policy initiatives, research, education, and outreach, and the operating members of the NFHA provide direct services to victims of housing discrimination.  NFHA has been, is, and seeks to be in the future a federal contractor, federal subcontractor, and/or federal grant recipient.

20.    The American Association for Access, Equity and Diversity ("AAAED") is a 501(c)(6) membership organization headquartered in Washington, DC.  Founded in 1974, AAAED is the oldest operating association of professionals in the equal opportunity field and has been a leader in equal opportunity, affirmative action, and diversity training in higher education, private industry, and government for over four decades. In addition to functioning as a professional development organization, AAAED operates as an advocacy organization, providing expert opinion, guidance, and commentary in response to new and existing federal legislation, agency regulations, and executive orders that threaten the advances made in providing access, inclusion, and equal opportunity for all.

21.    AAAED's membership, which is composed of institutions as well as individuals, consists of numerous members who are currently federal contractors or subcontractors or have been federal contractors or subcontractors in the past, with some of the contracts valued in the tens of millions of dollars and even in the hundreds of millions of dollars.  Many of these institutions

have a long history of government contracting (and subcontracting) and will continue to seek out more government contracts (and subcontracts) in the future.

22.     AAAED also has a special relationship with each of its members.  Members receive discounts on AAAED's trainings and programs, as well as selected webinars free of charge and daily informational emails on issues related to regulatory or legal developments.  In addition, AAAED maintains a Career Center job board for members seeking opportunities in the equal employment opportunity, affirmative action, and diversity professions and a Member Listserv, where members can seek advice and counsel from their peers on issues facing them as equal opportunity professionals.  AAAED seeks to be both a resource, voice, and advocate for its members in furtherance of their common interest and goals to advance access, equity, diversity, and equality in workplaces throughout the country.

23.     Many AAAED members fear retribution—and possible risk to their existing, pending, or future federal contracts, subcontracts, and/or grants—if they publicly criticize EO 13950 and, thus, are relying on AAAED to advocate on their behalf.

## II.     DEFENDANTS

24.     Donald J. Trump is the President of the United States.  He is sued in his official capacity.  In that capacity, he issued EO 13950, which is challenged in this lawsuit.

25.     The United States Department of Labor ("DOL") is a federal agency charged with overseeing the wellbeing of wage earners, job seekers, and retirees in the United States. DOL enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Plaintiff NUL and Class members.  In addition, EO 13950 directs DOL to "take appropriate enforcement action and provide remedial relief, as appropriate" with respect to that Order.  EO 13950 § 4(b).  DOL's Inspector General informed OMB that DOL plans

to implement EO 13950 within the agency in 2021.  However, DOL has recognized a preliminary injunction issued on December 22, 2020, by the United States District Court for the Northern District of California,[2] "prohibiting OFCCP from implementing, enforcing, or effectuating Section 4 of Executive Order 13950 'in any manner against any recipient of federal funding by way of contract [or] subcontract. . . .'"[3]

26.     Eugene Scalia is the United States Secretary of Labor.  He is sued in his official capacity.

27.     The Office of Federal Contracts Compliance Programs ("OFCCP") is part of the DOL and is responsible for ensuring that employers that do business with the federal government comply with all laws and regulations requiring nondiscrimination.  EO 13950 directs OFCCP to establish a hotline and investigate complaints received under the Order alleging that a federal contractor or grantee is utilizing training programs in violation the Order.  EO 13950 § 4(b). However, pursuant to the Santa Cruz Preliminary Injunction, OFCCP has been directed to cease using any hotline, investigating, or taking any enforcement action in connection with any contractor's alleged noncompliance with EO 13950 while the preliminary injunction is in effect.

28.     Craig E. Leen is the Director of OFCCP.  He is sued in his official capacity.

29.     The Office of Management and Budget ("OMB") is the largest office within the Executive Office of the President of the United States.  OMB produces the President's budget, and

---

[2] On December 22, 2020, Judge Beth Labson Freeman of the U.S. District Court for the Northern District of California issued a nationwide preliminary injunction in *Santa Cruz Lesbian and Gay Community Ctr. v. Trump*, No. 20 Civ. 7741 (N.D. Cal.)—a separate lawsuit challenging EO 13950—to halt the enforcement of certain portions of EO 13950 by all defendants in that case except for President Trump ("Santa Cruz Preliminary Injunction").

[3] *Notice Regarding Executive Order 13950*, U.S. Dep't of Labor, Office of Federal Contract Compliance Programs, at https://www.dol.gov/agencies/ofccp/executive-order-13950/preliminary-injunction.

ensures that agency programs, policies, and procedures comply with the President's policies. OMB has issued guidance on federal agencies' implementation and enforcement of EO 13950. Pursuant to EO 13950, the heads of all federal agencies were required to submit a report to OMB within 60 days of the Order, which listed all grant programs for which the agency may, as a condition of receiving such grant, require certification of compliance with the Order. EO 13950 § 5.

30.     Russell Vought is the Director of OMB. He is sued in his official capacity.

31.     The Office of Federal Procurement Policy ("OFPP") is within OMB and plays a central role in shaping federal agencies' policies and practices to acquire goods and services through federal contracts. OFPP provides overall direction for, *inter alia*, government-wide procurement policies, regulations, and procedures, including procurements governed by federal contracts that are required to include EO 13950's provisions.

32.     The Federal Acquisition Regulatory Council ("FAR Council") assists in the direction and coordination of the procurement policy and procurement regulatory activities across the entire federal government and helps ensure that procurement regulations, promulgated by executive agencies, are consistent with the Federal Acquisition Regulations ("FAR") and OFPP policies. The FAR Council manages, coordinates, controls, and monitors the maintenance and issuance of changes in the FAR, including any regulatory changes related to EO 13950.

33.     Dr. Michael Wooten is the Administrator of OFPP and Chair of the FAR Council. He is sued in his official capacities.

34.     The United States Department of Defense ("DOD") is a federal agency charged with coordinating and supervising all agencies and functions of the government related to national security and the United States Armed Forces. DOD enters into contracts and subcontracts with—

and provides grants to—private entities, including without limitation one or more of Plaintiff AAAED's members and Class members.  DOD issued a class deviation to require the implementation and enforcement of EO 13950's terms and provisions in all of its contracts and subcontracts entered into on or after November 20, 2020.  On January 6, 2021, DOD issued a subsequent class deviation revising and superseding the prior class deviation regarding EO 13950, rendering the Order's terms and provisions "inoperable until further notice" in compliance with the Santa Cruz Preliminary Injunction.

35.     Christopher C. Miller is Secretary of Defense and Member of the Federal Acquisition Regulatory Council.  He is sued in his official capacities.

36.     The National Aeronautics and Space Administration ("NASA") is a federal agency responsible for the civilian space program, as well as aeronautics and space research.  NASA enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation one or more of Plaintiff AAAED's members and Class members.  NASA issued a class deviation to require the implementation and enforcement of EO 13950's terms and provisions in all of its contracts and subcontracts entered into on or after November 21, 2020.  On January 6, 2020, NASA deactivated the class deviation that had been issued regarding EO 13950.

37.     James Frederick Bridenstine is the Administrator of NASA and Member of the Federal Acquisition Regulatory Council.  He is sued in his official capacities.

38.     The United States Department of Energy ("Energy Dept") is a federal agency charged with ensuring the United States' security and prosperity by addressing its energy, environment, and nuclear challenges through transformative science and technology solutions. The Energy Dept enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation one or more of Plaintiff AAAED's members and

13

Class members.  The Energy Dept issued a class deviation to require the implementation and enforcement of EO 13950's terms and provisions in all of its contracts and subcontracts entered into on or after November 21, 2020.

39.     Dan Brouillette is Secretary of Energy.  He is sued in his official capacity.

40.     The United States Department of Agriculture ("USDA") is a federal agency charged with developing and executing federal laws related to farming, food, forestry, and rural economic development.  USDA enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation one or more of Plaintiff AAAED's members and Class members.  USDA issued a class deviation to require the implementation and enforcement of EO 13950's terms and provisions in all of its contracts and subcontracts entered into on or after November 21, 2020.  Without explanation, this class deviation no longer appears on the USDA website listing all FAR class deviations.

41.     Sonny Perdue is Secretary of Agriculture.  He is sued in his official capacity.

42.     The United States Department of Housing and Urban Development ("HUD") is a federal agency charged with overseeing the development and execution of policies on housing and metropolises. HUD enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Plaintiff NUL, Plaintiff NFHA, and Class members.

43.     Dr. Ben Carson is the HUD Secretary. He is sued in his official capacity.

44.     The National Oceanic and Atmospheric Administration ("NOAA") is a federal agency within the United States Department of Commerce that focuses on the conditions of the oceans, major waterways, and the atmosphere. NOAA enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation one or more of Plaintiff AAAED's members and Class members.

14

45.     Neil Jacobs is the Administrator of NOAA.  He is sued in his official capacity.

46.     The United States Department of Veterans Affairs ("VA") is a federal agency charged with providing myriad services and benefits to eligible veterans and their family members, including life-long healthcare at certain medical centers and outpatient clinics, disability compensation, vocational rehabilitation, education assistance, home loans, life insurance, and burial benefits.  The VA enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation one or more of Plaintiff AAAED's members and Class members.

47.     Robert Wilkie is Secretary of Veteran Affairs.  He is sued in his official capacity.

48.     The United States Department of Education ("DOE") is a federal agency charged with establishing policy for, administers, and coordinates most federal assistance to education; collects data on schools nationwide; and enforces federal education laws. DOE enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation one or more of Plaintiff AAAED's members and Class members.

49.     Mick Zais is Acting Secretary of Education.  He is sued in his official capacity.

50.     The National Institutes of Health ("NIH") is a federal agency responsible for biomedical and public health research.  NIH enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation one or more of Plaintiff AAAED's members and Class members.

51.     Dr. Francis Collins is the Director of NIH.  He is sued in his official capacity.

52.     The United States Geological Society ("USGS") is a federal agency that studies the landscape of the United States, its natural resources, and the natural hazards that threaten it.  USGS

enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation one or more of Plaintiff AAAED's members and Class members.

53.     Jim Reilly is the Director of USGS.  He is sued in his official capacity.

54.     The Centers for Disease Control ("CDC") is a federal agency charged with protecting the public health and safety through the control and prevention of disease, injury, and disability in the United States and abroad.  CDC enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Plaintiff NUL, one or more of Plaintiff AAAED's members, and Class members.

55.     Dr. Robert R. Redfield is the Director of CDC.  He is sued in his official capacity.

56.     The General Services Administration ("GSA") is a federal agency established to manage and support the basic functioning of federal agencies through the supply of products, communications, transportation, and office space to government offices and federal employees. In this capacity, GSA enters into contracts and/or subcontracts with private entities, including without limitation Class members.

57.     Emily W. Murphy is the Administrator of the GSA and Member of the Federal Acquisition Regulatory Council.  She is sued in her official capacities.

58.     The Department of Homeland Security ("DHS") is a federal agency charged with safeguarding the security of the United States and the American people.  DHS enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Class members.  DHS issued a class deviation to require the implementation and enforcement of EO 13950's terms and provisions in all of its contracts and subcontracts entered into on or after November 21, 2020. In January 2021, DHS issued a notice, stating that, as long as the Santa Cruz

Preliminary Injunction "remains in force," it will not enforce EO 13950 against federal contractors or subcontractors.

59.    Chad Wolf is the Acting Secretary of Homeland Security.  He is sued in his official capacity.

60.    The United States Chemical Safety and Hazard Investigation Board ("CSB") is a federal agency charged with investigating industrial chemical accidents. CSB enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Class members.  CSB's Inspector General confirmed to OMB that CSB is in full compliance with EO 13950's requirements.

61.    Dr. Katherine Lemos is the Chairperson and CEO of the Chemical Investigation Board.  She is sued in her official capacity.

62.    The Farm Credit Administration ("FCA") is a federal agency charged with ensuring that Farm Credit System institutions and Farmer Mac are safe, sound, and dependable sources of credit and related services for all creditworthy and eligible persons in agriculture and rural America.  FCA enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Class members.  FCA's Inspector General confirmed to OMB that FCA is in full compliance with EO 13950's requirements.

63.    Glen Smith is the Board Chairman and CEO of the FCA.  He is sued in his official capacity.

64.    The Nuclear Regulatory Commission ("NRC") is a federal agency charged with ensuring the safe use of radioactive materials for beneficial civilian purposes while protecting people and the environment.  The NRC also regulates commercial nuclear power plants and other uses of nuclear materials, such as in nuclear medicine, through licensing, inspection, and

enforcement of its requirements.  The NRC enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Class members.  The NRC's Inspector General confirmed to OMB that the NRC is in full compliance with EO 13950's requirements.

65.     Kristine Svinicki is the Chairman of the NRC.  She is sued in her official capacity.

66.     The Peace Corps is a federal agency charged with promoting world peace and friendship by fulfilling three goals: (1) to help the people of interested countries in meeting their need for trained men and women; (2) to help promote a better understanding of Americans on the part of the peoples served; and (3) to help promote a better understanding of other peoples on the part of Americans.  The Peace Corps enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Class members.  The Peace Corps's Inspector General informed OMB that the Peace Corps plans to implement EO 13950 in 2021.

67.     Josephine K. Olsen is the Director of the Peace Corps.  She is sued in her official capacity.

68.     The Tennessee Valley Authority ("TVA") is a federal agency charged with providing electricity for business customers and local power companies in parts of seven southeastern states, providing flood control, navigation, and land management for the Tennessee river system, and assisting local power companies and state and local governments with economic development and job creation.  The TVA enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Class members.  The TVA's Inspector General confirmed to OMB that the TVA is in full compliance with EO 13950's requirements.

69.     John Ryder is the Chair of the TVA.  He is sued in his official capacity.

70.     The United States Environmental Protection Agency ("EPA") is a federal agency charged with protecting human health and the environment.  The EPA enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Class members.  The EPA's Inspector General confirmed to OMB that the EPA is in full compliance with EO 13950's requirements.

71.     Andrew Wheeler is the Administrator of the EPA.  He is sued in his official capacity.

72.     The United States Department of State ("State Dept") is charged with leading the United States' foreign policy through diplomacy, advocacy, and assistance by advancing the interests of the American people, their safety, and economic prosperity.  The State Dept enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Class members.  The State Dept's Inspector General confirmed to OMB that the State Dept is in full compliance with EO 13950's requirements.

73.     Michael R. Pompeo is the Secretary of State.  He is sued in his official capacity.

74.     The Department of Justice ("DOJ") is a federal agency charged with enforcing the law and defending the interests of the United States according to the law; ensuring public safety against threats foreign and domestic; providing federal leadership in preventing and controlling crime; seeking just punishment for those guilty of unlawful behavior; and ensuring fair and impartial administration of justice for all Americans.   DOJ enters into contracts and/or subcontracts—and/or provides grants to—private entities, including without limitation Plaintiff NUL and Class members.  In addition, EO 13950 requires the Attorney General to "continue to assess the extent to which workplace training that teaches the divisive concepts [defined in the

19

Order] may contribute to a hostile work environment and give rise to potential liability under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq."  EO 13950 § 8.

75.     Jeffrey A. Rosen is Acting United States Attorney General.  He is sued in his official capacity.

## JURISDICTION AND VENUE

76.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) because this action arises under the Constitution and the laws of the United States.

77.     Venue is proper in this District under 28 U.S.C. § 1391(e) because Plaintiffs National Fair Housing Alliance and American Association for Access, Equity and Diversity reside within this District and/or because each Defendant is an agency of the United States or an officer or employee of the United States or any agency thereof acting and sued in their official capacities, at least one Defendant resides in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

78.     The Court is authorized to award the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 (Declaratory Judgment Act).

## FACTUAL ALLEGATIONS

### I.     EO 13950 PROHIBITS AND CENSORS PROTECTED SPEECH.

**A.     The Text of EO 13950 Demonstrates Its Purpose to Prohibit, Censor, and Chill Speech and Viewpoints with Which the Trump Administration Disagrees.**

79.     On September 22, 2020, President Trump issued EO 13950, which prohibits workplace trainings of federal contractors and their subcontractors and vendors that "inculcate" in their employees any form of certain defined "divisive concepts," as well as federal grant recipients' "promot[ion]" of these so-called divisive concepts with federal funds ("Protected Speech").

80.     The very text of the Order reveals that its purpose is not to combat unlawful stereotyping as purported, but to prohibit private entities' expression of views on race, sex, and gender that take into account the history and persistent discrimination of people of color, women, and the LGBTQ community in order to foster a diverse and inclusive workplace that respects and values all employees.

81.     EO 13950 imposes the inaccurate and ahistorical viewpoints of the Trump Administration on federal contractors, subcontractors, and grantees simply because President Trump disagrees with the Protected Speech.

82.     Among other things, EO 13950 takes exception to "people" advancing a "vision of America" that takes into account "collective social and political identities."  EO 13950 § 1.  The Order objects to an "ideology" that is grounded in particular portrayals of "our country's history and its role in the world."  *Id.*

83.     EO 13950 bans discussions of inequality grounded in the context of our Nation's history and the lived experiences of those who have been most marginalized and discriminated against.  The Order presents an ahistorical and counterfactual narrative that prohibits consideration of the structural barriers rooted in race and gender discrimination, thereby reinforcing and cementing existing inequalities into a permanent status quo.

84.     EO 13950 restricts Protected Speech by proscribing the teaching of "divisive concepts," defined to include vague and subjective categories of speech that might cause an individual to feel "discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex" based on fact-based discussions about structural inequalities.  *Id.* § 2(a).

85.     To effectuate its categorical ban on the Protected Speech, EO 13950 requires government contracting agencies to place the following restrictions on any contractors they employ:

> The contractor shall not use any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating, including the concepts that (a) one race or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (d) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (h) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.

*Id.* § 4.  Federal contractors are likewise required to include these restrictions in their own subcontracts and purchase orders.  *Id.* § 4(4).

86.     Thus, for example, EO 13950 prohibits workplace training that discusses implicit biases and addresses how best to counteract implicit biases, eradicate systemic discrimination, and ensure a hostility-free work environment.

87.     In short, EO 13950 prohibits any federal contractor—and its subcontractors and vendors—from engaging in speech, including the provision of certain training to its employees, that may foster belief in certain concepts that President Trump has deemed divisive, but which are widely-accepted, historically-based concepts that have been used for years in trainings and programs across the country in corporate, public sector, and educational settings without creating disunity or otherwise thwarting the purported aims of EO 13950.

88.     If a federal contractor fails to comply with the Order, its contract "may be canceled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts."  EO 13950 § 4(a)(3).  The contractor may also be subjected to sanctions as authorized in Executive Order 11246, such as publication of the contractors' names or recommendation that the United States Equal Employment Opportunity Commission initiate proceedings against the contractor under Title VII of the Civil Rights Act of 1964.  *Id*. (citing Exec. Order No. 11,246 (Sept. 24, 1965), as amended by Exec. Order 12,086, 43 Fed. Reg. 46501 (Oct. 5, 1978)).

89.     EO 13950 sets forth similar restrictions for federal grant recipients.  Under the Order, the heads of all government agencies must "identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use Federal funds to promote the concepts [(a) through (h) described above]," and they must submit this list to the Director of the Office of Management and Budget (or "OMB") within sixty days.  EO 13950 § 5.

90.     EO 13950 also threatens the prospect of enforcement against those who express viewpoints that the Trump Administration disfavors.  Specifically, the Order directs the Attorney General to assess the extent to which "workplace training that teaches the divisive concepts" may contribute to a hostile work environment and give rise to liability under Title VII of the Civil Rights Act of 1964.

91.     EO 13950 further permits contractors who become involved in, or are threatened with, litigation with a subcontractor or vendor as a result of compliance with EO 13950 to request that the United States enter the litigation to protect the interest of the United States as defined in the Order.  EO 13950 § 4(a)(4).

B.    **Events Before and After President Trump Issued EO 13950 Illuminate the Administration's Intent to Silence Viewpoints on Race and Gender with Which the Trump Administration Disagrees.**

92.    The sequence of events leading up to the issuance of EO 13950 demonstrates that the Order was part of a reactionary effort by the Trump Administration to use the power of the federal government to force private entities to adopt its own narrative that denies or maligns any acknowledgement of the enduring consequences of slavery and the subsequent subjugation of Black people and other people of color in the United States.

93.    On June 26, 2020, during the aftermath of George Floyd's killing and in response to protests against monuments of men who enslaved Black people,[4] President Trump issued an Executive Order ensuring that any person or group that destroyed or vandalized a monument, memorial, or statue would be prosecuted to the fullest extent, authorizing a penalty of up to ten years imprisonment for willful injury of federal property.  Exec. Order No. 13933, 85 C.F.R. 40081 (2020).

94.    On July 3, 2020, in further response to protests against monuments of men who enslaved Black people, President Trump signed an Executive Order to re-erect monuments of these men in a National Garden of American Heroes.  Exec. Order No. 13934, 85 C.F.R. 41165 (2020).[5]

---

[4] Alan Taylor, *The Statues Brought Down Since the George Floyd Protests Began*, THE ATLANTIC (Jul. 2, 2020), https://www.theatlantic.com/photo/2020/07/photos-statues-removed-george-floyd-protests-began/613774/.

[5] On January 6, 2021, white supremacist agents led an insurrection at the United States Capitol, which threatened the lives and safety of individuals within the Capitol, including Members of Congress, their staff, and Capitol personnel, and resulted in property destruction, vandalism of Congressional offices and historic artifacts, and five fatalities, including the death of a law enforcement officer.  President Trump initially stated that "we love you" in referring to the white supremacist perpetrators and called them "very special."  Igor Derysh, "Trump tells Capital rioters 'we love you,' stokes election lies after Biden condemns 'insurrection,'" Salon.com (Jan. 6. 2021), at https://www.salon.com/2021/01/06/trump-tells-capitol-rioters-we-love-you-stokes-election-lies-after-biden-condemns-insurrection/.

95.     On August 12, 2020, Christopher F. Rufo, a director at the conservative think tank Discovery Institute, tweeted that Sandia National Laboratories hosted a mandatory training called "White Men's Caucus on Eliminating Racism, Sexism, and Homophobia in Organizations."[6] Mr. Rufo described this training as "a 3-day reeducation camp for 'white-males,' with the goal of exposing their 'white privilege' and deconstructing 'white male culture.'"  He then proceeded to post documents from what he described as "the race-segregated, taxpayer-funded session."[7]  The next day, Mr. Rufo tweeted an update that "multiple congressional and White House officials ha[d] reached out to [him] about Sandia Lab's white male reeducation camp.'"[8]  That same day, Mr. Rufo appeared on *Tucker Carlson Tonight*, a program on the Fox News Network, and described the Sandia Labs trainings as "a mandatory program for white male executives where they were supposed to essentially break down their white male identity and confess their sins to diversity trainers."[9]

96.     On September 1, 2020, Mr. Rufo returned to *Tucker Carlson Tonight* and described his new investigation into a Treasury Department diversity training, which "told Treasury employees that America is a fundamentally white supremacist country . . . [a]sking them to accept all of the baggage that comes with this reducible essence of whiteness."[10]  Mr. Rufo further revealed "[t]he FBI is now holding weekly sessions on intersectionality, which is a hard-Left

---

[6]  Christopher F. Rufo (@realchrisrufo), TWITTER (Aug. 12, 2020, 1:40 PM), https://twitter.com/realchrisrufo/status/1293603172842221570.

[7] *Id.*

[8]  Christopher F. Rufo (@realchrisrufo), TWITTER (Aug. 13, 2020, 8:50AM), https://twitter.com/realchrisrufo/status/1293892725683568641.

[9]  Christopher Rufo, TUCKER CARLSON TONIGHT, FOX NEWS (Aug. 13, 2020), https://www.foxnews.com/us/chris-rufo-one-man-war-race-theory.

[10]  Christopher Rufo, TUCKER CARLSON TONIGHT, FOX NEWS (Sept. 1, 2020), https://www.youtube.com/watch?v=rBXRdWflV7M .

academic theory . . . with the white, straight male being at the very top of this pyramid of evil."[11] On Twitter, Mr. Rufo called on President Trump to "immediately issue an executive order abolishing critical race theory from the federal government."[12]

97.     Just three days later, on September 4, 2020, OMB Director Russell Vought released a memorandum that ended "agency spending related to any training on 'critical race theory' 'white privilege, 'or any other training or propaganda effort that teaches or suggests either (1) that the United States is an inherently racist or evil country or (2) that any race or ethnicity is inherently racist or evil."  Off. of Mgmt. & Budget, Exec. Off. of the President, Memorandum for the Heads of Executive Departments and Agencies No. M-20-34, *Training in the Federal Government* (Sept. 4, 2020).  Director Vought announced the Administration's measures "to halt critical race theory trainings immediately" on Twitter.[13] Director Vought described Critical Race Theory trainings as "indoctrination trainings that sow division and racism[.]"[14]

98.     On September 5, 2020, a day after OMB's Memorandum issued, President Trump tweeted that "Critical Race Theory" was a "sickness that cannot be allowed to continue" and directed people to "report any sightings so we can quickly extinguish!"[15]  The President's tweet linked to a Breitbart article entitled "Trump Orders Purge of 'Critical Race Theory' from Federal Agencies," which described Critical Race Theory as a "leftist, racist doctrine that forms the

---

[11] *Id.*

[12] Christopher F. Rufo (@realchrisrufo), TWITTER (Sept. 1, 2020, 10:31 PM), https://twitter.com/realchrisrufo/status/1300984639108968449?s=20.

[13] Russel Vought (@RussVought45), TWITTER (Sept. 4, 2020, 7:57 PM), https://twitter.com/RussVought45/status/1302033078848753665.

[14] Russ Vought (@RussVought45), TWITTER (Sept. 4, 2020, 7:57 PM), https://twitter.com/RussVought45/status/1302033078848753665.

[15] Donald J. Trump (@realDonaldTrump), TWITTER (Sept. 5, 2020, 7:52 AM), https://twitter.com/realDonaldTrump/status/1302212909808971776.

intellectual underpinnings of Black Lives Matter, Antifa, and other radical organizations currently engaged in unrest on America's streets."[16]

99.     On September 15, 2020, Director Vought responded to Mr. Rufo's tweet about a scheduled CDC implicit bias training.   Director Vought tweeted that the training had been "cancelled immediately," "per @POTUS's directive."   The training reportedly planned to "'examine the mechanisms of systemic racism' and address '[w]hite supremacist ideology.'"[17] That same day, Director Vought was reported as describing diversity trainings that include Critical Race Theory as "problematic and un-American."[18]

100.    On September 17, 2020, President Trump hosted the inaugural White House Conference on American History, where he maligned Critical Race Theory and *The 1619 Project*—an historical account of slavery in America published by leading journalists in the New York Times in 2019—as "crusade[s] against American history," "toxic propaganda," and "ideological poison, that, if not removed [would] . . . destroy our country."[19]   The President explained that this was why he "banned trainings in this prejudiced ideology from the federal government and banned it in the strongest manner possible."   President Trump also announced

_____

[16] Id.; Allum Bokhari, Party's Over:  Trump Orders Purge 'Critical Race Theory' From Federal           Agencies,           Breitbart,           (September           4,           2020), https://www.breitbart.com/tech/2020/09/04/partys-over-trump-orders-purge-of-critical-race-theory-from-federal-agencies/.

[17] Russell   Vought   (@RussVought45),   TWITTER   (Sept.   15,   2020,   11:08   AM), https://twitter.com/RussVought45/status/1305886092361715713.

[18] OMB Director Russell Vought on Defunding Critical Race Theory in Federal Agencies, The   Federalist   (Sept.   15,   2020),   https://thefederalist.com/2020/09/15/omb-director-russell-vought-on-defunding-critical-race-theory-in-federal-agencies/.

[19] Remarks by President Trump at the White House Conference on American History, National   Archives   Museum   (Sept.   17,   2020),   https://www.whitehouse.gov/briefings-statements/remarks-president-trump-white-house-conference-american-history/.

that he would soon establish the 1776 Commission by Executive Order to "promote patriotic education."[20]

101.    Three days later, on September 22, 2020, President Trump issued EO 13950. President Trump explained in a tweet:  "A few weeks ago, I BANNED efforts to indoctrinate government employees with divisive and harmful sex and race-based ideologies.  Today, I've expanded that ban to people and companies that do business . . . [21] . . . with our Country, the United States Military, Government Contractors, and Grantees.  Americans should be taught to take PRIDE in our Great Country, and if you don't, there's nothing in it for you!"[22]  The White House announced the EO as one part of several previous executive actions intended to "Defend[] Our History."[23]  And Director Vought described it as "another important step that builds off [President Trump's] directive to agencies to stop trainings that push a radical anti-American agenda."[24]

102.    The same day EO 13950 was issued, Director Vought replied to a tweet by Mr. Rufo accusing the State Department, Environmental Protection Agency, and the Department of Veterans Affairs of hosting trainings about "critical race theory," that allegedly violated the Order by "pressuring staff to denounce their 'white privilege,' become 'co-resistors' against 'systemic racism' and sign 'equality pledges.'"  Director Vought responded that all three trainings

---

[20] *Id.*

[21] Donald J. Trump (@realDonaldTrump), TWITTER (Sept. 22, 2020, 6:53 PM), https://twitter.com/realDonaldTrump/status/1308539918075883523.

[22] Donald J. Trump (@realDonaldTrump), TWITTER (Sept. 22, 2020, 6:53 PM), https://twitter.com/realDonaldTrump/status/1308539921829781504.

[23] The White House, Law  & Justice Briefing Statement, *President Trump is Fighting Harmful Ideologies that Cause Division in Our Federal Workplaces* (Sept. 22, 2020), https://www.whitehouse.gov/briefings-statements/president-trump-fighting-harmful-ideologies-cause-division-federal-workplaces/.

[24] Russ Vought (@RussVought45), TWITTER (Sept. 22, 2020, 7:10 PM), https://twitter.com/RussVought45/status/1308544280701612034.

were cancelled, despite there being no indication in the tweet that these trainings violated the text

of EO 13950.[25]

103.    On September 23, 2020, Director Vought appeared on Fox News and further

explained:

> "[Critical Race Theory] is a theory that emanates from left-wing
> universities across the country that suggests that our institutions are
> fundamentally racist and need to be brought down.  And it reflects
> itself in two primary thoughts.  One is that the country itself, the
> founding, was flawed and that this country is racist to its core.  And
> number two that all white people are fundamentally racist and that
> is just itself discrimination on the basis of race. . . .  ***And obviously
> we believe something different than that. . . .  This is a specific
> effort to go after a specific leftist theory that we think is
> un-American***.[26]

104.    After the issuance of the EO and the preceding OMB Memorandum, the sequence

of trainings cancelled by the Administration revealed a pattern of targeting trainings that discussed

Critical Race Theory and related concepts intended to benefit people of color.

105.    On October 8, 2020, in a sweeping action expanding the reach of EO 13950's

repression, Assistant Attorney General Lee Lofthus ordered the Department of Justice leaders to

suspend not only diversity and inclusion trainings, but also any related "programs, activities, and

events."[27]

106.    A week later, during the first presidential debate, when asked why he ended "racial

sensitivity training that addresses white privilege or Critical Race Theory," President Trump

---

[25] Russ Vought (@RussVought45), TWITTER (Sept. 22, 2020, 6:34 PM),
https://twitter.com/RussVought45/status/1308535115006570498.

[26] Russ Vought (@RussVought45), TWITTER (Sept. 23, 2020, 5:22 PM),
https://twitter.com/RussVought45/status/1308879418891345920.

[27] Katie Benner, Justice Dept. Suspends All Diversity and Inclusion Training for Staff,
N.Y. TIMES (Oct. 9, 2020), https://www.nytimes.com/2020/10/09/us/politics/justice-department-
diversity-training.html.

responded, "I ended it because it's racist … [t]hey were teaching people to hate our country, and I'm not going to allow that to happen."[28]

107.    The sequence of events leading to President Trump's issuance of EO 13950, as well as statements made by him and his Administration after its issuance, reveal the Order's clear purpose to restrict, if not prohibit, the expression of viewpoints with which he disagrees or otherwise deems "un-American."

### C.    EO 13950 Fails to Provide Fair Notice of What Conduct and Content Is Actually Prohibited.

108.    Under the terms of EO 13950, there is no objective way to determine which activities are permitted and which are prohibited, creating a broad chilling effect and inviting unpredictable, uneven, and potentially selective enforcement.

109.    For example, EO 13950 prohibits employers from holding "workplace training" that "inculcates" certain "divisive concepts" in employees.  EO 13950 § 4(a)(1).  However, the Order never defines "workplace training," which can occur in many contexts and for many reasons—such as an employee's onboarding, part of the promotion process, ongoing professional education, or an effort to address workplace conduct issues.

110.    In addition, the Order does not explain, or otherwise define, the prohibited act of "inculcat[ing]."  There are no criteria in the Order for a federal contractor or subcontractor to understand whether training needs to reach a certain level of repetition, admonition, and insistence

---

[28] Donald J. Trump, *WATCH:  Biden urges unity to 'defeat racism'; Trump decries racial sensitivity training*, First Presidential Debate, YOUTUBE (Sept. 29, 2020), https://www.youtube.com/watch?v=pqGyzLjXfjo (footage from the First Presidential Debate).

to be deemed to "inculcate" employees or whether, for example, a single training that references a so-called "divisive concept" is enough to trigger the Order.[29]

111.    Nor are the prohibited "divisive concepts" sufficiently defined.  For example, the Order prohibits training that "inculcates" the concept that "the United States is fundamentally racist or sexist."  But there is no description of what "fundamentally" racist or sexist means.  Under the Order's prohibitions, it is unclear if explaining the historical context of race or gender inequality (*e.g.*, discussing the Nation's history of slavery, the Jim Crow laws, the Civil Rights Movement, the Women's Liberation Movement, the Stonewall uprising, mass incarceration, pay equity or other topics related to racial injustice, gender discrimination or inequity) and the foundational ways this history shapes present-day manifestations of discrimination and biases, would be considered an assertion that the United States is "fundamentally" racist or sexist.

112.    The Order also prohibits training that "inculcates" the view that "members of one race or sex cannot and should not attempt to treat others without respect to race or sex."  EO 13950 § 4(a)(1).  But the Order provides no explanation for what it means "to treat others without respect to race or sex," and the prohibition inexplicably flips basic anti-discrimination principles on their head.  Indeed Title VII, the ADEA, and the Pregnancy Discrimination Act all expressly prohibit workplace conduct and decisions that perpetuate gender and age stereotypes under the guise of "protecting" or showing "respect" for the elderly, women, or pregnant people.

113.    Additionally, employees' words, gestures, jokes, or acts can be hostile and discriminatory when viewed in light of the "totality of the circumstances," which may necessarily

---

[29] Inculcate, *v.*, OXFORD ENGLISH DICTIONARY ONLINE (last visited October 28, 2020), www.oed.com/view/Entry/94107 (defining "inculcate" as "[t]o endeavor to force (a thing) into or impress (it) on the mind of another by emphatic admonition, or by persistent repetition . . . to teach forcibly").

include an individual's "race or sex."  *See, e.g., Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). But contrary to well-established doctrine under Title VII, the Order suggests that considerations of race and sex should *not* factor into an employee's behavior—*i.e.*, that employees cannot be trained in a manner that restricts them from engaging in conduct "without respect to race or sex." Because of the Order's vague language, it is unclear what anti-discrimination workplace training comports with the Order's restrictions.

114.    The Order's prohibition on inculcating "discomfort, guilt, [and] anguish" is similarly inscrutable.  The Order apparently prohibits training that includes the view that "any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex."  EO 13950 § 4(a)(1).  However, the Order leaves unclear whether any training that leads to feelings of discomfort by virtue of the nature of the subject matter itself, rather than by "inculcation," is prohibited.

115.    The Order also prohibits the concept that "meritocracy or traits such as a hard work ethic are racist or sexist."  EO 13950 § 4(a)(1).  Purported objective measures of merit, such as workplace tests and evaluations, have been used historically to exclude qualified members of protected groups from employment opportunities. The Supreme Court has recognized that the disproportionate impact of these tools of purported meritocracy can undermine equality and fairness in the workplace and can, in fact, violate federal law.  *See Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971) ("[P]ractices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices.").  Under the Order, a reasonable employer has no way of knowing whether a seemingly appropriate discussion about the interplay between purportedly "meritocratic" standards and discriminatory impact—even a faithful explanation of the law—may

be prohibited "inculcation" of the view of "meritocracy" as "racist."

116.    Furthermore, the Order mischaracterizes the trainings that it claims are in violation of its terms.  The Order asserts that "[i]nstructors and materials teaching that men and members of certain races, as well as our most venerable institutions, are inherently sexist and racist are appearing in workplace diversity trainings across the country" and identifies one of these trainings as "[m]aterials from Sandia National Laboratories."  White Men As Full Diversity Partners, a well-regarded diversity training consulting firm, provided the referenced training to Sandia National Laboratories, and nowhere do its training materials assert that any person or institution is inherently sexist or racist.  In fact, the portions of the training that were quoted in EO 13950 were likely taken from participants' notes and comments, not from the actual training itself.

117.    Nor does the Order provide objective standards for enforcement.  There is no basis to determine whether any particular training program that discusses race relations, implicit bias, the historical foundations and context of discrimination, and racial sensitivity, would comply or violate the Order.  In the absence of any objective standards, the Order gives DOL unfettered discretion in enforcing the Order's workplace training prohibitions.

118.    The Order further states that grant recipients may need to certify that they will not use federal funds to "promote" the same vague and ill-defined concepts that are banned for federal contractors and subcontractors.  EO 13950 § 5.  As with federal contractors and subcontractors, federal grant recipients are unable to discern what precisely constitutes a prohibited use of federal funds under EO 13950, thus risking their eligibility for federal grants.

119.    In a letter to President Trump, dated October 8, 2020, the American Council on Education wrote that the Order "is creating concern, confusion, and uncertainty for federal

contractors and grant recipients across the country." [30]   Among other issues, the Council noted that the Order "contains many ambiguities and gray areas"—including the definition of "divisive concepts"—"which means potentially substantial penalties for federal contractors and grantees will be based upon the subjective determinations of federal officials."[31]

120.    On October 15, 2020 more than 150 businesses and nonprofit groups, including the U.S. Chamber of Commerce, wrote a letter to President Trump, stating that "[a]s currently written[,] . . . the E.O. will create confusion and uncertainty, lead to non-meritorious investigations, and hinder the ability of employers to implement critical programs to promote diversity and combat discrimination in the workplace."[32]   The groups noted that the definition of "divisive concepts" leaves "considerable ambiguity as to what content would not be permitted in diversity and inclusiveness . . . training" and "creates many gray areas and will likely result in multiple interpretations."[33]

121.    Paulette Granberry Russell, the President of the National Association of Diversity Officers in Higher Education, observed that the Order relies on "vague" terms, including "race or sex stereotyping," which the Order does not "concret[e]ly define."[34]   Likewise, the National

---

[30] Letter from Ted Mitchell, President, Am. Council on Educ., to President Donald J. Trump (Oct. 8, 2020), https://www.acenet.edu/Documents/Letter-White-House-Race-and-Sex-Stereotyping-Executive-Order-100820.pdf.

[31] *See id.*

[32] Coalition Letter on Executive Order 13950, U.S. Chamber of Com. (Oct. 15, 2020), https://www.uschamber.com/letters-congress/coalition-letter-executive-order-13950.

[33] *See id.*

[34] *See* Jeremy Bauer-Wolf, *3 colleges pause diversity efforts over Trump executive order*, EDUCATION DIVE (Oct. 9, 2020, 2:35 PM), https://www.educationdive.com/news/3-colleges-pause-diversity-efforts-over-trump-executive-order/586593/.

Council of Nonprofits has noted that terms like "inculcates" and "workplace training" are vague and ambiguous, and the divisive concepts themselves are unclear.[35]

### D. Other Executive Branch Guidance and Statements Have Only Added to the Lack of Clarity

122.     On September 28, 2020, OMB published a Memorandum entitled "Ending Employee Trainings that Use Divisive Propaganda to Undermine the Principle of Fair and Equal Treatment for All" ("Memorandum"), which provided additional content to EO 13950's directives. Off. of Mgmt. & Budget, Exec. Off. of the President, OMB M-20-37 (Sept. 28, 2020).  The Memorandum expanded on the Order by highlighting terms, such as "critical race theory," "white privilege," "intersectionality," "systemic racism," "positionality," "racial humility," and "unconscious bias," as key to identifying the targeted "divisive" diversity training programs. *Id.* at 2.

123.     This Memorandum singled out specific terms and subject matter, such as critical race theory or white privilege, as targets of the Order even though they were not explicitly included in the definition of "divisive concepts" proscribed by the text of the Order.

124.     On October 7, 2020, OFCCP released nine Frequently Asked Questions ("FAQs") addressing the EO.[36]  However, this guidance further contributed to the uncertainty surrounding the EO's enforcement.  Regarding the EO's date of effectiveness, OFCCP claimed that it could "investigate claims of sex and race stereotyping" now "pursuant to its existing authority under

---

[35] *See* Tim Delaney and David L. Thompson, *How Nonprofits Can Stop Trump's Effort to Roll Back Diversity Training*, NONPROFIT QUARTERLY (Oct. 5, 2020), https://nonprofitquarterly.org/how-nonprofits-can-stop-trumps-effort-to-roll-back-diversity-training/.

[36] Executive Order 13950 – Combatting Race and Sex Stereotyping, Office of Federal Compliance Programs (Oct. 7, 2020), https://www.dol.gov/agencies/ofccp/faqs/executive-order-13950.

Executive Order 11246."  However, OFCCP also instructed that EO 13950 applies to contracts entered into or modified after November 21, 2020.

125.    The FAQs provide that "[u]nconscious or implicit bias training is prohibited to the extent it teaches or implies that an individual, by virtue of his or her race, sex, and/or national origin, is racist, sexist, oppressive, or biased, whether consciously or unconsciously."  The FAQs do not explain how a training may "imply" the prohibited concept; nor does it indicate who determines whether there has been such an implication.

126.    On October 22, 2020, OFCCP published, in the Federal Register, a request for information ("RFI")  pursuant to EO 13950, seeking "comments, information, and materials from Federal contractors, Federal subcontractors, and employees of Federal contractors and subcontractors concerning workplace trainings involving prohibited race or sex stereotyping or scapegoating."[37]  According to the RFI, the president "directed that the request for information should request copies of any training, workshop, or similar programming having to do with diversity and inclusion as well as information about the duration, frequency, and expense of such activities."[38]

127.    These interpretive documents from the federal government only reinforce how vague the terms of EO 13950 are and how expansively they can be interpreted for purposes of enforcement.

**E.     EO 13950 Departs from Normal Procedures.**

128.    Presidents historically follow specific procedural steps for enacting executive orders, which ensure that they are properly reviewed, vetted, and implemented.  One example of

---

[37] Request for Information; Race and Sex Stereotyping and Scapegoating, 85 Fed. Reg. 67,375-67,378 (Oct. 22, 2020).

[38] *Id.*

this procedure can be found in the provisions of 1 CFR § 19.2—"Routing and approval of drafts"— which lay out the procedure for review by the Office of Management and Budget, Attorney General, and Office of the Federal Register, in order to ensure legality and language, prior to submission to the President for signature.  Other procedures ensure that the executive order is properly implemented.

129.    These procedures have historically been found within the executive order itself with provisions for amendment to reconcile the executive order with past orders, as well as instructions to the relevant cabinet Secretary to draft rules and regulations for implementation.  Finally, executive orders are, historically, submitted to the Federal Acquisition Regulatory Council and Office of Federal Contract Compliance Programs for implementation into the Federal Register and insertion into federal government contracts.

130.    EO 13950 reflects a radical departure from other executive orders and from these standard procedures.  For example, unlike recent executive orders related to the federal workplace, such as President Obama's Executive Order 13672 (amending two prior executive orders to extend prohibitions against discrimination to also prohibit discrimination targeting sexual orientation or gender identity) and Executive Order 13665 (prohibiting retaliation for inquiring about, discussing, or disclosing compensation information), EO 13950 lacks any provision that purports to amend Executive Order 11246 (1965), which already addresses anti-discrimination requirements for federal contractors.  Instead, EO 13950 excludes all contracts exempted by Executive Order 11246, section 204, and mandates that all federal government contracting agencies shall include specified contract language set forth in the Order.  EO 13950 § 4(a).

131.    In addition, unlike prior workplace discrimination-related executive orders, the Order does not instruct the Secretary of Labor to prepare regulations to implement the

requirements of the Order.  Instead, the Order merely instructs the Department of Labor to establish a hotline and investigate complaints of purported violations of the Order.  EO 13950 § 4(b).

132.   In another departure from the ordinary procedural attributes of executive orders concerning workplace discrimination, the Order lacks any mechanism for rulemaking to modify the Federal Acquisition Regulations ("FAR"), which are incorporated as binding terms in all government contracts.  48 C.F.R. § 1.301(a)(1).  Ordinarily, to amend those regulations (and the binding terms for government contracts specified therein)—*e.g.*, to include the language required by the Order—agencies must go through general rulemaking procedures, which include publication of the proposed "procurement policy, regulation, procedure, or form and provide for a public comment period for receiving and considering the views of all interested parties on the proposal.  The length of the comment period may not be less than 30 days."  41 U.S.C. § 1707(b); *see also* 48 C.F.R. § 1.301(b); 48 C.F.R. Subpart 1.5.  "[A] procurement policy, regulation, procedure, or form (including an amendment or modification thereto) may not take effect until 60 days after it is published for public comment in the Federal Register" unless "there are compelling circumstances for the earlier effective date . . . ."  41 U.S.C. § 1707(a).  The notice and comment period "may be waived," but only "if urgent and compelling circumstances make compliance with the requirements impracticable."  41 U.S.C. § 1707(d).

133.   Contrary to normal procedures, there has been no notice of EO 13950 in the Federal Register; therefore, federal contractors were not afforded an opportunity to comment on the Order's terms before they were incorporated into federal contracts.  Waiver of the notice would be permitted if "urgent and compelling circumstances make compliance with [those] requirements impracticable."  41 U.S.C. § 1707(d).  On information and belief, there has been no specific

articulation as to the "urgent and compelling circumstances" that would render the notice and comment requirements impracticable.

134.   On November 20, 2020, DOD issued a Class Deviation to "implement[] Section 4 of E.O. 13950," which requires contracting officers to include the Order's provisions regarding government contractors "in solicitations issued on or after November 20, 2020, and in any resultant contracts" and to "[a]mend solicitations issued prior to November 20, 2020, to include [the Order's provisions] and in any resultant contract award expected to occur on or after November 20, 2020 . . . ." "Class Deviations" allow agencies to deviate from the FAR without amending it. *See* 48 C.F.R. §§ 1.401(a), (f), 1.402, 1.404. This Class Deviation did not identify any urgency or time sensitivity that supported a Class Deviation, as opposed to the normal rulemaking procedures.

135.   That same day, NASA and USDA issued their own Class Deviation with near identical language, which also did not identify any urgency or time sensitivity. On December 1, 2020, DHS issued a Class Deviation similar to those issued by the DOD, NASA, and USDA. The Energy Dept issued a class deviation on December 3, 2020. While the Energy Dept's Class Deviation contained a conclusory and cryptic statement that there were "urgent circumstances on implementation of the E.O.," it provided no explanation as to what those "urgent circumstances" were.

136.   Other agencies appear to have enforced EO 13950 even in the absence of Class Deviations. Inspectors General for the for the Department of State, Tennessee Valley Authority, Environmental Protection Agency, the U.S. Chemical Safety and Hazard Investigation Board, Farm Credit Administration and Nuclear Regulatory Commission confirmed to OMB that their

agencies are in full compliance with the EO's requirements.[39]  Inspectors General for DOL and

the Peace Corps have stated that "plans to implement and evaluate the EO [are] slated for 2021."[40]

## II.   THE PROTECTED SPEECH THAT EO 13950 CENSORS AND CHILLS IS OF IMMENSE PUBLIC CONCERN AND A MATTER OF PUBLIC WELFARE.

### A.   Discussions to Support and Advance Workplace Diversity, Inclusion, and Equality Constitute Important Protected Speech.

137.   Of the many ways that racism has blighted our democracy, economic and

employment-based injustice and exclusion rank among the most pervasive.  Slavery involved the

theft of Black labor.  Even in the non-slave states, Black people in the antebellum era were

relegated to menial employment positions.  After the Civil War, Black Codes, the Convict Lease

system, and a veritable reign of terror by white supremacist groups in the South was motivated, in

part, by a desire to ensure a racialized employment hierarchy that forced Black people into the

lowest status employment sectors.

138.   For most of the twentieth century, state-sanctioned segregation in education and

employment ensured that most Black people were maintained in low-paying jobs of domestic or

agricultural work, and blue-collar factory and plant jobs in the South included strict racial

hierarchies in which Black workers were held to the lowest rungs.  The federal government itself

practiced this racial hierarchy and, in the Woodrow Wilson administration, segregated or purged

the few Black employees in low-level positions from federal service.[41]  By the time Title VII of

---

[39] Jessie Bur, *Agencies begin to receive compliance checks on diversity executive order*, Federal Times, https://www.federaltimes.com/federal-oversight/watchdogs/2020/12/29/agencies-begin-to-receive-compliance-checks-on-diversity-executive-order/ (last accessed Jan. 4, 2021).

[40] Id.

[41] Judson MacLaury, The Federal Government and Negro Workers Under President, U.S. Dep't of Labor Woodrow Wilson, https://www.dol.gov/general/aboutdol/history/shfgpr00; Dick Lehr, *The Racist Legacy of Woodrow Wilson*, The Atlantic (Nov. 27, 2015), https://www.theatlantic.com/politics/archive/2015/11/wilson-legacy-racism/417549/.

the Civil Rights Act of 1964 was passed into law, employers regularly and overtly discriminated against Black employees in hiring, work assignments, and compensation.

139.    While Title VII achieved much progress in equalizing employment opportunities, the historic subjugation of Black people and other people of color persists in implicit biases and structural inequalities that have led to their continued underrepresentation at the highest levels of corporate leadership.

140.    For example, although Black people represent 13.4 percent of the U.S. population, within U.S. financial institutions, they account for only 2.4 percent of executive committee members, only 1.4 percent of managing directors, and only 1.4 percent of senior portfolio managers.[42]  Black people represent just 1.9 percent of technology executives and 5.3 percent of technology professionals.[43]

141.    Moreover, Asian Americans make up five percent of the U.S. population, but account for only 1.4% of *Fortune* 500 CEOs and 1.9% of corporate officers overall.[44]  And more than one-third of Latinx people report having experienced discrimination in terms of either their job applications, compensation, or consideration for promotions for jobs they already have.[45]

142.    Studies indicate that the underrepresentation of people of color in the private and public sector is not an issue of merit, but rather, opportunity.  For example, a Harvard Business School study found that people of color had to manage their careers more strategically than their

---

[42] Laura Morgan Roberts & Anthony J. Mayo, *Toward A Racially Just Workplace*, Harv. Bus. Rev. (Nov. 2019), https://hbr.org/cover-story/2019/11/toward-a-racially-just-workplace.

[43] *Id*.

[44] Liza Mundy, *Cracking the Bamboo Ceiling,* THE ATLANTIC (Nov. 2014), https://www.theatlantic.com/magazine/archive/2014/11/cracking-the-bamboo-ceiling/380800/.

[45] Press Release, Harv. Sch. of Pub. Health, *Poll finds one-third of Latinos say they have experienced discrimination in their jobs and when seeking housing* (Nov. 1, 2017), https://www.hsph.harvard.edu/news/press-releases/poll-latinos-discrimination/.

white peers and were required to prove greater competence than their white peers before securing the same promotions.[46]  Research by the Deans of Cornell University's Dyson School and Emory University's Goizueta Business School found that Black leaders in business are disproportionately given assignments with a high risk of failure.[47]  Another study of Black leaders found that, because of stereotyping, they were evaluated negatively regardless of their performance.[48]

143.    In addition to racial discrimination and harassment in the workplace, sexual harassment, gender discrimination, and discrimination on the basis of sexual orientation and gender identity are disconcertingly prevalent.

144.    In 2014, women who worked full time, year-round in the United States were paid only 79 cents for every dollar paid to their male counterparts.[49]  This wage gap reflects a number of factors, including lower pay for women within the same employment positions, segregation of women into lower-paying jobs, bias against women caregivers as workers, and workplace policies that impose long-term economic penalties on workers who take time out of the workforce to care for their families.[50]

---

[46] Roberts & Mayo, *Toward a Racially Just Workplace* (citing David A. Thomas & John J. Gabarro, Breaking Through: The Making of Minority Executives in Corporate America (1999)).

[47] *Id.*

[48] Andrew M. Carton & Ashleigh Shelby Rosette, Explaining Bias against Black Leaders: Integrating Theory on Information Processing and Goal-Based Stereotyping, 54 ACAD. OF MGMT. J., 1141, 1141 (2012).

[49] *See* Nat'l Women's L. Ctr., Fact Sheet: FAQ About the Wage *Gap* 1 (Sept. 2015), https://nwlc.org/wp-content/uploads/2015/08/faq_about_the_wage_gap_9.23.15.pdf  (comparing median earnings by women in full time, year round employment with median earnings by men in full time, year round employment).

[50] *Id.*

145.     Moreover, women—many of whom are supporting families—are over-represented in the low-wage workforce and comprise two-thirds of low-wage workers, despite making up slightly less than half of the workforce overall.[51]

146.     The intersectionality of race and gender exacerbates these dual biases for women of color.  Nearly half of women in the low-wage workforce are women of color,[52] and women of color are disproportionately represented in the low-wage sector of the workforce.[53]  For example, Black women are 6% of the overall workforce but their share of the low-wage workforce is nearly double that at 11%.[54]   Black and Hispanic women experience greater wage gaps—60 cents and 55 cents for every dollar paid to white, non-Hispanic men, respectively—than their white, non-Hispanic counterparts.[55]

147.     LGBTQ persons of color also are more than twice as likely to have experienced discrimination as compared to their white peers.  Whereas 13% of white LGBTQ persons report having experienced discrimination based on their LGBTQ status during the job-application

---

[51] *See* Anne Morrison & Katherine Gallagher Robbins, Nat'l Women's L. Ctr., *Women's Overrepresentation in Low-Wage Jobs* 1 (Oct. 2015) , https://nwlc.org/wp-content/uploads/2015/08/chartbook_womens_overrepresentation_in_low-wage_jobs.pdf (defining low-wage jobs as those that typically pay $10.50 per hour or less); Anne Morrison & Katherine Gallagher Robbins, Nat'l Women's L. Ctr., *The Women in the Low-Wage Workforce May Not Be Who You Think* 4 (Sept. 2015), https://nwlc.org/wp-content/uploads/2015/08/chartbook_women_in_the_low-wage_workforce_may_not_be_who_you_think.pdf.

[52] *Id*.

[53] Morrison & Robbins, Women's Overrepresentation in Low-Wage Jobs, at 6.

[54] *Id*.

[55] *See* Center for American Progress, *Quick Facts About the Gender Wage Gap* (Mar. 24, 2020), https://www.americanprogress.org/issues/women/reports/2020/03/24/482141/quick-facts-gender-wage-gap/.

process, that figure is 32% for LGBTQ people of color.[56]  Similarly, 27% of LGBTQ persons of color state that they are afraid to take time off work to care for a loved one for fear it would reveal their LGBTQ status at work (compared to 16% of white LGBTQ employees).[57]

148.    The rates of workplace discrimination against transgender people—including 26% reporting they have been fired based on anti-transgender bias and 50% who have been harassed on the job—are even higher for transgender people of color, who face "up to twice or three times the rates of various negative outcomes" as compared to white transgender employees.[58]

**B.    Discussions About Implicit Bias, Systemic Discrimination, and Racial and Gender Privilege Are Important Speech of Public Concern and Debate, About Which President Trump Has Expressed Disagreement.**

149.    As demonstrated by hostile environments in the workplace and persistent disparities in access to opportunities, the lasting effects of race and sex discrimination are deep and widespread.  Such discrimination, which was normalized for generations, continues to shape

---

[56] Nat'l Pub. Radio, et al., *Discrimination in America: Experiences and Views of LGBTQ Americans* 11 (Nov. 2017), https://legacy.npr.org/documents/2017/nov/npr-discrimination-lgbtq-final.pdf.

[57] Human Rights Campaign Foundation, *LGBTQ Working People of Color Need Paid Leave* 8 (May 2018), https://hrc-prod-requests.s3-us-west-2.amazonaws.com/files/assets/resources/HRC-PaidLeave-POCReport-FINAL.pdf?mtime=20200713133946&focal=none.

[58] Jaime M. Grant et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* 3, 51 (2011) https://transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf; *see also, e.g.*, Nat'l Ctr. for Transgender Equality, *Issues: Non-Discrimination Laws*, https://transequality.org/issues/non-discrimination-laws (last visited June 28, 2019); M.V. Lee Badgett et al., Williams Institute, *Bias in the Workplace: Consistent Evidence of Sexual Orientation and Gender Identity Discrimination* 3 (June 2007), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Bias-Workplace-SOGI-Discrim-Jun-2007.pdf (reporting similar evidence of pronounced discrimination against LGBTQ employees of color); M.V. Lee Badgett et al., Ctr. for Emp. Equal., *Evidence from the Frontlines on Sexual Orientation and Gender Identity Discrimination* (July 2018), https://www.umass.edu/employmentequity/evidence-frontlines-sexual-orientation-and-gender-identity-discrimination (same).

our perceptions and assumptions about individuals and groups based on their race, sex, gender identity, and/or sexual orientation, resulting in both explicit and implicit biases at an individual and systemic level.

150.    According to Professor Jennifer Eberhardt, one of the most preeminent experts of implicit bias and the recipient of the MacArthur "genius" fellowship, "categorization is a fundamental tool that our brains are wired to use," beliefs we have about categorized social groups are "stereotypes," and the attitudes we have about them are "prejudice."[59]  "Whether bad or good, whether justified or unjustified, our beliefs and attitudes can become so strongly associated with the category that they are automatically triggered, affecting our behavior and decision making . . . . The process of making these connections is called bias."[60]

151.    The explicit discrimination against people of color, women, and LGBTQ individuals was grounded upon—and has further generated—entrenched stereotypes that fuel the explicit and implicit biases that affect our interactions and decision making, resulting in significant disparities and inequality today.  For example, one of the strongest and most pervasive stereotypes in the United States is the strong association between Blackness and criminality, which has had dire consequences in the criminal justice system.[61]

152.    Ongoing implicit biases also have severe ramifications in the workplace.  A well-known study of the U.S. labor market sent out thousands of identical resumes with names that signaled the race of the applicant as white or Black, resulting in applications with "Black-sounding

---

[59] Jennifer Eberhardt, Biased:  Uncovering the Hidden Prejudice That Shapes What We See, Think, and Do 31 (2019).

[60] *Id.*

[61] *Id.* at 6.

names" to be 50% less likely to get a callback.[62]  Even increasing the qualifications of the Black applicants did not help—they were still less likely to be called back than less-qualified white applicants.[63]

153.    Women likewise face implicit biases in the workplace, such as being considered ill-fitted for high-powered positions, either too masculine or too feminine in male-dominated fields, and conflicted between their professional commitment and motherhood.[64]  And women of color experience the intersectionality of both race and gender bias—*i.e.*., needing to prove themselves as both women and people of color.[65]

154.    LGBTQ employees also suffer from implicit biases in the workplace.  In a study by the Human Rights Campaign, one-in-five LGBTQ employees (compared to one in 24 non-LGBTQ employees) were told by coworkers to dress in a more masculine or feminine way.[66]  Forty-six percent of non-LGBTQ workers state that they would not be very comfortable working with an LGBTQ colleague, and most of the discomfort stems from a desire not to hear about their LGBTQ colleagues' sex lives.[67]  And 46% of LGBTQ employees are still closeted at work.[68]

---

[62] *Id.* at 263-64.

[63] *Id*.

[64] Joan C. Williams, *Double Jeopardy? An Empirical Study with Implications for the Debates over Implicit Bias and Intersectionality*, 37 HARV. J. L. & GENDER 185, 189-93 (2014).

[65] *Id.* at 194.

[66] Human Rights Campaign, *Workplace Divided: Understanding the Climate for LGBTQ Workers Nationwide* 6 (2018), at https://assets2.hrc.org/files/assets/resources/AWorkplaceDivided-2018.pdf?_ga=2.11363569.430490975.1603766732-68969451.1603766732.

[67] *Id*.

[68] *Id*.

Intersectionalities with race and gender further exacerbate the implicit biases that LGBTQ employees confront.

155.    Both explicit and implicit biases normalize conditions under which people of color, women, and LGBTQ people are underrepresented and undervalued.  Thus, what may be perceived as natural, neutral, and objective is, to the contrary, a direct product of the legacy of discrimination that has become fully embedded in various aspects of our society, such as the educational system, the criminal justice system, housing, health care, and most certainly employment.

156.    The absence of explicit forms of bias that are more easily identified and remedied within the contours of our anti-discrimination laws do not render more nuanced and structural inequalities any less harmful to the victims of such inequalities.  It is in response to these structural inequalities that Critical Race Theory was born.  Although Critical Race Theory is comprised of a wide variety of scholarship, it is "unified by two common interests": (1) the pursuit of understanding how racial subordination originated and has been maintained in the United States, especially in relation to the legal system; and (2) a desire to change the legal system so that it no longer supports racial subordination.[69]

157.    Although it largely resides within the field of legal academia, Critical Race Theory is an invaluable lens through which to understand how structural inequalities proliferate despite the Equal Protection Clause and civil rights and anti-discrimination laws.  Moreover, the basic tenets of Critical Race Theory are very much aligned with the Black Lives Matter movement, which gained widespread support, including in the form of mass peaceful protests across the

---

[69] Kimberlé Crenshaw, et al., Critical Race Theory: The Key Writings That Formed the Movement viii (The New Press, ed. 1995).

country and globe, following the police killing of George Floyd this past summer and has been the subject of popular discourse, as well as discussions in the workplace.

158.     The mass protests against police violence in the Black community during the summer of 2020 have been widely reported as the largest movement in American history with dozens of millions of people of all races, both domestically and internationally, protesting against police violence and abuse against the Black community.[70]  In one day alone—on June 6, 2020— about 500,000 people protested in 550 locations across the United States.[71]

159.     Support for eradicating anti-Black racism has increased significantly among multiple entities and across industries.  Professional sports associations, such as the National Football League and NASCAR, that were previously reticent have publicly voiced their support for anti-racist efforts.[72]

160.     In July 2020, several large banks spoke out against the Department of Housing and Urban Development's decision to eviscerate the disparate impact standard under the Fair Housing Act, explaining that housing discrimination remains a reality for many Black Americans.[73]  And numerous corporations have expressed support not only for racial justice protesters, but also for

---

[70] Larry Buchanan, Quoctrung Bui, and Jugal K. Patel, *Black Lives Matter May Be the Largest Movement in U.S. History*, N.Y. TIMES, July 3, 2020, https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.

[71] *Id.*

[72] Tonya Pendleton, *NASCAR Stands for 'Black Lives Matter' in Video*, THE GRIO, June 8, 2020, https://thegrio.com/2020/06/08/nascar-black-lives-matter/; Mark Maske and Adam Kilgore, *What Made Roger Goodell Say 'Black Lives Matter' and Where It Leaves the NFL*, WASH. POST, June 6, 2020, https://www.washingtonpost.com/sports/2020/06/06/roger-goodell-black-lives-matter/.

[73] Joe Adler, *Big Banks Urge HUD to Shelve Redlining Plan. Small Banks Say Not So Fast*, AMERICAN BANKER, June 20, 2020, https://www.americanbanker.com/news/big-banks-urge-hud-to-shelve-redlining-plan-small-banks-say-not-so-fast#:~:text=A%202015%20Supreme%20Court%20decision%20affirmed%20disparate%20impact%2C,should%20restrict%20how%20the%20legal%20doctrine%20is%20applied

their own Black employees, by encouraging leadership to stand in solidarity with their Black friends and colleagues in the fight to eradicate racism.[74]

161.    Moreover, on June 4, 2020, all nine justices of the Washington State Supreme Court signed an open letter to the legal community in response to George Floyd's death and the subsequent mass protests.[75]  The letter recognized "the injustices faced by black Americans are not relics of the past. . . .  Our institutions remain affected by the vestiges of slavery: Jim Crow laws that were never dismantled and racist court decisions that were never disavowed."[76]  The Justices further stated that "we must recognize that systemic racial injustice against black Americans is not an omnipresent specter that will inevitably persist.  It is the collective product of each of our individual actions—every action, every day.  It is only by carefully reflecting on our actions, taking individual responsibility for them, and constantly striving for better that we can address the shameful legacy we inherit."[77]

162.    The effects of structural racism have also been revealed the COVID-19 pandemic. "Blacks, Latinos, and American Indians are experiencing hospitalizations at rates 4.5 to 5.5 times higher than non-Hispanic whites. . . .  Hispanics and Native Americans are both dying about 1.5 times the rate of white people.  And Black people are dying at 2.4 times the white rate."[78]

---

[74] Tiffany Hsu, *Corporate Voices Get Behind 'Black Lives Matter' Cause*, N.Y. TIMES, May 31, 2020, https://www.nytimes.com/2020/05/31/business/media/companies-marketing-black-lives-matter-george-floyd.html.

[75] The Supreme Court, State of Washington, *Open Letter to the Legal Community* (June 4, 2020), http://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%20060420.pdf.

[76] *Id.*

[77] *Id.*

[78] Daniel Wood, *As Pandemic Deaths Add Up, Racial Disparities Persist – And in Some Cases Worsen*, NPR, Sept. 23, 2020, https://www.npr.org/sections/health-

Shockingly, the "mortality rates and life expectancy are far better for white Americans" during the COVID-19 pandemic "than they are for Black people during normal, non-pandemic years."[79]

163.    Dr. Anthony Fauci, the foremost infectious disease expert in the United States and a member of the President's Coronavirus Task Force, attributed these disparities to institutional racism that contributed to socioeconomic inequality.  Oversight of the Trump Administration's Response to the COVID-19 Pandemic: Hearing Before the House Energy and Commerce Committee, 116 Cong. 56 (2020) (Unedited Hearing Transcript).

164.    Additionally, concerns about sexual harassment and violence and gender inequities have reached a pinnacle the past few years due to the Me Too Movement[80] and Times Up,[81] which have unearthed and publicized rampant discrimination against women in the workplace, especially against women of color and transwomen of color.

165.    The United States Supreme Court's recognition of marriage equality in *Obergefell v. Hodges*, 576 U.S. 644 (2015) was a culmination of decades of activism by the LGBTQ

shots/2020/09/23/914427907/as-pandemic-deaths-add-up-racial-disparities-persist-and-in-some-cases-worsen.

[79] Maria Godoy, *'Racial Inequality May Be as Deadly as COVID-19,' Analysis Finds*, NPR, Aug. 27, 2020,  https://www.npr.org/sections/health-shots/2020/08/27/906002043/racial-inequality-may-be-as-deadly-as-covid-19-analysis-finds.

[80] Founded in 2006 by sexual violence survivor and activist Tarana Burke, the Me Too Movement went viral on social media in 2017 with the #MeToo hashtag in connection with highly publicized revelations of sexual violence; Me Too continues to assist and support survivors of sexual violence and their allies by "connecting survivors to resources, offering community organizing resources, pursuing a 'me too' policy platform, and working with researchers . . . ." https://metoomvmt.org/.  Me Too Movement, *Get to Know Us* (last visited Oct. 28, 2020), *https://metoomvmt.org/get-to-know-us/;* Me Too Movement, *Vision & Theory of Change* (last visited Oct. 28, 2020), https://metoomvmt.org/get-to-know-us/vision-theory-of-change/.

[81] Originally founded in 2017 by over 300 women in the entertainment industry, Times Up is a not-for-profit organization and charitable foundation committed to gender equality. Time's Up *Time's Up Was Born When Women Said "Enough Is Enough"* (last visited Oct. 28, 2020), https://timesupfoundation.org/about/our-story/.

movement,[82] which continues to seek equality in other aspects of LGBTQ life, including employment.[83]

166.     Concepts like implicit bias, systemic discrimination, structural inequalities, and race and gender privileges and hierarchies have been increasingly acknowledged, embraced, and espoused in the speech of individuals, organizations, corporations, and associations of all races and backgrounds during recent months leading up to the issuance of EO 13950.

167.     It is, therefore, clear from the text of EO 13950, the statements and conduct of the Trump Administration before and after the issuance of the Order, and the words of President Trump himself that EO 13950 was conceived, drafted, and implemented to impose upon both public and private entities the views, opinions, and perspectives of the Trump Administration, in conflict with the Plaintiffs' own speech, as well as that of the Class—to the detriment of Plaintiffs and their members, as well as their employees, in fostering diversity, inclusion, and equality for people of color, women, and LGBTQ individuals.

### C.     EO 13950 Censors and Chills Important Speech that Advances Equality for People of Color, Women, and LGBTQ Persons in Deference to the Trump Administration's Viewpoints, as Expressed by President Trump Himself.

168.     Federal contractors and grant recipients like Plaintiffs reasonably want to discuss and address implicit biases and structural inequalities to ensure equal opportunity in their workplaces and prevent hostile work environments.  A study of gender biases among committee members evaluating candidates for competitive research positions found that "educating

---

[82] Nathaniel Frank, *The Long Road to Marriage Equality*, SLATE, June 26, 2015, https://slate.com/human-interest/2015/06/gay-marriage-a-history-of-the-movement-for-marriage-equality.html.

[83] Emma Green, *America Moved on From Its Gay-Rights Moment and Left a Legal Mess Behind*, THE ATLANTIC, Aug. 17, 2019, https://www.theatlantic.com/politics/archive/2019/08/lgbtq-rights-america-arent-resolved/596287/.

evaluative committees about gender biases" had an effect on whether committee members with strong implicit gender biases were able to make selection decisions unaffected by those biases.[84]

169.    Counteracting the effects of implicit biases or structural inequalities produces positive results for employers by maximizing the potential and productivity of their workforce, facilitating efficiency and economy in the workplace, and preventing discord and possible litigation regarding employment discrimination or a hostile work environment.  For example, a study of LGBTQ employees working in unwelcoming environments found that 25% felt "distracted from work," "17% felt exhausted from spending time and energy hiding their sexual orientation," and "20% searched for a different job."[85]

170.    Moreover, employers benefit directly from the diversity of their workforce. "[C]ompanies in the top quartile for gender or racial and ethnic diversity are more likely to have financial returns above their national industry medians.  Companies in the bottom quartile in these dimensions are statistically less likely to achieve above-average returns."[86]  Diversity can also "drive innovation" by "creating an environment where 'outside the box' ideas are heard."[87]  And "[i]n the fight for global talent, diversity and inclusion policies . . . help[] to broaden the pool of

---

[84] Isabelle Régner et al., Committees with Implicit Biases Promote Fewer Women When They Do Not Believe Gender Bias Exists, 3 NATURE HUM. BEHAV. 1171 (2019).

[85] Human Rights Campaign Foundation, *LGBTQ Working People of Color Need Paid Leave* 8 (May 2018), https://hrc-prod-requests.s3-us-west-2.amazonaws.com/files/assets/resources/HRC-PaidLeave-POCReport-FINAL.pdf?mtime=20200713133946&focal=none.

[86] Vivian Hunt et al., *Why Diversity Matters*, McKinsey & Company, Jan. 1, 2015, https://www.mckinsey.com/business-functions/organization/our-insights/why-diversity-matters.

[87] Sylvia Ann Hewlett et al., *How Diversity Can Drive Innovation*, HARV. BUS. REV. (2013), https://hbr.org/2013/12/how-diversity-can-drive-innovation.

talent a company can recruit from, while also helping to build an employment brand that is seen as fully inclusive."[88]

171.    Fortune 500 companies and leaders in the United States military have repeatedly expressed the importance of diversity to the success of their work and speak openly about the value of diversity initiatives to building strong teams and increasing productivity.  *See*, *e.g.*, Brief of Lt. Gen. Julius W. Becton Jr., et al., as Amici Curiae Supporting Respondents, *Grutter v. Bollinger*, 539 U.S. 98 (2003) (Nos. 02-241, 02-516), 2003 WL 1787554; Brief for General Motors as Amici Curiae Supporting Respondents, *Grutter v. Bollinger*, 539 U.S. 98 (2003) (Nos. 02-241, 02-516), 2003 WL 399096; Brief of Lt. Gen. Julius W. Becton Jr., et al., as Amici Curiae Supporting Respondents, *Fisher v. Univ. of Texas at Austin* (No. 14-981), 2015 WL 6774556; Brief for Fortune-100, et al. as Amici Curiae Supporting Respondents, *Fisher v. Univ. of Texas at Austin*, (No. 14-981), 2015 WL 6735839.

172.    Nevertheless, EO 13950 threatens to slow, restrict, or prohibit the various forms of speech and actions that corporations and other entities have undertaken in response to increased awareness of racial and gender inequity and to the related demands of their employees, customers, investors, boards of directors and leadership.

173.    EO 13950 censors and chills Protected Speech of all federal contractors and subcontractors, hindering their ability to successfully train their employees and implement critical programs to combat discrimination in the workplace and promote diversity and inclusion.  The Order more broadly prohibits federal grantees from "promoting" what the Administration considers to be "divisive concepts."  Plaintiffs' Protected Speech, including any diversity trainings,

---

[88]    *Fostering Innovation Through a Diverse Workforce*, FORBES 7 (2011), https://images.forbes.com/forbesinsights/StudyPDFs/Innovation_Through_Diversity.pdf.

provides an essential forum for citizens to discuss public issues that affect society broadly speaking and also have a meaningful application in the workplace, maximizing the productivity of employees and ensuring that employees of all backgrounds are respected and included.

174.    Thus, when federal contractors and grant recipients are discussing issues of equality and inclusion, they are expressing protected viewpoints concerning topics of the utmost importance to our democracy and essential to the successful functioning of a diverse workplace. Such discourse is critical speech protected by the First Amendment. *Snyder v. Phelps*, 562 U.S. 443, 453 (2011).

175.    The Supreme Court has recognized that such speech is at the *core* of the First Amendment's protections.  "Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'"  *Lane v. Franks*, 573 U.S. 228, 235-36 (2014) (quoting *Roth v. U.S.*, 354 U.S. 476, 484 (1957)).  Speech on public issues, particularly relating to any matter of political, social, or other concern to the community, "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."  *Snyder*, 562 U.S. at 453.  For that reason, courts have historically struck down government actions censoring speech by federal employees that relates to issues of racial justice, gender equality, and social progress.  *See, e.g.*, *Hardy v. Jefferson Cmty. College*, 260 F.3d 671, 679 (6th Cir. 2001) (finding that "race, gender, and power conflicts in our society" are "matters of overwhelming public concern").

176.    EO 13950 places a significant burden on Plaintiffs' Protected Speech because it explicitly calls for government retaliation against federal contractors and subcontractors who

express Protected Speech, including diversity trainings, that are in not in line with President Trump's views, even when those trainings are with the contractors' own employees.

177.     The Protected Speech, including workplace trainings, of an entire organization can be censored by EO 13950 by virtue of a single federal contract even when the Protected Speech has no connection to a federal contract.

178.     As a result, private entities must refrain from constitutionally-protected speech in order to compete for and receive federal contracts and grants.

179.     The Order also threatens to chill speech that may not even violate the restrictions in the Order because many federal contractors will choose to err on the side of caution and decline to discuss any matters that even remotely bear on issues of race or sex, for fear of violating the broad prohibitions in the Order.  In addition, the Order invokes the enforcement power of DOJ and the prospect of liability under Title VII of the Civil Rights Act of 1964 for those who would express views on race and gender that differ from the Administration's preferred approach as set out in the Order.  EO 13950 Secs. 4(a)(4) & 8.

180.     EO 13950 is already having an immediate and discernible chilling effect on protected speech as companies, organizations, and academic institutions halt diversity trainings for fear of the retaliation they might face pursuant to the terms of Section 4(a)(3) of the Order, which punishes non-compliance by "cancel[ing], terminat[ing], or suspend[ing]" contracts and allowing the offending contractors to "be declared ineligible for further Government contracts." EO 13950 § 4(a)(3).

181.     In efforts to comply with EO 13950, multiple workshops, trainings, and initiatives to address diversity, equity, and inclusion have been put on hold or canceled.  Some entities have requested the exclusion of terms like "diversity," "racism," "systemic racism," "critical race

theory," "white privilege," "intersectionality," and "unconscious bias" from workshops, trainings, initiatives, and related materials for fear of violating the Order.

182.    For example, John A. Logan College, in Carterville, IL, rescinded an invitation to a professor who planned to give a talk in celebration of Hispanic Heritage Month.[89]  The talk would have included discussions of Hispanic identity as well as Mr. Barrios's own story as an immigrant from Guatemala.[90]

183.    Similarly, within days of the Order's issuance, University of Iowa administrators suspended all diversity and inclusion trainings pending review even though the Order is not explicitly directed at public universities and despite the University administrators' acknowledgment that the Order would have a chilling effect on campus.[91] The administrators' actions were motivated by a fear of losing federal funding due to the possibility that they could be found in noncompliance with ambiguous terms of the Order notwithstanding their best efforts to comply.

184.    Stanford University also temporarily prohibited all trainings, workshops or programs that included "*any reference* to structural or systemic racism."[92]

---

[89] Hailey Fuchs, *Trump Attack on Diversity Training Has a Quick and Chilling Effect*, N.Y. TIMES, Oct. 13, 2020, https://www.nytimes.com/2020/10/13/us/politics/trump-diversity-training-race.html.

[90] *Id.*

[91] Cleo Krejci, Executive order silences speech, UI leaders say, following decision to suspend diversity training under White House treat to cut funding, Iowa City Press-Citizen, Oct. 9, 2020, https://www.press-citizen.com/story/news/education/university-of-iowa/2020/10/09/university-iowa-suspend-diversity-training-trump-executive-order-raises-questions/5903117002/

[92] Khari Johnson, Stanford rushes to comply with Trump executive order limiting diversity training, Venture Beat (November 17, 2020 11:14), https://venturebeat.com/2020/11/17/stanford-rushes-to-comply-with-trump-executive-order-limiting-diversity-training/ (emphasis added).

185.    In a December 1, 2020 letter to OFCCP, the American Council on Education explained that in just the 10 weeks since the issuance of the EO, it "is already disrupting the planning and delivery of [workplace diversity and inclusion training programs], creating a chilling effect on the good faith and lawful efforts of campus officials to build and sustain non-discriminatory and non-hostile workplaces and learning communities."[93]

186.    On December 22, 2020, DOJ employees who are members of DOJ affinity and employee resource organizations, submitted a complaint and requested an investigation under the federal whistleblower laws, 5 U.S.C. § 2302(b) and 41 U.S.C. § 4712(a), regarding EO 13950's implementation within federal agencies (the "Whistleblower Complaint").[94]   Among the harms from the Order identified in the Whistleblower Complaint are the cancellations of a gender equity panel that was to feature the Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives and a former U.S. Attorney for the District of Columbia, a high-profile implicit bias training with several prominent national organizations, and various other diversity and implicit bias trainings and programs.   The Whistleblower Complaint further cited gross mismanagement and gross waste of funds stemming from EO 13950 and its implementation.

187.    Federal grantees, which the Order prohibits from "promoting" "divisive concepts," have been left with the untenable decision either to cancel affinity groups, diversity and inclusion initiatives, and trainings critical to the deployment of their services, or to compromise their ability to deploy these crucial services, including, for example, support for victims of

---

[93] Letter from ACE to Office of Federal Contract Compliance Programs (Dec. 1, 2020) at 1-2, *available at* https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/DOL.RFI.Race-and-Sex-Stereotyping-Executive-Order.letter.final.12.1.20.pdf.

[94] *See* Letter From Gov't Accountability Project to U.S. House of Representatives, *et al.* re: "Cancellations of Diversity Educational and Training Programs" (Dec. 22, 2020), https://beta.documentcloud.org/documents/20436498-gap-letter.

domestic violence by organizations like Safe Horizon and the New Teacher Center's nationwide training for public school teachers that serve marginalized students.

188.     This chilling effect works to the detriment of all employees, but particularly members of protected groups who are losing out on the beneficial effects of such opportunities and programs that otherwise would have been available.

189.     Plaintiffs are experiencing the chilling effect by having to consider what terms can or cannot be used in their Protected Speech in order to comply with EO 13950 and allow them to be remain eligible for federal contracts, subcontracts, and/or federal grants.

190.     Due to the unconstitutional censorship from EO 13950, over 50 different organizations and groups[95]—covering hundreds of entities across the private and public sectors—have published public statements or letters to date condemning the Order and urging its repeal.

191.     The Administration can offer no credible justification for its broad assault on free speech.  To the contrary, the language in the Order, as well as the context in which it was issued, make clear that the primary motive for the Order is to silence particular viewpoints on race and gender with which President Trump disagrees.

192.     With the enforcement of the Order, Plaintiffs and more than 100,000 other federal contractors, subcontractors, and grantees will be denied the right to free speech, one of the most fundamental rights in our democratic system.

193.     When issuing the Santa Cruz Preliminary Injunction, which bars enforcement of Sections 4 and 5 of EO 13950 that are applicable to federal contractors and federal grant recipients, Judge Freemen held that the plaintiffs in that case are likely to succeed on their claim of a First

---

[95] Due to length, a full citation of these public statements condemning EO 13950 is attached as Exhibit 1 hereto.

Amendment violation because the Order "impermissibly chills the exercise of the Plaintiffs' constitutionally protected speech, based on the content and viewpoint of their speech" and their claim of a Fifth Amendment Due Process violation because "it is impossible for plaintiffs to determine what conduct is prohibited."

III.   **EO 13950 DIRECTLY HARMS PLAINTIFFS NATIONAL URBAN LEAGUE, NATIONAL FAIR HOUSING ALLIANCE, AMERICAN ASSOCIATION FOR ACCESS, EQUITY AND DIVERSITY AND ITS MEMBERS, AND CLASS MEMBERS**

A.   **NATIONAL URBAN LEAGUE**

194.   NUL entered into an Apprenticeship Contract with the Department of Labor in July of 2016, for a 12-month term with four (4) one-year renewal options.  Specifically, NUL contracted to act as a National Equity Partner to work with the DOL's Office of Apprenticeship to develop partnerships with strategic sponsors committed to increasing the numbers of underrepresented persons who enter and complete Registered Apprenticeship Programs.  NUL's work under the Apprenticeship Program includes: developing and presenting trainings on diversity and inclusion; developing strategic tools and plans to increase access, entry and retention of underrepresented persons to apply to Registered Apprenticeships; scaling current diversity and inclusion practices; and developing tools and strategies for employer affirmative action plans among other work.

195.   NUL's Apprenticeship Contract is a part of the DOL's Employment and Training Administration's ("ETA") investment in the growth of apprenticeship programs in various industries, including healthcare, construction, transportation and logistics, manufacturing, and information and communications technology; and support increasing demographic diversity and inclusion in apprenticeship among traditionally underrepresented populations.

196.   NUL intends to apply for future contracts with the government.  After working with the ETA for four years, NUL has become a valuable contractor with the government and has gained

further expertise in the apprenticeship program.  NUL's contract with the government was extended in 2017, 2018 and 2019.  Despite a positive relationship for almost four years, this September, around the time that the EO 13950 was written and issued, DOL extended the contract only until December 31, 2020 instead of September 20, 2021, as was an option in the contract.

197.    NUL has also received many grant awards from various federal government agencies and expects to continue to apply for and receive federal grants in the future.  Several of NUL's government grants are currently effective.  NUL received a grant from DOL's Employment and Training Administration ("ETA") for $11,571,239 for the period of July 1, 2020 through June 30, 2021.  This grant award was provided under DOL's Senior Community Service Employment Program, which is a program under the DOL ETA where grantees provide training for low-income, unemployed seniors to allow them to reenter the workforce.  NUL recently awarded a cooperative agreement from the Department of Commerce's Minority Business Development Agency of $500,000 for the period of June 1, 2020 through May 31, 2021, to provide technical assistance to US small minority-owned businesses to respond to the COVID-19 pandemic.  Moreover, NUL was awarded a grant of $4,500,000 from DOL-ETA under the Young Adult Reentry Partnership for the period of July 1, 2020 through December 31, 2023, to provide education and training services to improve the employment outcomes for young adults involved in the criminal justice system.

198.    NUL's past grants further evidence the organization's continued interest in applying for future grant funds.  For example, NUL previously received a H-1B Skills Training grant for $10,000,000 covering the period from October 27, 2015 through October 26, 2019 to provide training and related activities to workers to assist them in gaining the skills and competencies needed to obtain or upgrade employment in high-growth industries or economic

sectors.  NUL also received an award for $1,800,000 covering the period of October 1, 2017 to September 30, 2020 from the DOJ Office of Juvenile Justice and Delinquency Prevention under the Juvenile Mentoring Program where grantees provide mentorship programs for youth. Additionally, NUL received a grant of $871,183 from the Department of Housing and Urban Development ("HUD") in order for NUL to engage in comprehensive counseling for HUD customers from October 1, 2018 until March 31, 2020.

199.     In order to qualify for the Apprenticeship Contract, NUL was considered a subject matter expert regarding issues of diversity, equity and inclusion.  In keeping with this status, NUL provides external and internal messaging to the public and its own employees regarding the issues of bias and structural racism that are inherent in American institutions and workplaces.  Over the years, NUL has published a variety of external-facing documents that mirror the concepts that NUL communicates internally to its employees.  From discussions on implicit racial biases to the systemic oppression that Black Americans face, NUL employees regularly engage in the discussion of concepts that the Order appears to target.[96]

200.     Among these efforts, NUL publishes a "State of Black America" ("SOBA"), a seminal publication on the impacts of systemic racism and America's historical racist roots on Black Americans that has been published each year since the 1970s.   Policymakers, advocates, and researchers anticipate and use SOBA in their work.  NUL has already planned and started the research for the upcoming report.  SOBA is critically important to NUL's identity and reputation.

201.     NUL's work also involves public speaking events, such as panels, conferences, and workshops, where NUL staff discuss the history and impact of systemic racism, privileges, and

---

[96] *See, e.g.*, Marc Morial (President, NUL), *Starbucks Arrests Show "Hidden" Implicit Bias*, HUDSON    VALLEY    PRESS    (April    25,    2018), https://hudsonvalleypress.com/2018/04/25/starbucks-arrests-show-hidden-implicit-bias/.

disadvantages associated with race, unconscious or implicit bias, and the collective responsibility of people of all races to overcome and eradicate societal discrimination.

202.    Fundamental to NUL's current and future work is its conceptual understanding of racism and sexism, especially as roadblocks to diversity and inclusion efforts.  NUL employees operate from an understanding that successful diversity and inclusion efforts must acknowledge and account for systemic racism and sexism in America and that diversity and inclusion efforts require open dialogue around these issues and the space to recognize and name biases consciously and unconsciously held.

203.    Moreover, NUL's diversity and inclusion work specifically aims to counteract the reliance in this country on concepts like "colorblindness" and "meritocracy" as a means to ignore or minimize the historical and ongoing impact of policies and institutions set up for the benefit of a white majority at the expense of people of color.  These concepts—that inform and animate NUL's internal and government-contracted work—have been deemed unacceptable "divisive concepts" under EO 13950, which specifically prohibits all government contractors (such as NUL) from communicating these concepts to their own employees.  The Order thus invades NUL's freedom of speech and unduly interferes with its prerogative to communicate mission-critical ideas and principles to its employees.

204.    NUL has a mutual interest with its employees to ensure diversity and inclusion in its workplace so that all employees, regardless of their race, ethnicity, sex, gender, sexual orientation, or gender identity, feel welcome and valued.  Having a more diverse and inclusive workplace increases employee satisfaction and productivity, produces greater innovation and ideas, and helps NUL better serve its mission overall.  NUL is concerned that EO 13950 will have

a detrimental impact on its employees of color, female employees, and LGBTQ employees, who may not be able to challenge the Order themselves.

205.     Because NUL has been considered a subject matter expert in diversity concepts that the Order targets, NUL is less likely to be awarded future contracts or grants due to its visible alignment with (and promotion of) these disfavored concepts.  Notwithstanding NUL's ability and readiness to do so, enforcement of the Order would mean that NUL will no longer be able to compete for federal grants or contracts on a fair and equitable basis against other organizations whose mission and public statements are less intertwined with promoting racial equality.  Indeed, within days of the Order being released on September 22, 2020, NUL was informed that its current DOL contract would not be extended for a fifth year, despite being previously granted extensions in each of the last four years.

### B.     NATIONAL FAIR HOUSING ALLIANCE

206.     NFHA and its members have previously been awarded contracts and grants from the Federal Government.  NFHA contracted with the Department of Housing and Urban Development ("HUD") in 2019 in the Technical Assistance and Capacity Building Program Cooperative Agreement (the "TACBP Contract").  The TACBP Contract is a part of a broader HUD program aimed at procuring and supporting organizations to focus on needs assessments, capacity-building engagements, maintenance of tools and products used in teaching adults how to understand HUD requirements, data analysis and reporting, Indian Housing Block Grant Allocation Formula rulemaking, administrative activities, coordination of activities, and other learning initiatives and knowledge management initiatives.  The TACBP Contract between HUD and NFHA has a three-year term and is currently set to expire on July 29, 2022.  Under the TACBP Contract, HUD requests that NFHA performs certain services, such as trainings, to HUD and its

customers under the direction and oversight of HUD through a work order.  HUD reimburses NFHA for both administrative costs and approved time and expenses under specific work plans.

207.    Two important funding sources for NFHA's fair housing enforcement work have been HUD's Fair Housing Initiatives Program Private Enforcement Initiative ("FHIP PEI") Grant and HUD's Fair Housing Initiatives Program National Media Campaign ("FHIP NMC") Grant. NFHA has received both grants many times over several decades, and has been awarded new grants, under each program, that are set to commence in 2021.  In July 2020, NFHA was awarded new, three-year FHIP PEI and FHIP NMC grants, which are set to commence in March and July 2021, respectively.  Together, NFHA is set to receive approximately $610,000 per year under both grant agreements.  NFHA has yet to receive or begin negotiating the terms that will govern these new grants but, based on prior practice, believes that such negotiations will begin in February and June 2021, respectively.   Additionally, many of NFHA's approximately 94 members in 35 different states either currently are, or soon will be, federal grant recipients.

208.    Over the duration of its federal contracts and grants, NFHA conducted several internal trainings for its members regarding diversity and inclusion efforts.  In order to fulfill its mission in an effective manner, NFHA commonly holds trainings and conversations for its members and staff that address issues of systemic racism, unconscious bias, and racial inequities. Recently, NFHA held informal discussions with its employees concerning systemic racism and perceptions of white people and other demographic groups in connection with the killing of George Floyd.   As an organization focused on preventing housing discrimination and providing underserved populations with equal access to housing opportunities, NFHA will continue to hold similar trainings and discussions with its members and employees in the future.  Indeed, fair

housing advocates must use the lessons of history to address the current manifestations of that history; otherwise, they cannot help create a fair and equitable society.

209.    NFHA has also held conversations, discussions, education and outreach events, and trainings with non-profit groups and housing and lending stakeholders, including fair housing organizations, academicians, think tanks, non-profit organizations, financial services institutions, governmental entities, real estate sales groups, and housing industry trade associations on issues of systemic racism, structural inequities, sexism, unconscious bias, and intersectionality.  Many of these groups include NFHA's members.  These conversations, discussions, education and outreach events, and trainings increased precipitously in the aftermath of the COVID-19 health pandemic and the murder of George Floyd.  Various stakeholders wanted training and information from NFHA on why the nation was experiencing grave disparities related to the COVID-19 pandemic and economic crisis; a better understanding about why residential segregation is still significant in many communities; insights into why racial disparities exist with respect to arrest and conviction rates; information about the intersectionality between segregation and disparate health, housing, credit, and criminal justice outcomes; and help understanding what programs and policies should be implemented to address continuing racial inequities.

210.    NFHA also produces an annual report, Fair Housing Trends, that discusses the major issues related to housing discrimination and equal housing opportunity in the nation.  This report often covers issues like residential segregation and its intersection with structural inequality, environmental injustice, criminal injustice, climate change.  The report often also deals with issues that impact fair housing like implicit or unconscious bias, systemic racism, and sexism.  This report is used by a wide group of stakeholders, including its members and employees.

211.    The Order purports to prohibit private entities from speaking about structural inequalities in America and implicit biases with their employees or member organizations by deeming such subjects "divisive concepts."  Based on its past and future speech, NFHA could face debarment or the loss of future opportunities to compete for (and receive) federal grants and contracts should it continue to discuss issues of race and inclusion with its members and its employees consistent with its mission and purpose.

212.    NFHA has a mutual interest with its employees to ensure diversity and inclusion in its workplace so that all employees, regardless of their race, ethnicity, sex, gender, sexual orientation, or gender identity, feel welcome and valued.  In fact, having a more diverse and inclusive workplace increases employee satisfaction and productivity, produces greater innovation and ideas, and helps NFHA better serve its mission overall.  NFHA is concerned that EO 13950 might have a detrimental impact on its employees of color, female employees, and LGBTQ employees, who may not be able to challenge the Order themselves.

## C.    AMERICAN ASSOCIATION FOR ACCESS, EQUITY AND DIVERSITY

213.    Over the years, AAAED has worked with federal equal employment and equal education opportunity agencies, including the OFCCP, the DOL, the Equal Employment Opportunity Commission ("EEOC"), the Office for Civil Rights at the DOE, DOJ, and the Office of Personnel Management (for federal EEO professionals).   The AAAED Professional Development and Training Institute currently provides an Annual Refresher Training for Federal EEO Counselors and Investigators.  It also provides a Federal EEO Barrier Analysis to assist federal agencies in compliance with the EEOC's Management Directive 715.

214.    Although AAAED is not currently a federal contactor or a current recipient of federal grants, AAAED is actively working to be added to the list of contractors eligible to deliver

EEO training to federal agencies.  AAAED specifically aims to provide EEO training to the OFCCP and will pursue that goal with President-elect Biden's Administration as soon as the new leadership at OFCCP is in place.  AAAED has already met with members of President-elect Biden's transition team to discuss policy and administrative issues, including the diminishing staffing at the OFCCP and the need to implement a robust training program at the same.  As it has done with past administrations, AAAED will offer to provide the services of its AAAED Professional Development and Training Institute to the OFCCP.

215.    Furthermore, AAAED's membership, which is composed of institutions as well as individuals, consists of numerous members who are currently federal contractors or subcontractors and have been federal contractors or subcontractors in the past, with some of the contracts valued in the tens of millions of dollars and even in the hundreds of millions of dollars.  Indeed, two of AAAED's members were included in the list of the top 100 federal contractors for fiscal year 2019.  Many of these institutions have a long history of government contracting (and subcontracting) and will continue to seek out more government contracts (and subcontracts) in the future.

216.    Given AAAED's years of work with affirmative action, and its founding in 1974 by professionals working for institutions of higher education, roughly half of its membership consists of individuals and institutions in the higher-education sector.  AAAED members in the higher-education sector include individuals such as Adrienne Lyles, Ph.D., J.D., Senior Deputy Title IX Coordinator at Iowa State University; Ricardo Alcaíno, M.P.A., Director of the Office of Equal Opportunity and Discrimination Prevention at the University of California Santa Barbara; and Jose J. Soto, J.D., Vice President for Access, Equity, and Diversity at Southeast Community College.  Its membership includes Ivy League research institutions, leading public universities, and prestigious liberal arts colleges.  In addition, AAAED boasts membership from technical

colleges, historically black colleges, and community colleges.  Many of these institutions are federal contractors, subcontractors, and/or recipients of federal grants.

217.    The balance of AAAED's membership consists of individuals and institutions in the private sector, government, or nonprofit sector, many of which are government contractors or subcontractors.  Examples of AAAED members include Harold M. Bush, President and CEO of Bush Group, LLC, a consulting company in Charlotte, North Carolina; Marilyn L. Schuyler, Esq., an attorney at Schuyler Affirmative Action Practice, a law firm specializing in federal contractor compliance; and Joyce Pratt, President of T&J Associates of New Jersey LLC, a consulting company that specializes in workplace investigations.  AAAED's membership includes blue-chip technology companies, city and county governments, and construction companies.  AAAED members are located in approximately 40 states, including Alaska and Hawaii, as well as the District of Columbia.

218.    As noted above, many of AAAED's members enjoy federal contractor or subcontractor status.  For example, Marilyn Schuyler is a subcontractor who conducts workplace training to clients who are themselves federal contractors, including academic and non-academic supply and service federal contractors.  As a subcontractor, she is prohibited from using "divisive concepts" in workplace trainings, as well as the workplace trainings provided to her clients who are federal contractors.  Ahmed Younies of HR Unlimited and Sandra K. Hueneman, Sr. CAAP, of Manchester Consultants are likewise AAAED members who conduct workplace training to federal contractors.  They too are subcontractors and are prohibited from using "divisive concepts" in workplace trainings to their own employees and to the employees of their federal contractor clients.

219.    As still another example, several AAAED members have provided bio-medical services and laboratory testing to various health-related agencies.  Other members are defense contractors or serve agencies such as NASA, the National Oceanic and Atmospheric Administration, and the Departments of Energy and Veterans Affairs.   Among AAAED's institutional members:[97]

(a) Member A holds or has held contracts in amounts ranging from approximately $25,000 to a multi-million-dollar contract with such agencies as NASA, the National Institutes of Health, the Department of Veterans Affairs and the Department of Justice.

(b) Member B holds or has held research and development contracts in amounts ranging from approximately $10,000 to more than $1 million. This institution has done work for NASA, the US Geological Survey and the Centers for Disease Control.

(c) Member C holds or has held contracts for services in amounts ranging from approximately $10,000 to more than $1 million with such agencies as NASA, the Centers for Disease Control and the Department of Veterans Affairs.

(d) Member D holds or has held grants and contracts for training and research ranging from approximately less than $3,000 to more than $500,000 with such agencies as NASA, the Centers for Disease Control and Department of Agriculture, and

(e) Member E holds or has held grants and contracts for research with NASA, the Department of Defense, the U.S. Geological Survey and other agencies, in amounts ranging from approximately $15,000 to more than $300,000.

---

[97] To maintain their anonymity and protect them from retribution and possible risk to their government contracts, AAAED's members are assigned a sequential letter of the alphabet in reference to each member for whom specific facts are averred.

220.    According to the Federal Procurement Data System, each of the Members A through E identified above held government contracts as of 2020; each has, over the last number of years, conducted diversity workplace trainings or has staff that has enrolled in such trainings with AAAED and other organizations; and, given their histories of government contracting, each has a demonstrated continuing interest in serving as a government contractor.

221.    One hundred percent of AAAED's domestic institutional members that are colleges and universities received Pell Grants in 2017-18, administered by the US Department of Education. https://www2.ed.gov/finaid/prof/resources/data/pell-institution.html.

222.    AAAED's trainings to its members and their employees regularly implicate speech that potentially violates the EO—and such speech is central to AAAED's mission and purpose to provide equal opportunity, affirmative action, and diversity training in higher education, private industry, and government.  Among other things, "unconscious bias" is one of the core topics in both AAAED's New Professionals Academy and AAAED's Diversity Management Program.  In that training, the sources of unconscious bias, including race and pervasive cultural stereotypes, are discussed.  AAAED also offers other trainings addressing the United States' history of systemic racism, such as its Federal Programs Course.  In one recent presentation in this course, AAAED President Dr. Anthony Baker traced the historical developments that contributed to the passage of Title IX, Title VI, and Section 504 and, as part of this discussion, mentioned the United States Supreme Court *Dred Scott* decision, the Ku Klux Klan, and the white supremacist terror that plagued the United States following the Civil War.

223.    As a result of EO 13950, AAAED's members have hesitated to send their employees to AAAED's trainings for fear that requiring or even allowing them to do so would violate the terms of the Order, even though the topics would benefit the member organizations.

Members' concerns about compliance with EO 13950 have, in turn, affected AAAED's trainings. For example, AAAED has already been forced to postpone a virtual training session for members at its 46th National Conference, which was originally scheduled for December 2, 2020, because of the uncertainty created by EO 13950 and the potential impact on members who registered for the session.  The presentation, which was titled "Impacting Perceptions: Evolving Views of Social Identities to Promote Equity and Inclusion," was postponed because it could potentially be labeled as "divisive" under EO 13950 and because it specifically discussed several of the search terms targeted by the OMB's guidance, including "unconscious bias" and "systemic racism."

224.    AAAED is a small organization that depends on fees from its trainings and seminars—which are its primary sources of funding—to sustain its operations.  Comparing last year's registration for AAAED's Diversity Management Program versus this year's registration figures illustrates the extent of the financial impact of EO 13950 on AAAED's bottom line: last year, 15 individuals registered for the 16-hour course at AAAED's 45th Annual Meeting but this year, following the issuance of EO 13950, no one signed up.  Without these fees, the organization will experience significant financial harm.

225.    AAAED has heard directly from its members about EO 13950's chilling of their speech.  For example, members are afraid to fulfill their diversity-related requirements and programs and have cancelled observations of Martin Luther King, Jr's birthday, Black History Month, Asian-American, Pacific Island Month, and similar celebrations.

226.    AAAED has a mutual interest with its members to ensure diversity and inclusion in their workplaces so that all employees, regardless of their race, ethnicity, sex, gender, sexual orientation, or gender identity, feel welcome, respected, and valued.  Having a more diverse and inclusive workplace increases employee satisfaction and productivity, produces greater innovation

and ideas, which are essential to AAAED's overall mission and their members' welfare.  AAAED is concerned that EO 13950 might have a detrimental impact on its members and their ability to break down barriers to employment opportunity for their employees of color, female employees, and LGBTQ employees.

## IV.    EO 13950 DISCRIMINATES AGAINST PLAINTIFFS' EMPLOYEES WHO ARE PEOPLE OF COLOR, WOMEN, AND LGBTQ.

227.    In addition to Plaintiffs' direct First Amendment and Fifth Amendment injuries, their employees and the employees of their members, who are people of color, women, and LGBTQ individuals, are also directly harmed by EO 13950's intentional discrimination against them.

228.    EO 13950 targets employees of color, female employees, and LGBTQ employees by banning important diversity and inclusion trainings intended to breakdown their barriers to equal employment opportunities.

229.    Plaintiffs and their members have implemented important diversity and inclusion trainings and initiatives to promote racial and gender equity and Title VII compliance in their workplaces.  EO 13950 significantly threatens and even terminates these important efforts by prohibiting purported "divisive concepts" that seek to acknowledge and address the enduring consequences of historic racial subjugation and the marginalization of women and the LGBTQ+ individuals in the American workforce.

230.    Plaintiffs and their members have a close relationship with their employees of color, female employees, and LGBTQ employees to ensure the continuation of workplace trainings and other initiatives to break down the barriers of equal employment opportunities for these employees while ensuring compliance with all civil rights and anti-discrimination laws.  These diversity, equity, and inclusion workplace trainings and initiatives, which are at grave risk from EO 13950,

aim to help employers fully capitalize the talent of employees of color, female employees, and LGBTQ employees, who may currently not be reaching their full potential due to various forms of bias and inequities in the workplace.

231.    In fact, all employees benefit from a diverse, equitable, and inclusive workforce, which in turn creates greater productivity for employers.  With these common interests in continuing diversity, equity, and inclusion trainings that seek to dismantle race and gender inequalities in the workplace, Plaintiffs and their members serve as effective advocates on behalf of their employees of color, female employees, and LGBTQ employees who are harmed from EO 13950's intentional discrimination.

232.    Additionally, the employees of Plaintiffs and their members are hindered from vindicating their own Equal Protection rights as to EO 13950 through litigation because, as employees, they do not enter into contract, subcontract, or grant agreements with the federal government, are not privy to the details of those agreements or the processes of entering into those agreements, and do not control the workplace trainings provided by their employers.

## CLASS ACTION ALLEGATIONS

233.    Plaintiffs bring this suit on behalf of themselves and, under Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and/or (c)(4), as representatives of the Class defined as follows ("the Class"):

> All persons and entities who contract or subcontract, bid to contract or subcontract, or intend to bid to contract or subcontract with, or who receive or intend to seek to receive federal grant funds from, the United States government or any federal agency, department, or division.

Plaintiffs reserve the right to amend the Class definition, including with the use of subclasses and the exclusion of specific named entities and/or individuals.

234.    The members of the Class are so numerous that joinder is impracticable.  Upon information and belief, there are more than 100,000 federal contractors and subcontractors and more than 10,000 federal grantees each year.  All such contractors, subcontractors, and grantees are subject to the unlawful Order.

235.    The claims and defenses of Plaintiffs are typical of the claims or defenses of members of the Class.  Plaintiffs' claims arose out of the same events and course of conduct that give rise to the claims of other members of the Class.  Plaintiffs and all members of the Class are subject to similar harm from the Order now and in the future.

236.    The members of the Class share common issues of fact and law, including but not limited to:

a.   what speech is barred by EO 13950;

b.   whether the average person can discern what speech is prohibited by EO 13950;

c.   whether the speech, including workplace trainings, targeted by EO 13950 is protected by the First Amendment;

d.   whether EO 13950's prohibition of Protected Speech, including workplace trainings, bars such speech based on the viewpoint of the speaker;

e.   what motivated EO 13950's prohibition of Protected Speech, including workplace trainings;

f.   what interests, if any, the federal government may have in enforcing EO 13950 and whether such interests are "legitimate" or "compelling" or pretextual;

g.   whether Defendants' actions may impair or threaten future activities protected by the First Amendment;

> h.   whether EO 13950's prohibition of Protected Speech, including trainings, violates the Equal Protection component of the Fifth Amendment's Due Process Clause; and
>
> i.   what equitable and injunctive relief is warranted.

237.   Plaintiffs will fairly and adequately protect the interests of the proposed Class. None of the Plaintiffs has any interest that is now or may later be antagonistic to the interests of the proposed Class.  The attorneys representing the Plaintiffs include experienced attorneys who are considered able practitioners in federal civil litigation, including complex litigation and class actions, and they should be appointed class counsel.

238.   Maintaining individual actions would create a risk of "inconsistent or varying adjudications with respect to individual members that would establish incompatible standards of conduct for the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A).  While the Santa Cruz Preliminary Injunction is consistent with the goals and interests of Plaintiffs and Class members, having other courts issue multiple and varying injunctions governing the permissible reach and effect of the Order on the Class would be untenable.  Doing so would only contribute to the existing state of uncertainty and confusion that surrounds the meaning and effect of the Order.

239.   This case involves "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications."  Fed. R. Civ. P. 23(b)(1)(A).  A ruling with respect to a single Plaintiff in this case would arguably be strong stare decisis—if not necessarily res judicata—with respect to the other putative Class members and the federal government's contracting, subcontracting, and granting bodies.  There is no benefit to allowing the overwhelmingly common issues in this case

to be litigated individually.  The interests of both Class members and Defendants require class-wide treatment.

240.    Defendants have acted or will act on grounds generally applicable to the Class by subjecting them to and purporting to enforce the Order. Injunctive and declaratory relief is therefore appropriate with respect to the Class as a whole.

241.    Questions of law and fact common to members of the Class will predominate over any questions that may affect only individual members because Defendants have acted on grounds generally applicable to members of the entire Class.

242.    Class treatment is a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly-situated entities to prosecute their common claims in the same forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

243.    A class action is also manageable, and Plaintiffs know of no management difficulties that would preclude class certification in this case.

244.    Plaintiffs reserve the right to seek to certify common questions related to Defendants' knowledge, intent, and actions.

## PLAINTIFFS REQUIRE IMMEDIATE RELIEF

245.    Plaintiffs have standing to challenge EO 13950 and their claims are ripe for immediate adjudication today.

246.    Plaintiffs have suffered injury-in-fact.   As set forth above, Plaintiffs provide Protected Speech, including workplace training and other communications, containing subjects almost certainly prohibited by the Order.   For example, Plaintiffs' workplace trainings rely on in-depth discussion of systemic racism, gender and sex discrimination, privileges and advantages associated with such discrimination, and implicit biases derived from and perpetuating the discrimination, which, under the vague definitions of the Order, could be considered prohibited "inculcat[ion]" of several "divisive concepts."   Given the existing content of Plaintiffs' Protected Speech, including any workplace training, and their intention to continue expressing the Protected Speech, Plaintiffs are preemptively disqualified from federal contract, subcontract, and grant opportunities.   These "lost contracting [and grant] opportunities" are sufficient to establish injury in fact.  *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003).

247.    Plaintiffs would compete for future federal contracts, subcontracts, and/or federal grants absent the unconstitutional censorship of their Protected Speech.   As set forth above, Plaintiffs competed for and received federal contracts, subcontracts, and grants in the past; Plaintiffs provide expertise and services that are beneficial to the government and/or to disadvantaged communities; and Plaintiffs have actively explored whether they could compete for future federal contracts, subcontracts, and/or federal grants consistent with their organizational mission and/or values.   Notwithstanding Plaintiffs' ability and readiness to compete for future contracts and/or federal grants, the Order prevents Plaintiffs from doing so.

248.    In addition, the Order burdens Plaintiffs' expressive rights.   As set forth above, the Protected Speech, including any workplace diversity training, is critical to Plaintiffs' respective

organizational goals.  But the only way they can continue to compete for and receive federal contracts, subcontracts, and/or grants is to refrain from expressing their Protected Speech

249.    In light of the substantial and imminent constitutional injury, Plaintiffs are left with no choice but to seek immediate judicial relief, including declaratory relief and a preliminary and permanent injunction.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## ULTRA VIRES ACTION IN VIOLATION OF THE FIRST AMENDMENT – VIEWPOINT DISCRIMINATION

250.    Plaintiffs incorporate and re-allege each and every allegation contained above as if fully set forth herein.

251.    Plaintiffs have a cause of action in equity and under the All Writs Act, 28 U.S.C. § 1651, to declare unlawful and to enjoin a Presidential Executive Order or other Presidential action that is ultra vires.  *See Armstrong v. Exceptional Child Ctr., Inc*., 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.").

252.    The First Amendment to the United States Constitution prohibits any law that "abridg[es] the freedom of speech."  U.S. CONST. amend. I.

253.    In violation of the First Amendment's protection of speech, President Trump issued EO 13950 to silence viewpoints disliked by his Administration.  *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017).

254.    The Order identifies viewpoints that the Trump Administration dislikes—such as the existence of white privilege, implicit bias, systemic racism, structural inequalities, or

intersectional experiences of discrimination—and attempts to purge them from the national conversation by denying benefits, such as government contracts, subcontracts, and grants, to private entities like Plaintiffs who expresses speech on these censored topics.

255.     This targeted censorship violates the First Amendment rights of Plaintiffs and the Class by chilling their ability to speak on important issues of diversity and equality without risking the loss of government benefits.  *See Agency v. Int'l Dev. v. Alliance for Open Soc'y Int'l Inc*., 570 U.S. 205 (2013) (holding unconstitutional a statutory provision conditioning funding on organizations expressly opposing prostitution).

256.     Plaintiffs' Protected Speech is protected by the First Amendment notwithstanding their status as federal contractors because they are speaking 1) in their capacity as a private citizen, and 2) on matters of public concern.  *Garcetti v. Ceballos*, 547 U.S. 410, 420, 426 (2006); *Umbehr*, 518 U.S. at 669 (treating federal employees and contractors the same).

257.     The Trump Administration is not permitted to ban Protected Speech by Plaintiffs who are contractors because their interests "in a broad range of present and future expression" are not "outweighed by that expression's 'necessary impact on the actual operation' of the Government," *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 468 (1995), and EO 13950 is not "tailored to address the harm that the government allegedly aims to protect," *Sanjour v. E.P.A.*, 56 F.3d 85, 97 (D.C. Cir. 1995).

258.     Plaintiffs who are recipients of federal grants are private citizens.  *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 548-49 (2001).  "Where private speech is involved, even [the government's] antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest."  *Id.*  "The Government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has

no entitlement to that benefit." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (quotations and citation omitted).  Pursuant to EO 13950, a funding condition on federal grants "can result in an unconstitutional burden on First Amendment rights." *Id.* (quotations and citation omitted).  Because EO 13950 prohibits federal grantees from using federal funds "to promote" concepts defined in the Order without regard for the purpose of the grant, the federal government is not lawfully exercising its right to subsidize speech related to a certain issue, but instead is unconstitutionally withholding funding in order to broadly suppress viewpoints with which it disagrees.

259.     A Presidential Executive Order issued in violation of the U.S. Constitution is *ultra vires* and therefore void.

260.     EO 13950 unlawfully restricts speech on matters of public concern and public welfare, which is entitled to the highest protection in our constitutional system.  The Order was intended to have, is having, and will likely continue to have, the effect of chilling constitutionally protected speech on issues of racial and gender equality as well as efforts to reckon with historical systems of oppression in order to shape a more just and fair society.

261.     As alleged above, EO 13950, on its face and as applied to Plaintiffs, unconstitutionally infringes or imminently threatens to infringe Plaintiffs' rights under the First Amendment to the United States Constitution.

262.     Plaintiffs have been and will be irreparably harmed by President Trump's ultra vires EO 13950 issued in violation of the First Amendment and have no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

## VIOLATION OF THE FIFTH AMENDMENT – VOID FOR VAGUENESS

263.     Plaintiffs incorporate and re-allege each and every allegation contained above as if fully set forth herein.

264.     Under the Fifth Amendment to the United States Constitution, a federal law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008); *see also* U.S. CONST. amend. V.  EO 13950 fails on both fronts.

265.     EO 13950 fails to provide fair notice of what conduct it requires from the Plaintiffs. The Order prohibits "workplace training" that "inculcates" in employees certain "divisive concepts," but it does not adequately define "workplace training," "inculcates," or many of the "divisive concepts," among other terms.  EO 13950 provides no way to reasonably discern the line between "discussing" a divisive concept on the one hand, and impermissibly "inculcat[ing]" that concept on the other.  The failure to define this subjective term, among others, renders the standards of EO 13950 essentially meaningless.

266.     EO 13950 also fails to provide any explicit, objective standards for enforcement. Section 4, for example, directs the Department of Labor to "investigate complaints" and "take appropriate enforcement action and provide remedial relief, as appropriate" in response to violations.  EO 13950 § 4.  There are no standards to guide what is and what is not a violation.  As a result, the Department of Labor has unfettered discretion to enforce EO 13950 as it sees fit, including by terminating the federal contracts, subcontracts, and/or grants of organizations committed to diversity and inclusion, or preventing them from competing for contracts, subcontracts, and/or grants in the first place.  EO 13950 thus encourages and sanctions arbitrary, subjective, and discriminatory enforcement.

267.     The absence of explicit, objective standards in EO 13950, coupled with the Department of Labor's unfettered discretion to enforce the Order, have, is having, and will likely

continue to have the effect of chilling constitutionally protected speech on issues of racial and gender equality as well as efforts to reckon with historical systems of oppression in order to shape a more just and fair society.

268.    For all these reasons, and as set forth elsewhere in this Complaint, EO 13950 is unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

### THIRD CLAIM FOR RELIEF

### FIFTH AMENDMENT – VIOLATION OF EQUAL PROTECTION

269.    Plaintiffs incorporate and re-allege each and every allegation contained above as if fully set forth herein.

270.    The Equal Protection component of the Fifth Amendment's Due Process Clause guarantees persons the equal protection of the laws and prohibits the government from treating persons differently—on the basis of their race, religion, national origin, or alienage—than similarly situated individuals.  *Sessions v. Morales*, 137 S. Ct. 1678, 1686 n.1 (2017); *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013); *Bolling v. Sharpe*, 347 U.S. 497 (1954).

271.    Race and sex-based discrimination against individuals who are people of color, women, and/or LGBTQ were a substantial or motivating factor behind the issuance of EO 13950, in violation of the Fifth Amendment.

272.    The inference of a race and sex-based discriminatory motive is supported by several factors.

273.    President Trump's multiple false statements maligning speech and viewpoints that acknowledge the history and persistence of discrimination evince a discriminatory motive.

274.    EO 13950's prohibitions on topics, including systemic race and sex discrimination, implicit race and sex biases, and the persistent harms associated with systemic discrimination and

implicit biases, penalizes employers seeking to eradicate discrimination in the workplace and to ensure a hostility-free work environment for people of color, women, and/or LGBTQ individuals.

275.    The Trump Administration has engaged in procedural and substantive departures in the course of its issuance, resulting in substantive irregularities, which are indicative of its discriminatory intent.

276.    Although maximizing efficiency and economy in the workplace are claimed as motivating reasons for the issuance of EO 13950, the Order actually undermines these goals because employers counteracting the effects of implicit biases, structural inequalities, systemic discrimination, and racial/gender privileges and hierarchies maximize the potential, productivity, and economy of their workforce.

277.    The historical background of the Order evinces its "invidious purpose" of silencing viewpoints inconsistent with those of the Trump Administration and advancing a revisionist history that denies the enduring effects of the historic subjugation of people of color, women, and/or LGBTQ individuals to the detriment of those persons.

278.    Moreover, the specific sequence of events leading up to the issuance of the Order illustrate its intention to continue the Trump Administration's efforts to deny the historic and persistent discrimination experienced by people of color, women, and/or LGBTQ community in our society.

279.    Finally, the Trump Administration's cancellation of trainings in response to EO 13950 has established a clear pattern of targeting trainings and other speech that addresses and discusses concepts pertaining to systemic discrimination and structural inequalities.

280.    Taken together, the false statements made about the Order's prohibited speech; the inconsistency between the Order's stated goals and the actual effect; the foreseeable certainty of

its disparate impact on people of color, women, and/or LGBTQ individuals; the Order's procedural and substantive departures; the Order's historical background and the sequence of events preceding its issuance; and the Trump Administration's clear pattern of cancelling trainings that address and discuss issues pertaining to systemic discrimination and structural inequalities against people of color, women, and/or LGBTQ individuals, demonstrate an intent to discriminate on the basis of race, national origin, sex, and/or gender.

281.     The Trump Administration's stated justifications and policy rationales for EO 13950 are pre-textual and meant to obfuscate its impermissible discriminatory purpose.

### REQUEST FOR RELIEF

Plaintiffs respectfully request that the Court grant the following relief:

A.     A declaration pursuant to 28 U.S.C. § 2201 that EO 13950 is unlawful and invalid.

B.     A permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing EO 13950, including without limitation the promulgation of any rules or regulations, in any manner against any recipient of federal funding by way of contract, subcontract, purchase order, grant, or sub-grant, including Plaintiffs.

C.     A permanent injunction mandating that Defendants permanently rescind all Federal Acquisition Regulations Class Deviations or similar agency-wide directives of all federal agencies implementing and effectuating the EO 13950 that were issued prior to this injunction.

D.     A permanent injunction mandating that Defendants unwind, rescind, strike, modify, or otherwise rectify contracts, subcontracts, agreements, and/or any other such binding documents entered into with all federal agencies, in which terms, clauses, or provisions have been inserted pursuant to or in furtherance of EO 13950.

E.     A permanent injunction mandating that Defendants provide notice of this injunction to all federal contractors (and their subcontractors and vendors) and all federal grantees (and their sub-grantees) for whom such terms, clauses, or provisions have already been imposed.

F.     An order awarding Plaintiffs' cost of suit, and reasonable attorneys' fees and expenses, pursuant to any applicable law; and

G.     Such other relief as this Court deems equitable, just, and proper.

Dated:   January 11, 2020

Respectfully submitted,

/s/ Samuel Spital
Sherrilyn Ifill*
    *Director-Counsel*
Janai Nelson*
Samuel Spital, Bar ID NY0248
    *Counsel of Record*
Jin Hee Lee**
Monique Lin-Luse**
Amber Koonce**
**NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.**
40 Rector St., 5th Floor
New York, NY 10006
Tel.: (212) 965-2200
Fax.: (212) 226-7592
sspital@naacpldf.org

Ajmel Quereshi, Bar ID 1012205
Anuja Thatte***
**NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.**
700 14th Street N.W., Ste. 600
Washington, DC 20005
Tel: (202) 682-1300

*Counsel for All Plaintiffs*

85

Eric W. Bloom Bar ID 417819
Michael B. Johnson***
Winston & Strawn LLP
1901 L Street, N.W.
Washington, DC 20036

*Counsel for Plaintiff AAAED*

*\*admission to the D.D.C. forthcoming*
*\*\*admitted pro hac vice*
*\*\*\*admission pro hac vice forthcoming*